# Carolyn Smith, et al. v. Jefferson County, Mississippi, et al.

## Shaquita McComb

## April 18, 2025

All depositions & exhibits are available for downloading at
<<www.brookscourtreporting.com>>
Please call or e-mail depo@brookscourtreporting.com if you need a **Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION


CAROLYN SMITH, ET AL

                                                                  PLAINTIFFS


V.         CIVIL ACTION NO. 5:24-CV-0072-DCB-ASH


JEFFERSON COUNTY,
MISSISSIPPI, ET AL

                                                                  DEFENDANTS


DEPOSITION OF SHAQUITA MCCOMB


Taken at the instance of the Defendants at the Law
Offices of Carroll Rhodes, 119 Downing Street,
Hazlehurst, Mississippi 39083, on Friday,
April 18, 2025,
beginning at 10:18 a.m.


REPORTED BY:

ROBIN G. BURWELL, CCR #1651

## Page 2

```
 1    APPEARANCES:
 2
 3       CARROLL RHODES, ESQ.
         Law Offices of Carroll Rhodes
 4       Post Office Box 588
         Hazlehurst, Mississippi 39083
 5       crhode@bellsouth.net
 6
             COUNSEL FOR PLAINTIFF
 7
 8
         THOMAS L. CARPENTER, ESQ.
 9       Wise, Carter, Child & Caraway
         2510 14th Street, Suite 1125
10       Gulfport, Mississippi 39501
         tlc@wisecarter.com
11
12           COUNSEL FOR DEFENDANT
13
     ALSO PRESENT:
14
         Carolyn Smith
15       Bonita Blake
         Sandra Sanders
16       James Ellis, Jr.
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                INDEX
 2   Style.........................1
 3   Appearances...................2
 4   Index ........................3
 5   Certificate of Deponent ..................63
 6   Certificate of Court Reporter .............64
 7            EXAMINATIONS
 8   Examination By Mr. Carpenter ...............4
 9   Examination By Mr. Rhodes .................58
10   Examination By Mr. Carpenter ..............60
11             EXHIBITS
12   Exhibit 4 Photos ..........................18
13   Exhibit 5 Medical Records .................38
```

## Page 4

 1  SHAQUITA MCCOMB,
 2  having been first duly sworn, was examined and
 3  testified as follows:
 4  EXAMINATION BY MR. CARPENTER:
 5    Q.  Ms. McComb, I'm Tom Carpenter.  I
 6  represent the Sheriff and the County.  And we
 7  probably -- like I said, because there were some
 8  special questions that Lieutenant Smith had
 9  regarding the confidential position, we don't have
10  those so we can probably move a bit faster.  We're
11  on track for 11:00.  So I can probably cut through
12  a lot of stuff because you were here to hear what
13  Ms. Smith heard.  So, you understand everything up
14  to that point, correct?
15    A.  Yes.
16    Q.  You got it.
17        MR. CARPENTER:  And so, reading and
18  signing, yes?
19        MR. RHODES:  Yes.
20        MR. CARPENTER:  Okay.  Usual
21  stipulations?
22        MR. RHODES:  Yes.
23    Q.  (By Mr. Carpenter)  What is your full
24  name, Ms. McComb?
25    A.  Shaquita McComb.

## Page 5

 1    Q.  And what is your address?
 2    A.  1040 Albert Lane, Port Gibson,
 3  Mississippi.
 4    Q.  Is that in Adams County?
 5    A.  It's Claiborne County.
 6    Q.  And how long have you lived there?
 7    A.  About -- going on 13 years now.
 8    Q.  Got it.  So during the period of time
 9  you worked -- and I'm going to make it even easier
10  -- "The Facility", the Jefferson Franklin
11  Correctional Facility, but Facility.  You were
12  living in Port Gibson at the time?
13    A.  No, I was living in Union Church,
14  Mississippi.
15    Q.  So when did you move to Port Gibson?
16    A.  I'm going to say -- when did I move to
17  Port Gibson?  It was like in -- can't remember
18  exactly what year.
19    Q.  Okay.  Has it been in the past couple of
20  years or a while ago?
21    A.  Past couple of years.
22    Q.  Gotcha.
23        Okay.  Before we get started, because
24  we've got a bunch of questions.
25        MR. CARPENTER:  Okay.  Carroll, can I

Shaquita McComb 4/18/2025

**Page 6**

1  catch you for a second?
2      (Off the record.)
3      Q. (By Mr. Carpenter) Ms. McComb, where do
4  you work?
5      A. I'm a substitute teacher at the
6  Jefferson County Elementary School. School
7  district.
8      Q. And how much do you get paid per hour or
9  per day?
10     A. $60 a day.
11     Q. And how many days in a month do you
12 work?
13     A. Probably about 15.
14     Q. Okay.
15     A. Nine days. Depends on if a teacher's
16 out.
17     Q. Gotcha.
18        Do you have another job?
19     A. No.
20     Q. Okay. Are you looking for other work?
21     A. Not at this moment, I wasn't.
22     Q. Okay. And when did you get the job as a
23 substitute teacher?
24     A. I started working there August the 15th.
25     Q. And is it for the high school,

**Page 7**

1  elementary, secondary?
2      A. Whoever calls.
3      Q. You got it.
4         The School District?
5      A. Yes.
6      Q. Okay. What is your educational
7  background?
8      A. Graduated.
9      Q. Okay.
10     A. Two years of college.
11     Q. Was that at Co-Lin?
12     A. Yes.
13     Q. Did you get an associate's degree?
14     A. I have -- yes.
15     Q. And what's your associate's degree in?
16     A. Professional cooking.
17     Q. Got it. And when did you graduate from
18 Co-Lin?
19     A. 2003.
20     Q. Okay. And between --
21     A. Yeah, '03.
22     Q. And between 2003 -- well, when did you
23 start at the -- well, let me rephrase that.
24        Was there more than one occasion when
25 you worked for the Facility?

**Page 8**

1      A. Yes.
2      Q. Okay. When did you -- when was your
3  first tenure at the Facility?
4      A. I'm thinking 2012, when Sheriff Walker
5  was there.
6      Q. Right.
7      A. And I think -- I'm not for sure what
8  date.
9      Q. Fair enough.
10        Why did you leave the facility under
11 Sheriff Walker?
12     A. I got terminated.
13     Q. Gotcha.
14        And what that was for?
15     A. They said -- how did they put it?
16 Something dealing with my car insurance.
17     Q. Okay. Was that Sheriff Walker that
18 terminated you?
19     A. Yes.
20     Q. And when -- where did you go from there?
21     A. I think I went to Wal-Mart.
22     Q. Okay.
23     A. And I worked there 2015.
24     Q. It also mentioned you attended Belhaven?
25     A. Yes.

**Page 9**

1      Q. What kinds of classes did you take at
2  Belhaven?
3      A. Just the regular classes.
4      Q. Okay. And you had also worked -- after
5  you left the Facility, you worked at Angola?
6      A. Yes.
7      Q. Did you move over to Louisiana for that
8  or commute?
9      A. Commute. They had somewhere where you
10 could stay.
11     Q. I follow you.
12        And clearly, at Angola, you served as a
13 correctional officer there, too?
14     A. Yes.
15     Q. And then it looks like in 2019, you left
16 there and then started at the Facility in 2020?
17     A. Yes.
18     Q. Who hired you in 2020?
19     A. Sheriff Bailey.
20     Q. Got it. All right.
21        And because you're here for all of the
22 depositions, you heard Ms. Smith. And she is your
23 aunt?
24     A. Yes.
25     Q. Is that from your mother's side or

3 (Pages 6 to 9)

Page 10

1  father's side?
2      A.  Mother.
3      Q.  Okay.  And how much were you -- when
4  December '23 came around, how much were you making
5  as a correctional officer?
6      A.  $9.
7      Q.  And there was some discussion, because
8  I've talked to the sheriff, about -- was there a
9  pay raise in the month or two before, if you
10 recall?
11     A.  I don't recall.
12     Q.  Okay.  Do you ever remember any, like,
13 he gets everybody together and sometimes --
14 because I'm military.  You get the whole team
15 together, from the junior guy to the most senior
16 guy and say hey, here's what we're doing, in
17 general.  I wanted to see if you ever recall a
18 conversation that you may have heard from the
19 sheriff where he's like, look, I need y'all to do
20 everything you can to be behind because I'm in the
21 legislature trying to -- or Sean Tindall, trying
22 to get money on a per diem basis for the inmates
23 so I can pay you more.  Do you ever remember any
24 conversations like that?
25     A.  Yes, he had a mandatory meeting for

Page 11

1  that.
2      Q.  And what did he say?
3      A.  I'm not for sure.  I wasn't paying
4  attention.
5      Q.  Was it something like that?
6      A.  Yes.
7      Q.  Fair enough.
8          And did you ever hear what was the
9  outcome of that was?
10     A.  No.
11     Q.  All right.  And you had -- I think you
12 said you started in 2020.  Had you always -- from
13 the time you began at the Facility through January
14 of '23, did you serve as a tower operator?
15     A.  Yes.
16     Q.  Okay.  At the Facility, were you
17 anything other than a tower operator?
18     A.  No.
19     Q.  Okay.  And what does a tower operator
20 do?
21     A.  Tower operator will keep up what goes on
22 during that day, what truck come in, who come in
23 and all that.
24     Q.  Gotcha.
25     A.  And the counts.

Page 12

1      Q.  That's where I was going to ask you.
2  You hit the nail on the head.
3          Your position was to sit at a console,
4  and the tower might have been where the cameras
5  were located --
6      A.  Yes.
7      Q.  -- and looking out?  And your position
8  was to look at the cameras and basically see what
9  was going on around you?
10     A.  Yes.
11     Q.  And look for something unusual that
12 might indicate someone was trying to throw
13 something in or someone was trying to get out?
14     A.  Yes.
15     Q.  If you saw something, what would you do?
16     A.  I notified my supervisor.
17     Q.  Were you on -- because as I see the
18 organizational chart that Carroll brought in,
19 there's an A shift and a B shift?
20     A.  Yes.
21     Q.  What was your shift?
22     A.  I'm thinking it was B shift.
23     Q.  Fair enough.
24     A.  No, A shift.
25     Q.  That's all right.  We're going to get

Page 13

1  help.  And frankly, that's okay, too.
2      A.  A shift.
3      Q.  Now, and who was your supervisor for A
4  shift?
5      A.  Terrell Walker.
6      Q.  And he would have been a sergeant,
7  correct?
8      A.  Yes.
9      Q.  And he, in turn, would have reported to
10 Ms. Smith?
11     A.  Lieutenant, yes.
12     Q.  At the time, that would have been
13 Lieutenant Smith?
14     A.  Yes.
15     Q.  And then you heard your aunt kind of go
16 up the chain of command there to --
17     A.  Yes.
18     Q.  -- you had a chief of security, but
19 there was someone in between there.  There was a
20 captain?
21     A.  Yes.
22     Q.  Then a chief of security?
23     A.  Uh-huh.  (Affirmative response.)
24     Q.  And then a assistant warden or deputy
25 warden --

Page 14

1  A. Yes.
2  Q. -- who was the office manager?
3  A. Yes.
4  Q. Then the warden?
5  A. Yes.
6  Q. And then the sheriff?
7  A. Yes.
8  Q. And we'll go ahead and we'll cover this
9  incident in January of '23. But I'll do this sort
10 of in a grab-bag way.
11      Other than January 23rd of 2023, were
12 there any other instance you recall where you were
13 involved in catching contraband coming over or
14 seeing contraband come over, really anything
15 relating to contraband?
16 A. No.
17     MR. RHODES: Object to the form.
18 Q. (By Mr. Carpenter) So where I'm getting
19 at is, this was really the only instant that you
20 recall where contraband was even asked about?
21 A. Yes.
22 Q. Fair enough.
23     Tell me what happened in that
24 conversation.
25 A. Well, that conversation, I had a phone

Page 15

1  call from one of his secretaries that he wanted to
2  see me, which I was off that day, and what time to
3  be there. I was there. I called my auntie to let
4  her know that I was on my way there and could she
5  be over there.
6  Q. Right.
7  A. He wasn't there. I had to wait on him.
8  Q. Right.
9  A. So, he did come. He went to his office,
10 I guess to talk to his secretary or whatever, and
11 he called me back to the back.
12 Q. Okay.
13 A. So my auntie had made it by then. So,
14 we both went back there. We sat down and he said
15 that -- how he put it -- that an inmate said that
16 I supposed to been -- I was supposed to get some
17 contraband. And I was like, excuse me. And he
18 was like, you supposed to have been receiving
19 contraband for an inmate. And I told him -- my
20 exact word, that was a lie. He said that I've
21 been in his office several times. I told him I
22 never been in your office several times. This the
23 first time ever being in your office.
24 Q. Right.
25 A. Like that. And he wouldn't tell me what

Page 16

1  inmate that said it. So he was like -- he said a
2  lot of stuff I can't remember. And I -- I just
3  told him that if that's the case, I will quit
4  because I'm not fixing to have no one lying saying
5  that I received contraband. I never did, and I
6  had no incident of the contraband being thrown
7  over there since.
8  Q. Right.
9  A. I only heard it when he was there.
10 Q. Right.
11 A. So, he never had the warden over there,
12 he never had the deputy warden over there. Which
13 is what the handbook supposed to be -- supposed to
14 have a warden or a deputy warden in there, any
15 conversation dealing with a correctional officer.
16 No one was there but my auntie.
17 Q. And what did she say when you were
18 saying "I'm going to leave?"
19 A. She just told me don't quit my job
20 because I need it. I have kids.
21 Q. Gotcha. Okay.
22     Was there -- because you were here when
23 your aunt was saying and, furthermore, you were on
24 a different shift?
25 A. Yes.

Page 17

1  Q. What was your shift that particular day?
2  A. A shift, which I was supposed -- I work
3  on his side where the outside inmates come in at,
4  like -- I'd say, like, the street. That inmates
5  come in from the streets of if they bring someone
6  in. So, I was over on his side.
7  Q. And what was your hours on that day?
8  A. 6:00 to 6:00.
9  Q. And that would be 6:00 a.m., 6:00 p.m.,
10 day shift?
11 A. Uh-huh. (Affirmative response.)
12 Q. You would have been on tower the whole
13 time?
14 A. Yes.
15 Q. And you didn't see anything?
16 A. No, sir.
17 Q. Okay.
18 A. Because before I get there, I have to do
19 a parameter check. Which the person that's in the
20 office before I get there click the door, and I go
21 to the back door, walk around the gate and make
22 sure that there's nothing, no contraband being
23 throwed or anything found.
24 Q. Right.
25 A. And I go back. And when she leave, I do

5 (Pages 14 to 17)

**Page 18**

1  my routine what time I got there, no contraband,
2  everything was secured and all that.
3     Q.  And the next day, if you had been
4  working that day -- and you were off that day, the
5  following day, that is.  But if you had been on,
6  you would have done a parameter walk-through?
7     A.  Yes.
8     Q.  So if it had still been hanging on the
9  wire somewhere --
10    A.  If the night shift haven't did theirs,
11 yes.
12    Q.  Do you -- I think we'll make these
13 collective -- actually, we'll make this exhibit --
14       MR. RHODES:  The contraband?
15       MR. CARPENTER:  You sure can.  Let me
16 show them to you first.  And these are numbered,
17 too.  It's just the first number is obscured by
18 the photograph, but it's 264 and then following.
19       MR. RHODES:  These will be four.
20       MR. CARPENTER:  These will be four.  And
21 I can number them too, Pages 264 to 273.
22       (Exhibit 4 marked for identification.)
23    Q.  (By Mr. Carpenter)  I just wanted to
24 see, Ms. McComb, if you had ever seen these
25 photographs before today?

**Page 19**

1     A.  No, this is my first time ever seeing
2  these.
3     Q.  Gotcha.
4        So let's see -- because you've got
5  experience in looking at -- through the tower, do
6  these look like photo stills that would have been
7  taken from a tower camera?
8     A.  Yes.
9     Q.  Okay.  And again, since you worked there
10 for quite sometime, and twice, what kinds of
11 things would inmates do to try to get stuff in
12 past y'all?
13    A.  They'll probably have cellphones up in
14 there that we don't know anything about.  If they
15 bring, like, lunch trays over from the prison
16 side, they probably getting -- trying to get in
17 through there, the inmates coming from off their
18 jobs into the Facility.
19    Q.  Okay.  And this, to me, because I've
20 seen this done before, actually with kids at
21 Co-Lin Community College is where we caught them,
22 me and the assistant attorney general.  They would
23 take vodka -- empty the water bottles out, pour
24 the vodka in, screw the top back on real tight so
25 you'd think it came direct from the factory that

**Page 20**

1  way, and unless you sit there and shake it -- if
2  it's a soft drink like Sprite, you'd think it was
3  the real deal.
4     A.  Yes.
5     Q.  Is that kind of some of the things they
6  would do?
7     A.  Yes.
8     Q.  Okay.  But on this particular day, the
9  day following you're being on the tower and being
10 called in, none of these photographs were shown to
11 you?
12    A.  No.
13    Q.  Fair enough.
14       And so I know we had a discussion
15 between you and your aunt.  So what came of it?
16 To the best of your knowledge, what came of this
17 investigation as to who threw the contraband over,
18 and under whose watch this would have been?
19    A.  It would probably be on night shift.
20    Q.  Okay.  Did the sheriff say anything in
21 response when he learned -- because I understand
22 y'all told him, hey, this is a night shift thing
23 not a day shift.
24    A.  Yes.
25    Q.  Did he have a response?

**Page 21**

1     A.  I told him I was not on duty when it got
2  thrown.  And the only thing he said, well, I was
3  supposed to have received it.
4     Q.  And that was based on an inmate?
5     A.  Yes.
6     Q.  And you didn't know who?
7     A.  No.
8     Q.  Okay.  And was anything else ever done
9  with it?
10    A.  No, I never heard anything else about
11 it.
12    Q.  Didn't get a writeup?
13    A.  Didn't get a writeup.
14    Q.  All right.
15    A.  Didn't get suspended or anything.
16    Q.  Got it.
17       Now, back in '22, do you recall a
18 situation where you might have brought in a
19 hunting knife?
20    A.  Yes.
21    Q.  Okay.  What happened?
22    A.  I was running late that day.  My
23 daughter's backpack ended up tearing, so I just
24 told her to get mine and to take the thing that's
25 in the corner and just put all my stuff in it.  I

**Page 22**

1  didn't even look in to check to see what was in
2  it.
3  Q. Gotcha.
4  A. So, I did that and I left out the door.
5  So when I made it to work we are getting searched.
6  So I just poured everything on the table, which I
7  was the last one to come in. And I poured
8  everything out on the table and it fell out. And
9  I said, oh, my God, I didn't know that was in it.
10 The only thing my sergeant told me was take it
11 back to my truck. And that was it.
12 Q. And other than just writing it up in
13 August of '22, that's all that ever happened?
14 A. Yes. I didn't know anything about a
15 writeup.
16 Q. Got it. And it never happened again?
17 A. No.
18 Q. Okay. Fair enough.
19    So, we started with that. Now we'll
20 sort of go back through the documents and
21 different things. I'm going with this from the
22 complaint.
23    It says prior to the primary election in
24 '23, Sheriff Bailey asked you if you were going to
25 vote for him and you said no, you were not going

**Page 23**

1  it vote for him.
2     When was that?
3  A. I can't even say exactly what day it
4  was. But, I was at the store and he pulled up.
5  And he asked me was I was going to be on his team
6  to vote for him and I just told him no.
7  Q. And you say the store?
8  A. Shell station, gas station in Fayette.
9  Q. I know where it is. Is that the only
10 time that he ever asked you that?
11 A. No. I seen him -- I think my tire had
12 got on a flat, and he was passing by. And he
13 pulled over and -- to see did I need him, and I
14 told him my husband was on the way. And he stayed
15 there until he come. But before he got there, he
16 said like, now I need you for the vote. And I was
17 like, I'm not voting for you.
18 Q. All right. And on those two occasions
19 it was him and you, basically?
20 A. Yes.
21 Q. Did he do it a third time?
22 A. He had his officer to call me out of the
23 tower to talk to me.
24 Q. Okay. Now, did you hear him say that to
25 the officer --

**Page 24**

1  A. No.
2  Q. -- or did the officer tell you?
3  A. Yes, the officer told me that.
4  Q. And who's the officer?
5  A. Officer Green. Anthony Green.
6  Q. And what did he say to you?
7  A. That he need our help in putting his
8  boss back in and Sheriff Bailey wants to know
9  would I vote for him. And I told him no.
10 Q. When that conversation happened with the
11 Correctional Officer Green, was there anybody else
12 around?
13 A. No.
14 Q. All right. Any other occasions like
15 that?
16 A. Not that I know.
17 Q. Fair enough. And when it says -- it
18 says, "Ms. McComb actively supported another
19 candidate other than Sheriff Bailey." And who was
20 that?
21 A. Jones.
22 Q. Shawn Jones?
23 A. Yes.
24 Q. Okay. All right.
25    And was he in the runoff by any chance?

**Page 25**

1  A. Yes, I think, yes.
2  Q. Fair enough.
3     And what did you -- when you say
4  "actively support," because I'm familiar with city
5  campaigns and whatnot. Would that be road signs,
6  would that be door knocking or phone calls?
7  A. Road side.
8  Q. So you had a sign, and there it was?
9  A. No, I didn't have a sign. No, no road
10 side.
11 Q. So, what did you do?
12 A. On what?
13 Q. How did you support Shawn Jones?
14 A. I just waited until vote time and just
15 voted for him.
16 Q. Okay. I'll tell you where I was getting
17 at. Lots of folks will go door-to-door before a
18 campaign, hey, can you vote for so-and-so, I'm
19 their friend or whatnot. But in your case, it was
20 you voted?
21 A. Yes.
22 Q. All right. And between these three
23 conversations, which were before the primary, and
24 the end of 2023, when you were not rehired, did
25 Sheriff Bailey ever mention this to you again?

7 (Pages 22 to 25)

**Page 26**

1   A.  No, never talked to again.
2   Q.  Now, your aunt indicated that he was a
3   little different when he learned what she was
4   doing.  Do you recall his demeanor changing any?
5   A.  Yes.
6   Q.  How did that happen?
7   A.  I was at work.  He comes in the tower.
8   He didn't speak.
9   Q.  Okay.
10  A.  Which he supposed to come -- when he
11  come to the back, he's supposed to sign the book.
12  And he didn't speak.  And on another occasion, on
13  a weekend we had visitation, he came -- he didn't
14  even come by the tower, which he's supposed to do
15  when he's on the Facility and he come the back --
16  he has to sign that book.  And he never did.  He
17  went straight to the back to talk to the other
18  officers back there about voting for him.
19  Q.  Okay.  All right.
20      And I think we covered regarding work.
21  And between January of 2024, January 1, and when
22  you ultimately started work as a substitute
23  teacher in August of 2015, did you work anywhere
24  else?
25  A.  No.

**Page 27**

1   Q.  What kinds of things did you do to try
2   to find work in that eight-month period?
3   A.  Just went online, did applications.
4   Q.  Okay.  And while that was going on, did
5   you have some source of income like unemployment
6   or something that you were drawing?
7   A.  No, I couldn't draw unemployment because
8   I had a lawsuit going on at the time.  I had a
9   lawsuit going on.
10  Q.  Okay. I'm sorry.  And what was the
11  lawsuit, workers' comp?
12  A.  Yes.  I received workers' comp.
13  Q.  Having done work comp for a while, was
14  there something -- and of course, about -- because
15  you're receiving comp, you can't get unemployment
16  at the same time?
17  A.  Yes.
18  Q.  Yeah, I'm familiar.  Okay.
19      And what was the workers' comp from?
20  A.  Angola injury.
21  Q.  Okay.
22  A.  Shoulder injury.
23  Q.  Okay.  And was the compensation that
24  you're receiving in Angola -- in Mississippi we
25  have all sorts of flavors, if you will, of

**Page 28**

1   unemployment -- or not unemployment -- workers'
2   comp.  Here's what I mean:  You can be temporary
3   totally disabled or you can be temporary partially
4   disabled.
5   A.  Partially disabled.
6   Q.  And so, were you under restrictions
7   during that period of time?
8   A.  Yes.
9   Q.  What were the restrictions?
10  A.  No overhead activities, no lifting or
11  anything like that.
12  Q.  Okay.
13  A.  And no interact with the inmates.
14  Q.  Gotcha.
15      Which for an ordinary job, that wouldn't
16  be an issue.  But for you, that was part of what
17  you had?
18  A.  Yes, so that's how I end up being a
19  tower operator.
20  Q.  Exactly.
21      And so during the period of time, at
22  least through August of 2015, you still had those
23  restrictions from your work comp injury in Angola?
24  A.  Yes.
25  Q.  Okay.  And Louisiana pays a little more

**Page 29**

1   than Mississippi?
2   A.  Yes.
3   Q.  How much were they paying?
4   A.  Before I start, it was like 1900.
5   Q.  Gotcha.
6   A.  But by me working, I had to turn in my
7   check stubs.  So, they had to go from my check
8   stub to -- and go from there.  So most of the time
9   it was like 12.
10  Q.  Right.  So you were receiving -- you
11  were receiving some compensation from Angola while
12  you were a tower operator?
13  A.  Yes.
14  Q.  And then once you left there in January
15  '24, you were getting more because at that point
16  you --
17  A.  Actually, it just stayed the same.
18  Q.  Okay. Is there an attorney helping you
19  in the Louisiana case?
20  A.  Yes.
21  Q.  What's his name, by chance?
22  A.  Brian Calvin.
23  Q.  Has that case been resolved?
24  A.  No, sir.  It's ongoing.
25  Q.  Have you -- there's something in work

8 (Pages 26 to 29)

Page 30

1  comp, me and Carroll would have heard this term
2  before, maximum medical improvement. And what
3  that means is you've been treating for a year or
4  nine months, can be a week, and you got as good as
5  you're going to get. And the doctor will say come
6  back when you need to; but, otherwise, there's
7  nothing more we can do. Do you know if you've
8  gotten to that phase with your shoulder?
9       A.  I just got through that phase.
10      Q.  Okay. That's usually when work comp
11 cases settle.
12         And after December 31st of 2023, did
13 Sheriff Bailey ever say anything to you about
14 anything that happened at the Facility?
15      A.  No, never talked to him.
16      Q.  All right. And other than him sending
17 Correctional Officer Green to talk to you about,
18 hey, support him for election, did anybody else
19 after the election mention anything to you about
20 Sheriff's not going to rehire you, Sheriff's
21 upset?
22      A.  Yes. I heard that a lot.
23      Q.  Who was that?
24      A.  My husband actually told me three weeks
25 before I was going to get fired. And how he know,

Page 31

1  I do not know.
2       Q.  Was he living with you at the time?
3       A.  Yes.
4       Q.  All right. Because we've already
5  covered -- there was a note -- in fact, you had
6  written a note as part of a grievance about what
7  Mr. Green had said?
8       A.  Uh-huh. (Affirmative response.)
9       Q.  And you might have to say yes or no
10 because she's going to throw something at us.
11      A.  Yes.
12      Q.  So we've covered that?
13      A.  Yes.
14      Q.  Fair enough.
15         Do you recall ever putting any of this
16 stuff on social media?
17      A.  No.
18      Q.  Fair enough.
19         And you're indicating that you've had
20 emotional distress?
21      A.  Yes.
22      Q.  And the physical pain and suffering
23 you're getting is relating to the distress?
24      A.  Yes.
25      Q.  All right. And that would be headaches,

Page 32

1  backaches, nervousness and loss of appetite, and
2  then sleepless nights?
3       A.  Yes.
4       Q.  Now, in terms of embarrassment and
5  humiliation, did anybody in the community ever
6  tell you, what happened to you, how you come
7  got -- what did you do wrong to get fired?
8       A.  Yes.
9       Q.  Who was that?
10      A.  Friends, classmates.
11      Q.  Anyone in particular?
12      A.  My sister, Kawana Smith, my cousin,
13 Kimberly Barns, Auntie, Yolanda Smith and all of
14 that.
15      Q.  And you told them, hey, it wasn't me.
16 It was the fact that Sheriff Bailey wanted his
17 political folks in there?
18      A.  Yes. Well, I just told them that I
19 didn't vote for him.
20      Q.  And they believed you, right?
21      A.  Yes.
22      Q.  Fair enough.
23         Do you recall a reinstatement interview
24 in October '23?
25      A.  Yes.

Page 33

1       Q.  What did Sheriff Bailey tell you in that
2  interview?
3       A.  That -- well, I was called over there.
4  He asked me to sit down, and he just said that
5  he's not having no one that support him on his
6  team working for him, and what did I bring to the
7  table.
8       Q.  Did he mention his election?
9       A.  Yes.
10      Q.  What did he say specifically?
11      A.  He was like on his team, voting for him,
12 have his back and all that.
13      Q.  Okay. So if I'm sitting here
14 listening -- so if I'm hearing what you're telling
15 me, he basically said I'm not bringing anybody
16 back that didn't vote for me?
17      A.  Yes.
18      Q.  Did you ask him about that?
19      A.  No, sir.
20      Q.  All right. Did you -- and so what was
21 your response at all, if anything?
22      A.  That I had his back.
23      Q.  And in a general sense. Because what
24 I'm trying to get at is in October '23 the
25 election's over.

9 (Pages 30 to 33)

**Page 34**

1    A.  Uh-huh. (Affirmative response.)  Yes.
2    Q.  But he also mentioned the past election
3  and the primary when he talked to you in October
4  of '23?
5    A.  Yes.
6    Q.  All right.  And was he -- when you
7  interviewed with him in October of '23, was there
8  anyone in the room?
9    A.  No.  It wasn't anything -- we had a
10 interview.  It wasn't anything pertaining to the
11 job, just what did I bring to the table.
12 Everything was about his election.
13   Q.  All right.  Let me explore that.  You
14 say he -- and I want to make sure I got the term
15 right, "what did I bring to the table"?
16   A.  Yes.
17   Q.  That's all he said?
18   A.  Yes.
19   Q.  Did he say what do you bring to the
20 table in regard to getting me reelected in four
21 years?
22   A.  No.
23   Q.  Okay.  Or -- but he also didn't say what
24 did you bring to the table in terms of your being
25 a tower operator?

**Page 35**

1    A.  Yes, he said that.  He just said what
2  did I bring to the table.  That's it.
3    Q.  All right.  So he didn't mention the
4  election when he said that -- used that phrase?
5    A.  No.
6    Q.  Or, for that matter, the job?
7    A.  No.
8    Q.  And what was your response to that
9  question?
10   A.  I bring a lot to the table, that I'm
11 very strict at doing my job.  I go by the handbook
12 and the rules of the Facility.
13   Q.  Got it.  Okay.
14   A.  And he asked did I have any problem with
15 anybody at the Facility that I work with.
16   Q.  Fair enough.  And what was your
17 response?
18   A.  Yes, the sergeant.
19   Q.  Okay.  And who was the sergeant?
20   A.  Sergeant Terrell Walker.
21   Q.  And what was Sergeant Walker -- he was
22 your supervisor?
23   A.  Yes.
24   Q.  And what was he doing?
25   A.  Making false accusations, saying I was

**Page 36**

1  doing -- I was cussing.  I was not doing my job
2  out of the tower or whatever.
3    Q.  Okay.
4    A.  Which I'm allowed to get up and go to
5  the restroom or go get food or something like
6  that, or stretch my legs.
7    Q.  Right.
8       Did he ever write you up for it?
9    A.  Later, I found out he did.
10   Q.  Okay.  And do you remember -- and the
11 way you put that, it makes it seem like -- and
12 it's probably the case -- he didn't call you in
13 and give it to you?
14   A.  No.
15   Q.  He just submitted it up the chain of
16 command?
17   A.  Yes.
18   Q.  And no one in the chain went back down
19 to even ask you about it?
20   A.  No.
21   Q.  To your knowledge, did anyone ever say
22 that affected your employment there?
23   A.  No.
24   Q.  Okay.  So when you mentioned to the
25 Sheriff Bailey in October '23 there was something

**Page 37**

1  wrong with your sergeant --
2    A.  Yes.
3    Q.  -- what was his response?
4    A.  That we can't have that.
5    Q.  Okay.
6    A.  And I was telling him the way he treated
7  the inmates there.
8    Q.  Did he leave you with the impression in
9  your mind he was going to do something about that?
10   A.  No.
11   Q.  Because when he's saying "we can't have
12 that," he's referring to we can't have you being
13 harassed or --
14   A.  He didn't put it in specific way.  He
15 just said we can't have that.
16   Q.  All right.  But he didn't give any
17 specific plans as to what he was going to do?
18   A.  No.
19   Q.  We're now going into the medical
20 records, and that's the last phase.
21   A.  Okay.
22   Q.  So we're shooting for 10 minutes.
23      (Off the record conversation.)
24   Q.  (By Mr. Carpenter)  This one is going to
25 be Exhibit 5, which will be the medical records

Page 38

1    of --
2         MR. RHODES:  You didn't put the pictures
3    in, did you?
4         MR. CARPENTER:  Yes, they're four.
5         (Exhibit 5 marked for identification.)
6    Q.  (By Mr. Carpenter) This will be five.
7    We're keeping up with the numbers because she's
8    got to keep up with the numbers.
9         This is going to be a reference Page 110
10   of 226 to 113 of 226.  And what we're doing here,
11   is I'm just setting sort of a pre -- what your
12   health condition was like before December of '23.
13        This is a medical note from January of
14   2020.  It indicates that you were having an issue
15   with shoulder pain?
16   A.  Uh-huh.  (Affirmative response.)
17   Q.  They use shoulder pain.  But this would
18   have been your right shoulder?
19   A.  Yes.
20   Q.  And that's related to your Angola
21   injury?
22   A.  No, that's related to a Wal-Mart injury.
23   Q.  Okay.  So, what happened in that injury?
24   A.  Tore my rotator cuff.
25   Q.  Was that on the job?

Page 39

1    A.  Yes.
2    Q.  Was that in Mississippi?
3    A.  Yes.
4    Q.  Are you getting comp for that?
5    A.  Yes.
6    Q.  Because I would think with a torn
7    rotator cuff, that would be --
8    A.  Yeah.
9    Q.  Did you get -- has that been resolved?
10   A.  Yes.
11   Q.  And you got what we call maximum medical
12   on that one?
13   A.  Yes.
14   Q.  Gotcha.  Okay.
15        And in January of 2020, it appears --
16   again, because it's Jefferson Health, they do a
17   depression screening.  Do you recall getting those
18   screenings or anybody asking you questions about
19   depression?
20   A.  They asked me questions about it.
21   Q.  And in this case, it indicates you were
22   fine.  I mean, you were what they call 0, which is
23   not depressed.  Does that sound right for January
24   '20?
25   A.  Yes.

Page 40

1    Q.  Okay.  Then, we're going to move ahead
2    four years.  This is now January of '24.  It
3    appears -- and this is with a man named Germany
4    King and he's a nurse at the --
5    A.  Yeah, she's a nurse.
6    Q.  She's a nurse.  Okay.
7         And it looks like here that -- do you
8    recall her doing a depression screening for you on
9    January the 23rd?
10   A.  January the what?
11   Q.  January 23rd.  I'll let you look at
12   this.
13   A.  Yes, I think that's what I see.
14   Q.  And in this case, if you look at the
15   first page, it indicates that she's got it marked
16   for severe depression?
17   A.  Uh-huh.  (Affirmative response.)
18   Q.  Is that correct?
19   A.  Yes.
20   Q.  Now -- and at this point, this is just
21   asking you what you think, you know, about it.
22   Was this related to the job?
23   A.  Yes.
24   Q.  Okay.  And what did Nurse King suggest?
25   A.  She referred me to -- I can't think of

Page 41

1    the woman name.  I had to talk to someone in
2    Jackson.
3    Q.  Okay.  And we'll get that.  It also
4    indicated -- it says reason for appointment was
5    lower back pain?
6    A.  Yes.
7    Q.  Where was that coming from?
8    A.  My lower back pain?
9    Q.  Uh-huh.  (Affirmative response.)
10   A.  Lower back pain is something that I
11   already had.
12   Q.  And she was prescribing medication, pain
13   medication for that?
14   A.  Yes.
15   Q.  And it indicates here that -- because,
16   you know, you were here with your aunt, and she
17   had eating -- you know, that she didn't eat as
18   much.
19   A.  Yes.
20   Q.  But Nurse King indicates that you were
21   not having an eating disorder, loss of appetite.
22   Is that correct?
23   A.  Yes.
24   Q.  But you were admitting stressors?
25   A.  Yes.

**Page 42**

1  Q. But denying suicidal thoughts?
2  A. Yes.
3  Q. And at that time you were married?
4  A. Yes.
5  Q. And then, this is Page 46 of 226. And
6  that's just a followup note from Nurse King. And,
7  essentially, you were mentioned that you would be
8  talking to someone in Telehealth?
9  A. Uh-huh. (Affirmative response.)
10  Q. Now, I know what Telehealth is and
11  Carroll knows what it is. But if I'm
12  understanding this correctly, Ms. McComb,
13  Telehealth would mean you would come here to
14  Fayette to an office?
15  A. Yes.
16  Q. And you would turn on a nice computer
17  with a -- with, I want to say, a camera?
18  A. Yes.
19  Q. And on the other end of that would be a
20  nurse in Jackson?
21  A. Yes.
22  Q. How long would those sessions last?
23  A. No more than about 10, 15 minutes.
24  Q. And would that be with a lady named
25  Nurse April Mitchell?

**Page 43**

1  A. Yes.
2  Q. Now, this one I'm going to show is Pages
3  39 and 40. And this is part of your Jefferson
4  records. But what's happened is, UMMC kicks those
5  records back to Jefferson so that if you ever come
6  in with -- a bus hits you something like that, all
7  your records are right there for somebody to look
8  at.
9      So, in this case, it indicates on
10  March the 5th of 2024 -- and I'll let you take a
11  look at that -- there appears to be a depression
12  screening from Nurse Mitchell where she's saying
13  that there's no depression or anxiety. And here's
14  part of that, too. I need to give this to you.
15  My fault. This is the specific depression
16  screening that she did. Do you recall her
17  mentioning anything about the depression
18  screening?
19  A. Yes.
20  Q. What did she say as to how you were
21  doing in March of '24?
22  A. She just asking me questions: How was
23  my day, how -- do I feel depressed, smoking or
24  anything, do I feel like suicidal. That's it.
25  Q. All right. And it looked like that in

**Page 44**

1  this case, she had indicated adjustment disorder.
2  Now, we're doctors, me and Carroll, but we're not
3  them doctors. But adjustment disorder, just
4  because we've done enough of this, would be
5  adjusting to a life change, like loss of job. It
6  could be a loss of spouse or anything like that.
7  A. Okay.
8  Q. Did she indicate that she had diagnosed
9  you with adjustment disorder?
10  A. No.
11  Q. Fair enough.
12      Did she prescribe any medication?
13  A. No.
14  Q. Okay. Fair enough.
15      And during this period of time --
16  because this would have been when you were
17  unemployed --
18  A. Yes.
19  Q. -- were you at home?
20  A. Yes.
21  Q. Okay. Did you have children at home?
22  A. Yes.
23  Q. And so, you were looking at after them?
24  A. Yes.
25  Q. And it looks like your husband -- was he

**Page 45**

1  working at the time?
2  A. Yes.
3  Q. And did he have like a day job?
4  A. Yes.
5  Q. And so, essentially, you were taking
6  care of everybody?
7  A. Yes.
8  Q. And still recovering on shoulders?
9  A. Yes.
10  Q. Okay. Now, I apologize for getting this
11  out of order, because I tried to put this in
12  chronology. But this one -- this one is from
13  January the 30th of 2024.
14      Do you recall talking to a Vanessa King
15  at Jackson Health?
16  A. Vanessa King?
17  Q. Yeah, her name's up at the top.
18  A. I'm thinking I did. I don't know her
19  name.
20  Q. Here's why I was asking, because this
21  was just -- in other words, to put it bluntly, it
22  was called telephone encounter and that's all it
23  was called. So, in other words, what Ms. King is
24  saying, you called and this is a description of
25  what you said. And it was, "patient and her

Shaquita McComb 4/18/2025

Page 46

1  husband are both unemployed."
2       A.  Yes.
3       Q.  So your husband was unemployed in
4  January?
5       A.  Yes.
6       Q.  Did he find work by March?
7       A.  No.
8       Q.  All right.  And it says, "She is
9  currently going through the process of suing past
10 employers."
11      A.  Yes.
12      Q.  So that would have been your comp
13 claims?
14      A.  Yes.
15      Q.  And, for that matter, what was going on
16 with the sheriff?
17      A.  Yes.
18      Q.  And then there was the issue about
19 affording medicines.  Do you know the specific
20 medicines that you had been recommended that you
21 couldn't get because of money?
22      A.  No, because I'm thinking they just --
23 when I went, they just add it to my Medicaid.
24      Q.  Gotcha.
25      A.  And I don't know why.

Page 47

1       Q.  Okay.  And then it was, "Patient says
2  she's applied for jobs but hasn't heard anything."
3       A.  Yes.
4       Q.  By January 30th, where had you applied?
5       A.  January 30th, I applied at the Dollar
6  Store in Port Gibson, Pizza Hut.  That's about it
7  that I can think of.  There's more.
8       Q.  Is there a job center, a Win Center or
9  anything like that?
10      A.  Yes, in Vicksburg, Mississippi.
11      Q.  Did you go there?
12      A.  No.
13      Q.  Do they cover this area as well, if you
14 know?
15      A.  Yes.
16      Q.  All right.  Now, I'm going -- like I
17 say, we're jumping ahead.
18          With your anxiety and depression, was
19 there any time that it was lightened.  You know,
20 say, for example, you know with shoulder pain, it
21 hurts real bad the first few months, real bad
22 after the rotator cuff surgery.  But, in time,
23 things get better, in terms of physical pain.  I'm
24 kind of using that analogy with your anxiety and
25 depression.  Was there a time when it got better?

Page 48

1       A.  What, my shoulder?
2       Q.  Oh, no.  Your feelings.  Your anxiety
3  and depression.
4       A.  Yes.
5       Q.  If you had to say today, about what time
6  would that have been?
7       A.  Today, around about -- I been two, three
8  when I got -- before I take my -- after I take my
9  medicine.
10      Q.  Does it feel as bad, in terms of anxiety
11 and depression, today as it did, let's say, on
12 January the 3rd of '24?
13      A.  No.
14      Q.  When did the mood start lightening?
15      A.  After I had started taking my
16 medication.
17      Q.  And when was that?
18      A.  Let's see.  I don't know exactly what
19 day they gave it to me.  Well, the first time they
20 gave it to me, I had my ups and downs.
21      Q.  Okay.  Was it before the middle of the
22 summer?
23      A.  I think it was really after the summer.
24      Q.  And who is "they?"  You say they gave it
25 to me.

Page 49

1       A.  When they prescribed it to me,
2  Dr. Mitchell.
3       Q.  And she was with Telehealth?
4       A.  Yes.
5       Q.  Got it.  Okay.  All right.
6           Now, I'm going to -- and this -- I don't
7  know mind and you don't mind, because we talked
8  about it.
9       A.  Yes.
10      Q.  We're going into something that
11 everybody knows, but I wasn't going to do this
12 without your say so.
13      A.  Okay.
14      Q.  Because it concerns a psychiatric
15 progress note, which sounds like a psychiatrist
16 but it's really April Mitchell writing this down
17 and she's a nurse prac.  So, what I wanted to ask
18 about is -- okay.  It indicates that you had had
19 depression and anxiety?
20      A.  Yes.
21      Q.  Fair to say you had not had it before
22 you left the Facility?
23      A.  Yes.
24      Q.  Okay.  But afterwards, you had?
25      A.  Yes.

13 (Pages 46 to 49)

Brooks Court Reporting
1-800-245-3376

Shaquita McComb 4/18/2025

Page 50

1    Q.  And says, "From this, she was last seen
2  in August."  Now, the date of the visit on this is
3  January of '25.  Do you recall seeing April
4  Mitchell between August of '24 and January '25 or
5  does that --
6    A.  Yes.
7    Q.  When was the last time you saw her?
8    A.  I think it was April 7th, my last time
9  seeing her.
10   Q.  This year?
11   A.  Yes.
12   Q.  Did you see her between August of '24
13 and January of '25?
14   A.  Yes.  I'm trying to see the days.
15   Q.  Okay.
16   A.  Because I have like -- they give me
17 appointments and stuff like that.  But I'm not
18 sure what exact day and month between there.
19   Q.  Okay.  And it indicates, she said
20 patient reports recent traumatic events where you
21 were shot on October 8th.
22   A.  Yes.
23   Q.  "Walked in on husband and female having
24 an affair."
25   A.  Yes.

Page 51

1    Q.  And she shot at you?
2    A.  Yes.
3    Q.  And it says, "superficial gunshot wound
4  to the right thigh."
5    A.  Yes.
6    Q.  What happened?
7    A.  We got into an altercation in the house.
8  And whatever, me and the girl got to fighting or
9  whatever.  I ended up kicking her out of my house,
10 went out -- well, she supposed to have been left
11 the yard.  But she had pulled out -- but when I
12 was going out there because my daughter was out in
13 the car, to go check on her, and that when she
14 started shooting at me.
15   Q.  Gotcha.
16       And fortunately, it was a graze?
17   A.  Yes.
18   Q.  What happened after that?
19   A.  I end up going to the police station.  I
20 ended up calling 911, going to the emergency room,
21 getting it cleaned up and going to the police
22 station to file charges.
23   Q.  Okay.  And which position station did
24 you go to?
25   A.  Claiborne County Police Department.

Page 52

1    Q.  I'm thinking of the judge in Claiborne
2  County.  I don't think she'd put up with this.
3  But, in any case, what happened following that?
4    A.  Nothing.  I went to a hearing, and that
5  was it.  They say I didn't have enough evidence.
6  It wasn't enough evidence.
7    Q.  I've been doing civil for 20 -- for 30
8  years and did the death penalties at the Supreme
9  Court --
10   A.  Actually they had taken my shirt that
11 had the bullet holes in it, but they said wasn't
12 enough evidence.
13   Q.  And this is only somewhat related, but
14 in a way it kind of is because I'm -- did your
15 husband testify on your behalf and say --
16   A.  No, he wasn't there.
17   Q.  So you were there, you had the bullet
18 holes --
19   A.  Uh-huh.  (Affirmative response.)
20   Q.  And you had, obviously, your medical
21 records?
22   A.  Yes.  They didn't show none of that.  It
23 was a hearing just for, I guess, to go see would
24 it go to trial.
25   Q.  Okay.  And sort of the related question,

Page 53

1  last one on that, was it a justice court, like
2  a -- or was it a city court that you went to or
3  was it --
4    A.  Was it city?  It's city.  Well, it was a
5  justice because it happened outside the city.
6    Q.  Right.  I follow you.  Because sometimes
7  justice courts in counties will handle the
8  preliminary hearings and then they, in turn,
9  decide whether it goes to a grand jury.  Or the
10 district attorney will take it.  I would say, if
11 this ever happens on the Coast, let me know
12 because I know the district attorney and this will
13 probably not get shoved under a rug.  But, in any
14 case...
15       Okay.  And so it indicated that --
16 that's -- it was saying you had not taken
17 prescribed medications, Lexapro and Trazodone.
18   A.  No.
19   Q.  And it said couldn't find your medicine.
20 Do you remember telling her that?
21   A.  Yes.
22   Q.  And you took it consistently for the
23 first month after prescribed, but since
24 discontinued use?
25   A.  Uh-huh.  (Affirmative response.)

14 (Pages 50 to 53)

Brooks Court Reporting
1-800-245-3376

**Page 54**

1  Q. Do you know why?
2  A. I just forgets to take it.
3  Q. Were you feeling a little better at the
4  time?
5  A. No. I needed it, but guess I just -- I
6  tried to find it, that what I did and I couldn't.
7  Q. Because, in fact, and I think we would
8  all agree, that you needed -- she expresses need
9  to resume her medication, saying I need my
10 medicine because I'm about to have a nervous
11 breakdown.
12 A. Yes.
13 Q. Absolutely.
14    And not attempted to reach out for
15 refills. And then it says that --
16    Okay. What did Nurse Mitchell say in
17 response to what you were saying?
18 A. Just asked me was I taking my
19 medication. I told her I had misplaced it and
20 couldn't find it, and she prescribed me more.
21 Q. Got it.
22 A. And I think it's up to six months when I
23 go back to see her. I've got enough to last me
24 until I go back to see her.
25 Q. And when's the next time you're going to

**Page 55**

1  see her?
2  A. Six months. I think it will be in --
3  I'm not for sure what date. I got it in my house.
4  Q. And this last medical note. This is
5  back with Nurse Turner here in Jefferson Health.
6  And this -- and by the way, just so we've got the
7  notes. These notes from Nurse Mitchell we just
8  talked about are 157 to 160.
9     And then this, being the last notes, are
10 Page 2 to 9 of 226. And it looks like this is
11 March 7th, 2025. And the depression screening in
12 this case is indicated to be 0. And what I wanted
13 to ask you about is, do you recall talking about
14 anxiety or depression with Nurse Turner?
15 A. Yes.
16 Q. What did you tell her?
17 A. That I was on medication for it. And
18 she asked me the -- and I couldn't think of the
19 name of it, but I said I talked to -- I called a
20 therapist in Jackson.
21 Q. Right.
22 A. And that was it.
23 Q. Okay. Did she ask you if you were
24 feeling down or normal or anything like that?
25 A. No.

**Page 56**

1  Q. Okay. All right.
2     When is your next app -- I think you
3  said you might have another appointment with Nurse
4  Mitchell?
5  A. Yes.
6  Q. Do you know when that is?
7  A. I'm not for sure, but it's coming up
8  soon. The last time was April the 7th.
9  Q. All right. Going to sort of the
10 aftermath of the October '24 incident. Are you
11 currently separated from your husband?
12 A. No.
13 Q. What happened following this?
14 A. I just put him out for a couple of
15 months.
16 Q. All right. And so he's living back in
17 the home?
18 A. Yes.
19 Q. Okay. And has he found work?
20 A. No. The job he was on, he ended up
21 hurting his back, almost fell off the top of the
22 roof.
23 Q. Is he receiving some sort of worker's
24 comp benefits?
25 A. No, because that's the private owner.

**Page 57**

1  He was getting cash.
2  Q. I follow you.
3     And is he being treated for, basically,
4  his back pain?
5  A. He went to the doctor last month. They
6  gave him some pain pills and stuff like that.
7  That's about it.
8  Q. Is he looking at applying for Social
9  Security Disability?
10 A. No.
11 Q. All right. And does he have plans to
12 return to work or is it sort of when things get
13 better?
14 A. When it get better.
15 Q. So, at this moment, between what you
16 might be receiving from Louisiana Workers' Comp
17 and substitute teaching work, that's the family
18 income right now?
19 A. Yes. And I get that every month. Once
20 a month.
21 Q. And how many children do y'all have?
22 A. We have three together.
23 Q. Do you have other children that live
24 with you?
25 A. No. I just have my two daughter's at

**Page 58**

1  the moment.
2      Q. I follow you. Fair enough. I think
3  that's all I have.
4      MR. CARPENTER: Carroll, do you have any
5  questions?
6      MR. RHODES: Just a couple.
7  EXAMINATION BY MR. RHODES:
8      Q. Ms. McComb, you testified about a
9  mandatory meeting where the Sheriff talked to
10  y'all about trying to get a pay increase for you?
11      A. Yes.
12      Q. Do you recall any other mandatory
13  meetings that the Sheriff might have called?
14      A. No, sir.
15      Q. Did he ever have a mandatory meeting of
16  all employees where he talked about supporting him
17  for reelection?
18      A. Yes.
19      Q. Do you recall when that --
20      A. It was that same meeting.
21      Q. Oh, in that same meeting?
22      A. Yes.
23      Q. So he talked about more than just --
24      A. Yes. He talked about more than just
25  getting a raise and everything else. He talked

**Page 59**

1  about voting and having his back and he need
2  people on his team who was going to be there for
3  him.
4      Q. Could you tell us what he said about
5  voting for him and --
6      A. He wanted us to go to the poll and vote
7  for him and get him back into the sheriff office.
8      Q. That was in that same meeting?
9      A. Yes.
10      Q. Do you recall the month that meeting
11  was? Was it before the primary election?
12      A. I'm not for sure.
13      Q. But he did ask all the employees?
14      A. Yes.
15      Q. And why did he say the meeting was
16  mandatory?
17      A. Because it was supposed to have been
18  about us a raise. But he said one thing about a
19  raise, and that was it. Everything else about
20  supporting him and having his back and being there
21  for him.
22      Q. And being there for him --
23      A. As going out and vote for him and that
24  sort of thing. Nothing about the Facility or
25  anything. It was all about coming in and have his

**Page 60**

1  back and voting for him and supporting him in the
2  election.
3      Q. And in the meeting that you had with him
4  in October of 2023, was that about reapplying?
5      A. Yes, our application that we did,
6  because that was my first time ever doing a
7  reapply application, ever, for a job that I
8  already had.
9      Q. Did he mention anything about voting in
10  that meeting?
11      A. Yes. He was -- when I got there, he was
12  like -- he was going over applications and seeing
13  who he was going to keep and see who's here for
14  him and have his back, supporting him in voting in
15  the election and all that.
16      Q. Okay. That's all I have.
17  EXAMINATION BY MR. CARPENTER:
18      Q. And in that reemployment interview in
19  October, were you and him the only people in that
20  room?
21      A. Yes.
22      Q. And in the meeting which started with
23  the pay raise, I'd like to know what he
24  specifically said regarding the election.
25      A. That he need everyone to go out and

**Page 61**

1  support him and vote for him in reelection.
2      Q. And when was that meeting?
3      A. I'm not for sure when that meeting -- I
4  think that's the same meeting. The mandatory
5  meeting, October, I think. I don't know. That's
6  the same meeting I'm talking about.
7      Q. Sometime in '23?
8      A. Yeah.
9      Q. That's about what you know --
10      A. Yes.
11      Q. -- sometime that year?
12      A. Yes.
13      Q. And who was at that meeting that you
14  recall, other than the Sheriff? Because if it's a
15  mandatory meeting, I'm thinking everybody.
16      A. Yes, everybody had to be there.
17      Q. So who did you know that was there?
18      A. Ms. Sanders, Blake, Lieutenant Elliot,
19  Ms. Diane Williams, Officer January, Felton,
20  Warden Kaho, Warden Doss, Captain Deveaux,
21  Sergeant Boyd, Officer Mims. Mostly everybody
22  that worked there.
23      Q. A and B shift?
24      A. Yes. A, B, C, and D.
25      Q. And what time of day was it?

16 (Pages 58 to 61)

### Page 62

```
 1        A.  It started about 2:00, 3:00.
 2        Q.  Was that during -- that doesn't appear
 3   to be during a shift change, that is?
 4        A.  No, that was during a shift.  No, it
 5   wasn't shift change.
 6        Q.  Right.  It was during A shift, but not
 7   when A to B, because that would be 6:00 a.m.,
 8   6:00 p.m.?
 9        A.  Yeah.
10        Q.  Got it.
11            Okay.  That's all I got.
12            (Time Noted:  11:21 a.m.)
13            SIGNATURE/NOT WAIVED
14
15   ORIGINAL:  MR. CARPENTER, ESQ.
16   COPY:  MR. RHODES, ESQ.
17
18
19
20
21
22
23
24
25
```

### Page 63

```
 1            CERTIFICATE OF DEPONENT
 2   DEPONENT:  SHAQUITA MCCOMB
     DATE:  April 18, 2025
 3   CASE STYLE:  SMITH, ET AL vs. JEFFERSON COUNTY,
     MISSISSIPPI, ET AL
 4   ORIGINAL TO:  THOMAS L. CARPENTER, ESQ.
         I, the above-named deponent in the
 5   deposition taken in the herein styled and numbered
     cause, certify that I have examined the deposition
 6   taken on the date above as to the correctness
     thereof, and that after reading said pages, I find
 7   them to contain a full and true transcript of the
     testimony as given by me.
 8       Subject to those corrections listed below,
     if any, I find the transcript to be the correct
 9   testimony I gave at the aforestated time and place.
     Page   Line        Comments
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17
18       This the ____ day of _____, 2025.
19            _____
                  SHAQUITA MCCOMB
20   State of Mississippi
     County of _____
21
         Subscribed and sworn to before me, this the
22   ____ day of _____, 2025.
23   My Commission Expires:
24   _____
25             Notary Public
```

### Page 64

```
 1            CERTIFICATE OF COURT REPORTER
 2       I, Robin G. Burwell, Court Reporter and
 3   Notary Public, in and for the State of Mississippi,
 4   hereby certify that the foregoing contains a true
 5   and correct transcript of the testimony of SHAQUITA
 6   MCCOMB, as taken by me in the aforementioned matter
 7   at the time and place heretofore stated, as taken by
 8   stenotype and later reduced to typewritten form
 9   under my supervision by means of computer-aided
10   transcription.
11       I further certify that under the authority
12   vested in me by the State of Mississippi that the
13   witness was placed under oath by me to truthfully
14   answer all questions in the matter.
15       I further certify that, to the best of my
16   knowledge, I am not in the employ of or related to
17   any party in this matter and have no interest,
18   monetary or otherwise, in the final outcome of this
19   matter.
20       Witness my signature and seal this the
21   30th day of April, 2025.
22
23            _____
              ROBIN G. BURWELL, #1651
24            CRR, RPR, CCR
     My Commission Expires:
25   April 6, 2029
```