# Carolyn Smith, et al. v. James E. Bailey, et al.

**James Bailey**

**April 29, 2025**

All depositions & exhibits are available for downloading at
<<www.brookscourtreporting.com>>
Please call or e-mail depo@brookscourtreporting.com if you need  a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

EXHIBIT 5

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION


CAROLYN SMITH, SHAQUITA McCOMB,           PLAINTIFFS
BONITA BLAKE, SANDRA SANDERS,
AND JAMES ELLIS, JR.


VS.              CIVIL ACTION NO. 5:24-cv-72-DCB-ASH


JAMES E. BAILEY, IN HIS                   DEFENDANTS
INDIVIDUAL CAPACITY AND IN HIS
OFFICIAL CAPACITY AS SHERIFF OF
JEFFERSON COUNTY, MISSISSIPPI,
AND DIRECTOR OF THE
JEFFERSON-FRANKLIN REGIONAL
CORRECTIONAL FACILITY, AND
JEFFERSON COUNTY, MISSISSIPPI




DEPOSITION OF JAMES E. BAILEY

Taken at the Jefferson County Circuit Courthouse,
1483 Main Street,
Fayette, Mississippi,
on Tuesday, April 29, 2025,
beginning at approximately 1:55 p.m.




REPORTED BY:

ELLA J. HARDWICK, CVR-M, CCR #1749

James Bailey 4/29/2025

## Page 2

```
 1              APPEARANCES
 2   CARROLL E. RHODES, ESQ.
     Law Offices of Carroll Rhodes
 3   119 Downing Street
     Hazlehurst, Mississippi 39083-3001
 4      Email:  Crhode@bellsouth.net
 5      COUNSEL FOR PLAINTIFFS
 6
     THOMAS L. CARPENTER, JR., ESQ.
 7   Wise Carter
     2510 14th Street, Suite 1125
 8   Gulfport, Mississippi 39501
        Email:  Tlc@wisecarter.com
 9
        COUNSEL FOR DEFENDANTS
10
11   ALSO PRESENT:  Ms. Carolyn Smith
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                 EXHIBITS
 2     NO.       DESCRIPTION       PAGE
 3   Exhibit 1   Organizational Chart      30
 4   Exhibit 2   General Policy on Employment     34
 5   Exhibit 3   Equal Opportunity Policy     35
 6   Exhibit 4   Letter to Employees Dated     47
                 10/17/2023
 7
     Exhibit 5   "Now Hiring" Advertisement      56
 8
     Exhibit 6   Defendants' Answers to     59
 9               Plaintiffs' First Set of
                 Interrogatories
10
     Exhibit 7   Letter to C. Smith re Denial     73
11               of Re-Employment
12   Exhibit 8   Letter to S. McComb re     86
                 Denial of Re-Employment
13
     Exhibit 9   Letter to B. Blake re Denial     91
14               of Re-Employment
15   Exhibit 10  Letter to S. Sanders re     99
                 Denial of Re-Employment
16
     Exhibit 11  Letter to J. Ellis re Denial     100
17               of Re-Employment
18
19
20
21
22
23
24
25
```

## Page 3

```
 1        TABLE OF CONTENTS
 2                          PAGE
 3   Title Page......................................  1
 4   Appearance Page................................  2
 5   Table of Contents.............................  3
 6   Exhibit Index..................................  4
 7   Certificate of Court Reporter.................109
 8
         EXAMINATION
 9
     Examination By Mr. Rhodes......................  5
10
```

```
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1          MR. CARPENTER:  Usual stipulations,
 2   and we'll see about read and signing at
 3   the end.
 4          MR. RHODES:  Yeah, yeah.
 5          MR. CARPENTER:  That'll work.
 6          MR. RHODES:  Usual stipulations.
 7          JAMES E. BAILEY,
 8      having been first duly sworn,
 9   was examined and testified as follows:
10          EXAMINATION
11   BY MR. RHODES:
12      Q.  Good afternoon, Sheriff Bailey.
13      A.  How you doing today?
14      Q.  All right.  My name is Carroll Rhodes, and
15   I represent Ms. Carolyn Smith and the other
16   plaintiffs that filed a case against you and the
17   county.
18      A.  Okay.
19      Q.  And we're here today to take a deposition.
20   And have you given a deposition before?
21      A.  No.
22      Q.  Okay.  A deposition is just like testimony
23   in court with the judge, except we don't have a
24   judge here.  We have a court reporter who took your
25   oath just like you would be in court.
```

2 (Pages 2 to 5)

James Bailey 4/29/2025

**Page 6**

1       And the testimony that you're giving to
2   the deposition is the same as testimony as if you
3   were on the witness stand.
4       A.   Correct.
5       Q.   So you understand that the process is --
6       A.   Yes, sir.
7       Q.   -- the same just like a courtroom?
8       A.   Okay.
9       Q.   And I might ask a convoluted question or a
10  question that doesn't make sense.  Don't hesitate
11  to tell me.  If you don't understand, ask me to
12  rephrase or re-ask a question.
13      A.   Okay.
14      Q.   Let me start with your name.  Could you
15  give the court reporter your full name?
16      A.   James, J-A-M-E-S, E, as in Edward,
17  E-D-W-A-R-D, Bailey, B-A-I-L-E-Y, Sr.
18      Q.   Okay.  Sheriff Bailey, how old are you?
19      A.   62.
20      Q.   And you live here in Jefferson County?
21      A.   I do.
22      Q.   Could you give us your educational
23  background?
24      A.   12th grade education.  Graduated from
25  Jefferson County High School in 1980.

**Page 7**

1       Q.   And do you have any licenses or
2   certifications?
3       A.   Meaning with law enforcement?
4       Q.   With law enforcement.
5       A.   I'm a certified law enforcement officer.
6   I graduated in class of -- base class 169 from
7   MLEOTA in Pearl, Mississippi.
8       Q.   What year was that?
9       A.   1995.  Base class 169.
10      Q.   Okay.  And could you give us your
11  experience in law enforcement?
12      A.   Yes.  Well, when I first graduated from
13  high school, I started at the supermarket, and I
14  worked there for, like, ten years.  And I started
15  with the Jefferson County Sheriff's Department in
16  1989 up under the administration of Sheriff J.P.
17  Wallace.  He was the sheriff then, and I started
18  out dispatching.
19      Later after Sheriff Wallace ended up
20  passing away, Bud Williams was the acting sheriff.
21  I worked up under him.  I hit the streets in '91 up
22  under his administration.  They had a special at
23  the end of '91 in the -- in early '93, they had a
24  special election with Bud Williams, who was acting
25  sheriff, and Peter Walker.

**Page 8**

1       And Peter Walker got elected in '93, and I
2   worked with him, and I also started working with
3   Alcorn PD in 1993.  That's who I went through the
4   police academy with, too, Alcorn PD.  And from
5   there I moved -- after deputy, I moved to sergeant
6   with the sheriff's department here in Jefferson
7   County.  I was a sergeant at Alcorn State
8   University and campus police.
9       And from there, I resigned from Alcorn
10  January 31st of 2001.  I still was working here.  I
11  had, like, 13 years in law enforcement then.  So I
12  moved from sergeant up to chief deputy later on,
13  maybe around 2017, something like that.
14      I moved up to chief deputy up under the
15  administration of Peter Walker.  I seek for sheriff
16  in 2019 and took office in 2020.
17      Q.   In 2019, do you recall -- and you ran as a
18  Democrat?
19      A.   I did.
20      Q.   Do you recall the other candidates in the
21  Democratic primary in 2019?
22      A.   In 2019, it was Bobby Bailey; me and him
23  was in the primary election, which was Democrat, in
24  August.  And in November, it was Peter Walker and
25  (indiscernible) Grover in November.  And Peter

**Page 9**

1   Walker ran as independent, and I think Grover --
2   both of them ran as independents, Peter and Walter
3   Grover.
4       Q.   And when -- in 2019, when Peter Walker --
5   he was the sheriff at that time?
6       A.   He had been sheriff for 26 years.
7   Correct.
8       Q.   For 26 years?
9       A.   26 and a half.
10      Q.   And you ran for sheriff against Peter
11  Walker?
12      A.   Correct.
13      Q.   Now, let me back up.  When you say that
14  after Sheriff J.P. Wallace -- he died in office?
15      A.   Yes.  He was -- he had one stroke, and
16  then he ended up having another stroke.  And matter
17  of fact, he died on his birthday, 53 years of age.
18      Q.   Okay.  Now -- and then Bud Williams became
19  the interim sheriff?
20      A.   He was the interim sheriff, acting
21  sheriff, and then they had a special election in
22  '93.  It was Peter Walker and Bud Williams.
23      Q.   Do you recall when it was that Bud
24  Williams became the interim sheriff or when it was
25  that Sheriff Wallace died?

Brooks Court Reporting
1-800-245-3376

James Bailey 4/29/2025

1     A.  Bud had become sheriff sometime in '92,
2  beginning of '92, somewhere around there maybe.
3     Q.  And when Bud Wallace became sheriff, what
4  position did you hold in the sheriff's department?
5     A.  I was dispatching during that time.  Then
6  he moved me from dispatcher to being a deputy law
7  enforcement officer.  It was me, Daniel Davis, and
8  Malcolm Gill.  It was only three deputies.
9     Q.  And the election to fill out Sheriff
10  Wallace's term was 1993?
11     A.  Correct.  That's when they had a special
12  election.
13     Q.  And the Interim Sheriff Williams ran in
14  that election?
15     A.  He did.  Bud Williams.
16     Q.  And Peter Walker also ran in that
17  election?
18     A.  Correct.
19     Q.  And that was a special election?
20     A.  It was a special election, because --
21     Q.  So it wasn't no party?  It was just
22  everybody ran?
23     A.  It was a special election because Sheriff
24  Waller passed away before his term.
25     Q.  Right, right.  But I'm just saying it was

1  a special election.  It wasn't a primary or
2  anything?
3     A.  No, no.
4     Q.  And Peter Walker won that election?
5     A.  Correct.
6     Q.  Now, did you support Bud Williams when he
7  ran in that election?
8     A.  No, I did not.
9     Q.  Did you support Peter Walker?
10     A.  I did.
11     Q.  And Peter Walker won?
12     A.  He did.
13     Q.  You said that in '93, you went to work at
14  Alcorn PD?
15     A.  Correct.
16     Q.  Now, was that part-time or full-time?
17     A.  I -- full-time.
18     Q.  Did you leave the sheriff's department?
19     A.  No.  I was still -- I was comfortable
20  working both of them.  I worked at Alcorn like 3:00
21  to 11:00 --
22     Q.  Okay.
23     A.  -- and come to Fayette 12:00 to 8:00.
24     Q.  Okay.  That's what I'm trying to say.  So
25  you were working both jobs at the same time?

1     A.  Same time.
2     Q.  Okay.  And you moved up through the ranks?
3     A.  Through the ranks on both.  Both I was
4  sergeant.  Then -- I was sergeant here at the
5  Jefferson County Sheriff's Department, and I was
6  sergeant at Alcorn until I resigned from out there.
7        And then maybe around 2017, something like
8  that, I moved up to the chief deputy here,
9  Jefferson County Sheriff's Department up under
10  Peter Walker's administration.
11     Q.  And so, in 2019, did you run as a
12  Democrat?
13     A.  I did.
14     Q.  And you said -- was it Bobby Bailey, he
15  was a Democrat?
16     A.  Correct.
17     Q.  And when you ran as a Democrat, you were
18  the chief deputy?
19     A.  Correct.
20     Q.  Serving up under Peter Walker?
21     A.  Correct.
22     Q.  Did you know that Peter Walker was going
23  to run in 2019?
24     A.  No, I did not.  January 17, one of his
25  units broke down.  Had a problem with one of his

1  units, either the Dodge Charger or the Dodge Ram.
2  And he took it to the Dodge place in Natchez.
3        And we was coming back, at the new
4  McDonald's in Natchez, but we come back north.  He
5  looked over at me and say, You need to start
6  getting out there.  Start getting out there now.
7  Two and a half years will be here before you know
8  it.  You need to start hitting the churches.
9        I said, You not going to run?  He said,
10  Nope, I'm not going to run.  I said, Okay.  I took
11  his advice.
12     Q.  And you ran?
13     A.  I ran.
14     Q.  When did you find out he was going to run
15  as an independent?
16     A.  When I qualified in January, I stayed
17  focused on myself.  No one else.  I never called
18  back down to the circuit clerk's office and asked
19  them who had qualified.  It was mid-February when I
20  knowed that Sheriff Walker was running again.
21        I went to town, and I was talking to a
22  lady over there, and he called me and asked me was
23  I 10-6; that means are you busy.  I told him, I
24  said, Well, I'm just talking to someone right now.
25        He said, Well, there's no hurry.  Just

James Bailey 4/29/2025

**Page 14**

1  when you get a chance, I need to talk to you.  I
2  said, Okay.
3      About ten minutes after that conversation
4  was done, we got a call about a 10-50, which is an
5  accident, which was out 28 about five miles, 28 by
6  the road called Puffer Road.  When I got in the
7  truck, I called him.  I said, Hey, Boss Man.
8  He said, Yeah, James.
9      I said, I'm here for this 10-50.  You said
10  you wanted to talk to -- he said, I'm coming out there.  I'm headed that way.  Fine.
11  I'm coming out there.  I'm headed that way.  Fine.
12  I got on the scene.  Direct traffic until the MHP
13  got there, until the people got loaded up, the
14  injured people got in the ambulance.  And it was a
15  logging road right there.  And so, I say, Hey, Boss
16  Man, let's go -- let's walk up this logging road
17  over here.  And we talked.
18      I said -- so we got -- he said, What are
19  you shooting at?  I said -- asked him, What are you
20  shooting at?  He say, Don't tell nobody.  I'm going
21  to run.  I say -- I mean, no.  I'm sorry.  Back up.
22      He said, Don't tell no one that I'm going
23  to drop out.  I go, like, Huh?  You qualified?  He
24  said, Yes, but I don't know what I'm going to do
25  yet.  I said, Sheriff, I don't mean no harm and no

**Page 15**

1  disrespect, I said, but ain't but three things I
2  got to do.  He said, What is that?  I say, Stay
3  safe in these streets, keep on taking care of the
4  citizens of Jefferson County, and stay focused on
5  my campaign.  I got $3,500 out here now.  You told
6  me you wasn't running.
7      And I ended the conversation because I
8  just knew he wasn't running, and he told me he
9  wasn't running.
10  Q.  Okay.  Now, I'm going to ask you now
11  back -- go back to 1993 when Peter Walker won that
12  special election.  Did he finish -- he finished
13  serving out Sheriff Wallace's term?
14  A.  He did.
15  Q.  And then did he run for reelection?
16  A.  Correct.
17  Q.  And he was reelected every four years up
18  until 2019?
19  A.  Correct.
20  Q.  Now, you were working for the sheriff's
21  department all that time?
22  A.  Oh, yes.
23  Q.  After every election, did you have to
24  reapply for your position?
25  A.  No.

**Page 16**

1  Q.  Now, let me ask you if you have any family
2  members in these counties:  Wilkerson, Amite, Pike,
3  Adams, Franklin, Lincoln, Jefferson, and Claiborne?
4  A.  Jefferson.  A few in Claiborne, but
5  they're not really -- I really don't know all of
6  them.  To be honest, I really don't know all of
7  them.
8  Q.  I'm just going to ask last names.  Last
9  names.
10  A.  Claiborne, don't ask me their first names,
11  'cause I don't know them.  They on my mama's side.
12  They stay out there around Pattison, and I don't
13  know them like that.  But I know their last name
14  Claiborne.  And Norrells.
15      MR. RHODES:  P-A-T-T-I-S-O-N.
16      THE WITNESS:  P-A-T-T -- yeah.
17  S-O-N, correct.
18      THE COURT REPORTER:  Thank you.
19  BY MR. RHODES:
20  Q.  And you said Norrells?
21  A.  Norrells.
22  Q.  In Claiborne County?
23  A.  In Claiborne County.
24  Q.  And any other Baileys that you're related
25  to in Jefferson?

**Page 17**

1  A.  No.  It's four different sets of Baileys.
2  It's my set, it's Bobby Bailey's set, it's Carl
3  Bailey, and Tony Ray Bailey's set, and then you had
4  another set that used to stay out here on Walker
5  Road.  Richard Bailey, Frank Bailey, them different
6  sets.
7  Q.  Okay.
8  A.  So four different sets here, and I'm not
9  related to the other three.
10  Q.  All right.  Now, when you won -- you ran
11  in 2019?
12  A.  I did.
13  Q.  And you took office in 2020?
14  A.  Correct.
15  Q.  In January 2020?
16  A.  January 1, 2020.
17  Q.  Did you -- did any of the employees of the
18  sheriff's department have to reapply?
19  A.  I had all of my employees to reapply,
20  even -- when I took my sheriff training in December
21  of '19 to be able to take office in 2020, I had all
22  the correction officers from the facility and from
23  the sheriff's office, and I reviewed them when we
24  was out of class up there.
25  Q.  Okay.  And when you were elected and took

**5 (Pages 14 to 17)**

James Bailey 4/29/2025

**Page 18**

1  office in January 2020 -- do you know Ms. Carolyn
2  Smith?
3      A.  I do.
4      Q.  She was working for the correctional
5  facility, wasn't she?
6      A.  Correct.
7      Q.  Okay.  Now, I'm going to ask you about the
8  actual sheriff's department itself.  You have
9  deputies within the sheriff's department?
10     A.  I do.
11     Q.  How many deputies?
12     A.  Eight deputies, one investigator.
13     Q.  Eight deputies and one investigator?
14     A.  Correct.
15     Q.  Do you have a chief deputy?
16     A.  No, I do not.
17     Q.  Okay.
18     A.  Last one I had was Derrick Stampley.
19     Q.  When was that?
20     A.  I guess Derrick must have left in, oh,
21  God, '23.
22     Q.  Okay.
23     A.  End of '22 or '23.
24     Q.  Do you have a position for chief deputy in
25  the sheriff's department?

**Page 19**

1      A.  I do, and I need a chief deputy, but I
2  just don't have no one that want to -- really want
3  to step to the plate and take on the
4  responsibility.
5      Q.  Now, you were working in the sheriff's
6  department back in -- when the Jefferson-Franklin
7  Regional Correctional Facility was created?
8      A.  It was built in 1997.
9      Q.  And that's a satellite prison for the
10  Mississippi Department of Corrections?
11     A.  It was a private industry back then.  It's
12  18 facilities in the state of Mississippi, and that
13  was one of them, and it's like an independent
14  operation.  We house inmates for MDOC, and MDOC pay
15  us or are reimbursing us for housing, however you
16  want to say it.
17     Q.  Okay.
18     A.  That's how we make our money.
19     Q.  Okay.
20         MR. RHODES:  I want to let him look
21     at that.
22         MR. CARPENTER:  Certainly.  You want
23     to mark that exhibit?
24         MR. RHODES:  No, not --
25         MR. CARPENTER:  Fair enough.  No

**Page 20**

1  sweat.  We're flexible.
2         MR. RHODES:  Okay.  Off the record.
3         (OFF THE RECORD.)
4  BY MR. RHODES:
5      Q.  Okay.  Toward the -- let me see --
6         MR. CARPENTER:  You want the page for
7     the Jefferson County?
8         MR. RHODES:  Yes.  It's toward the
9     end.
10        MR. CARPENTER:  You got it.  I think
11     that's it.  Bottom of 58?
12        MR. RHODES:  Yeah.
13        MR. CARPENTER:  You got it.  That's
14     what he's looking for.
15  BY MR. RHODES:
16     Q.  The reason I was showing you that, do you
17  see where --
18     A.  Uh-huh.  (Affirmative response.)  Where --
19     Q.  -- it says Jefferson-Franklin Regional
20  Correctional Facility?
21     A.  Correct.
22     Q.  And what type of facility does MDOC list
23  it as?  Is it a county?
24     A.  ACA facility open, ACA accreditation, ACA
25  (talking to self).

**Page 21**

1         MR. CARPENTER:  I think where you're
2     going -- I think he's asking you what type
3     of facility it is.
4         THE WITNESS:  It's an institution, a
5     county regional facility.
6         MR. RHODES:  Yes.
7  BY MR. RHODES:
8      Q.  It's not listed as a private facility?
9      A.  No, no.
10     Q.  Okay.  All right.
11     A.  Okay.
12     Q.  It's really a regional facility?
13     A.  Okay.  It's a regional jail.  Correct.
14     Q.  Okay.  All right.  And is there a
15  memorandum of understanding between the Mississippi
16  Department of Corrections and the Jefferson County
17  Board of Supervisors?
18     A.  It is a housing agreement that we have for
19  housing the inmates.
20     Q.  Okay.  Now, who actually built that
21  facility?
22     A.  Now that, I can't answer.
23     Q.  Okay.
24     A.  That was up under Sheriff Walker's
25  administration.

6 (Pages 18 to 21)

James Bailey 4/29/2025

## Page 22

1    Q.  Okay.  And what is that housing agreement?
2    A.  With a housing agreement, when we -- when
3  I first took office, if I'm not mistaken, we were
4  getting like $24.44 an inmate.  Okay?  That was
5  from 1 to 200.  When it got to 201 --
6    Q.  Let me stop you there.  You said $24 and?
7    A.  44 cents.
8    Q.  Is that a day?
9    A.  A day.
10    Q.  Okay.  All right.
11    A.  Okay.
12    Q.  Okay.  For housing state --
13    A.  State inmates.
14    Q.  -- inmates?  24.40 --
15    A.  I think it was 24.44 we was getting, and
16  that was from 1 to 200.
17    Q.  Okay.
18    A.  When it got to 201 to 270, it dropped down
19  to $20.  So 200, we were getting 24.44, and then
20  from -- from 201 to 270, we were getting $20.
21    Q.  Okay.  A day?
22    A.  A day.
23    Q.  Now, that's when you first became sheriff
24  in 2020?
25    A.  Correct.

## Page 23

1    Q.  The employees of the correctional
2  facility, who hired them?
3    A.  The correctional facility hired them.
4    Q.  The correctional facility?
5    A.  Right.  They're not a county employee.
6    Q.  Okay.  Who issued them their checks?
7    A.  The county does, and the reason for being
8  because they wanted me to get my own account
9  payable, and I couldn't afford it.
10    Q.  When you say "they," who is they?
11    A.  Okay.  Ms. Buck had mentioned, like, they
12  wanted me to get my own account payable, and I
13  couldn't afford it because of the equipment.
14    Q.  Now, when you say Ms. Buck, that's
15  Ms. Brenda Buck?
16    A.  Brenda Buck.
17    Q.  She was the county administrator?
18    A.  Correct.
19    Q.  Okay.  So the -- was MDOC paying the
20  county prior to Ms. Buck asking you to get your own
21  accounts payable?
22    A.  What you mean by that?  I don't understand
23  what you're saying.
24    Q.  The MDOC.
25    A.  Uh-huh.  (Affirmative response.)

## Page 24

1    Q.  They pay so much a day --
2    A.  Correct.
3    Q.  -- for you-all to house prisoners.
4    A.  Correct.
5    Q.  How do they make those payments and who do
6  they make those payments to?
7    A.  Okay.  MDOC was sent -- now what they do,
8  they wire the money to the facility budget, which
9  goes into a general fund, and the county make our
10  payroll out of that.
11    Q.  The general fund, is that the county
12  general fund?
13    A.  No.  It's the facility's general funds.
14    Q.  It's not the sheriff's general fund?
15    A.  No.  'Cause the sheriff is the county.  We
16  have two budgets.  I have a budget for the
17  sheriff's department, and I have a budget for the
18  facility.
19    Q.  Who approves the budget for the sheriff's
20  department?
21    A.  I run it, but -- I -- I do my budget, and
22  I bring it to the board.
23    Q.  Board of supervisors?
24    A.  Board of supervisors.
25    Q.  Who approves the budget for the regional

## Page 25

1  correctional facility?
2    A.  Same thing.
3    Q.  The board of supervisors approved the
4  budget for the regional --
5    A.  Right.  I have to bring them to them
6  and -- I have to bring it to them and present it
7  before the board; this is what it is.  When I got
8  my increase in my per diem for the inmates, I had
9  to add that money to it, and I had to put it in
10  different departments.
11    Q.  Okay.  And you have a budget that is
12  approved by the board of supervisors for the
13  sheriff's department and for the correctional
14  facility?
15    A.  They -- they approve mine, but really the
16  board of supervisors don't have anything to do with
17  that facility.  It's accountable now because they
18  paid for it, but I make my money from MDOC.
19    Q.  Yeah.  I'm talking about budgets now.
20    A.  Okay.
21    Q.  Isn't it true that the board of
22  supervisors approved budgets?
23    A.  They approved -- they approved budgets.
24    Q.  Okay.  And they approved the budget for
25  the regional correctional facility?

7 (Pages 22 to 25)

James Bailey 4/29/2025

| Page 26 |
| --- |

1    A.   Correct.
2    Q.   As well as for the sheriff's department?
3    A.   Correct.
4    Q.   And when you first were elected and took
5    office in January 2020, the employees at the
6    regional correctional facility were paid by the
7    county with money that had come from the Department
8    of Corrections; is that true?
9    A.   Correct.
10   Q.   But the actual checks or direct deposits
11   came from someone working for the county?
12   A.   Correct.  It come from Mary Thomas.  She
13   do it up there.
14   Q.   Mary Thomas?
15   A.   Mary Thomas.
16   Q.   What is her title?
17   A.   What is it?  Oh, God.  Right on the tip of
18   my tongue.
19   Q.   Not payroll clerk?
20   A.   Payroll clerk.  There you go.  Thank you,
21   sir.  Help me out.
22   Q.   And Ms. Thomas, does she -- is she the
23   payroll clerk that issues the checks for you, too?
24   A.   Oh, yeah.  Yes, sir.
25   Q.   For all county employees?

| Page 27 |
| --- |

1    A.   All.
2    Q.   The memorandum of understanding between
3    MDOC, Mississippi Department of Corrections, and
4    the county, is a copy of it at the correctional
5    facility?
6    A.   What you mean?  A memorandum of what, now?
7    What?
8    Q.   The original agreement between the county
9    and the Mississippi Department of Corrections.
10   A.   Oh, yeah.  That would be -- that would be
11   in the housing agreement.
12   Q.   Is that -- is a copy of it at the --
13   A.   Sure.  I just signed a new contract.  Of
14   course.
15   Q.   You just signed a new contract?
16   A.   Yeah.
17   Q.   How often do you sign those new contracts?
18   A.   I think I've signed two since I've been
19   there.  I think it's every term.
20   Q.   And where are those contracts kept?
21   A.   My deputy warden's office.
22   Q.   Who's the deputy warden?
23   A.   Cassandra Robinson.
24        MR. CARPENTER:  On it.  No problem.
25        MR. RHODES:  You know I was.

| Page 28 |
| --- |

1    BY MR. RHODES:
2    Q.   Would you get a copy of those two that you
3    signed to your lawyer so he could get them to me?
4    A.   Sure, no problem.  Now, she is out of town
5    right now.  So she out of town.
6         MR. CARPENTER:  Right.  We'll get
7    them as soon as we can.  You bet you.
8    Yeah.  That's no problem.  Yeah.
9         MR. RHODES:  Okay.
10   BY MR. RHODES:
11   Q.   Now, the employees for the regional
12   correctional facility, do they have uniforms?
13   A.   They do.
14   Q.   And do they have insignia or any emblems
15   or anything on their uniform?
16   A.   Well, they haven't had no Class A since
17   I've been there.  They used to have like 5.11s or
18   something like that.  Matter of fact, we fixing to
19   purchase some more uniforms now.
20   Q.   Now, the uniforms for the correctional
21   facility, are they the same or different from the
22   uniform for the deputies?
23   A.   Different.
24   Q.   Different.  And how are they different
25   from the deputy's uniform?

| Page 29 |
| --- |

1    A.   I'll have this stock --
2    Q.   Now, the only thing, when you say this
3    stock, the court reporter --
4    A.   Well, I'll have a, what, two, four,
5    six-prong star in --
6    Q.   Okay.
7    A.   Okay.  They'll have something like -- what
8    would you call it?  Like a -- like a -- have an
9    emblem -- an emblem in the middle and then have a
10   hanger on each side.  I don't know what you would
11   call it.  Something similar to like a Jewish thing.
12   Q.   Okay.
13   A.   I don't know what you would call it, but
14   they patches are different, and they is going to
15   have Jefferson Correctional Facility on it, and
16   I'll have Jefferson County Sheriff's Department.
17   Q.   Okay.
18   A.   Sheriff's office.  Not the department.
19   It's office.
20   Q.   Now, I want to ask you about -- the
21   plaintiffs in this case asked you, since you've
22   been sheriff, who they work for, the correctional
23   facility or the sheriff's department.  Carolyn
24   Smith?
25   A.   Yes.  She worked for the facility.

8 (Pages 26 to 29)

James Bailey 4/29/2025

| Page 30 |
| --- |

1    Q.  Shaquita McComb?
2    A.  Worked for the facility.
3    Q.  Bonita Blake?
4    A.  Worked for the facility.
5    Q.  Sandra Sanders?
6    A.  Worked for the facility.
7    Q.  And James Ellis, Jr.?
8    A.  Worked for the facility.
9        MR. RHODES:  I want to have that
10   marked.  Is that going to be 1?
11       THE COURT REPORTER:  Going to be 1.
12   (EXHIBIT 1 MARKED FOR THE RECORD.)
13       MR. CARPENTER:  And you can -- I
14   think we've got a copy, but, yeah.
15       Organizational chart.  Okay.
16   BY MR. RHODES:
17   Q.  Sheriff Bailey, what I handed you was an
18   organizational chart.  Does that appear to be the
19   organizational chart for the correctional facility?
20   A.  Correct.
21   Q.  Okay.  At the head of the correctional
22   facility is you as the sheriff; is that correct?
23   A.  Correct.
24   Q.  And up under you is a warden?
25   A.  Warden.

| Page 31 |
| --- |

1    Q.  Okay.  Now didn't you also have a deputy
2    warden?
3    A.  Correct.  Still does.
4    Q.  And who is the deputy warden now?
5    A.  Now, Cassandra Robinson.
6    Q.  And has she always been the deputy warden?
7    A.  No.  She came in in '24.
8    Q.  '24.  Prior to Cassandra Robinson, who was
9    the deputy warden?
10   A.  Brenda Doss.  Brenda Doss.
11   Q.  When was she deputy warden?
12   A.  Oh, that was under Sheriff Walker's
13   administration.  I can't answer that one, but she
14   retired.
15   Q.  Well, basically under your -- the time
16   you've been there.
17   A.  From 2020 to the end -- I think the last
18   day -- her last day I think was the 22nd, 22nd of
19   December of '23.
20   Q.  Okay.  And up under the -- who's the next
21   person down below the deputy warden?
22   A.  You have lieutenant -- no, I'm sorry.
23   Major.
24   Q.  Major?  And below the major?
25   A.  Would be lieutenant.

| Page 32 |
| --- |

1    Q.  Would you have captain?
2    A.  Well, yeah.  Your captain.  I'm sorry.
3    Yeah, captain.
4    Q.  And then lieutenant would be --
5    A.  Lieutenant.
6    Q.  The captain would supervise the
7    lieutenants?
8    A.  Supposed to.  They had it all switched up
9    around there, and I was going to make some changes
10   when I got everything situated like I wanted to.
11   Because Sheriff Walker had his captain in the
12   kitchen.
13   Q.  But let me ask about the year 2023.  The
14   captain supervised the lieutenants?
15   A.  Well, the captain had -- the captain in
16   the -- he was in the kitchen.
17   Q.  Okay.
18   A.  He was supervising the kitchen and the
19   floor sometimes.
20   Q.  Would the major supervise the captain?
21   A.  Yeah.
22   Q.  I'm trying to think of the chain of
23   command.
24   A.  Yeah.  He's -- the major supervised the
25   captain.

| Page 33 |
| --- |

1    Q.  Now, did you have sergeants who were below
2    the lieutenant?
3    A.  Correct.
4    Q.  And did the lieutenant supervise the
5    sergeants?
6    A.  Correct.
7    Q.  And the captain supervised the lieutenant?
8    A.  Correct.
9    Q.  And the major supervised --
10   A.  The captain.
11   Q.  -- the captain?  Now, would the deputy
12   warden supervise?
13   A.  Deputy warden was under -- was under the
14   warden.
15   Q.  The warden?
16   A.  Right.
17   Q.  Okay.
18   A.  She had say just like the warden had.
19   Q.  Okay.
20   A.  But the warden was still the head.
21   Q.  Okay.  Your command staff, would that be
22   your warden, a deputy warden?
23   A.  Yes.
24   Q.  And who did you have in charge of running
25   the correctional facility?

9 (Pages 30 to 33)

**Page 34**

1    A.  Warden Kaho, Clifton Kaho.
2    Q.  Clifton Kaho.  And how long was he the
3 warden when you were --
4    A.  I took off in 2020, but he was the warden
5 before --
6    Q.  No, no.  I'm just -- your term of office.
7    A.  2020 until he left in December or
8 sometime.  I don't really know when he left,
9 because he didn't give me a notification what date
10 it was, and I was getting ready for my sister's
11 funeral when I got the news that he had left.
12    Q.  In December 2023?
13    A.  '23.  So what day exactly it was, I'd have
14 to look at my sister's obituary to tell you that.
15       THE COURT REPORTER:  His name was
16 Cato?
17       MR. CARPENTER:  K-H-O-E (sic).
18       THE COURT REPORTER:  Thank you.
19       MR. CARPENTER:  You're welcome.
20       MR. RHODES:  I'll have this marked as
21    the next exhibit.
22    (EXHIBIT 2 MARKED FOR THE RECORD.)
23       MR. CARPENTER:  That's from your
24    employee handbook.
25

**Page 35**

1 BY MR. RHODES:
2    Q.  Sheriff Bailey, do you recognize that as
3 part of the general policy for the correctional
4 facility on employment?
5    A.  Sure.
6    Q.  And under number 2 on Political or
7 Religious Beliefs Activity, was it part of the
8 policy that there would be no discrimination
9 exercised, threatened, or promised in favor of any
10 applicant or competitor or employee because of his
11 political opinions or affiliations?
12    A.  Right.  That's exhibit -- in the handbook,
13 it would be Exhibit J.  Correct.
14       MR. CARPENTER:  Going to have this
15    marked as the next -- that's Exhibit 3?
16       MR. CARPENTER:  Yeah.  Correct.
17    (EXHIBIT 3 MARKED FOR THE RECORD.)
18 BY MR. RHODES:
19    Q.  Sheriff Bailey, I'm handing you what --
20       MR. CARPENTER:  Yeah.  I've got one.
21       MR. RHODES:  Don't have those marked.
22       MR. CARPENTER:  But one of them isn't
23    and one and two is.
24       MR. RHODES:  Yeah.
25       MR. CARPENTER:  You got it.  Yeah.

**Page 36**

1       I'm going to put them right there for us.
2       MR. RHODES:  Okay.
3       MR. CARPENTER:  Yeah.  I see it.
4 BY MR. RHODES:
5    Q.  Do you recognize Exhibit 3 as part of the
6 equal opportunity policy for the --
7    A.  I do.
8    Q.  -- correctional facility?
9    A.  I do.  This should be -- the exhibit in
10 the handbook should be K and L, or something like
11 that, in the handbook.
12    Q.  Okay.  And you already testified that you
13 know Ms. Carolyn Smith.
14    A.  I do.
15    Q.  And do you recall Ms. Carolyn Smith
16 working at the correctional facility during Sheriff
17 Peter Walker's term?
18    A.  I do.
19    Q.  Did you and her work together?
20    A.  Not really.  I mean, she was an employee,
21 and I was an employee of the sheriff's department.
22    Q.  Now, I was about to ask.  When Peter --
23 Sheriff Peter Walker was the sheriff, were you --
24 did you work on the correctional facility side or
25 the sheriff's side?

**Page 37**

1    A.  Sheriff's side.  I was a deputy.
2    Q.  You were a deputy?
3    A.  Right.
4    Q.  And Ms. Smith worked on the --
5    A.  Correct.
6    Q.  -- correctional facility side?
7    A.  Correct.
8    Q.  Did you-all ever interact?
9    A.  Oh, yeah.  They're my coworkers.
10    Q.  And how did y'all get along?
11    A.  Great.
12    Q.  Okay.  While Sheriff Peter Walker was the
13 sheriff, did you ever supervise Ms. Smith?
14    A.  No.
15    Q.  You ran for sheriff in 2019, first time?
16    A.  Correct.
17    Q.  And you had all employees of the
18 correctional facility to reapply?
19    A.  Correct.  And the sheriff's department.
20    Q.  And the sheriff's department?
21    A.  Correct.
22    Q.  And do you recall Ms. Smith reapplying?
23    A.  She did.
24    Q.  And was she hired in 2019?
25    A.  Yes, she was.

James Bailey 4/29/2025

**Page 38**

1    Q.  Why did you hire her in 2019?
2    A.  Because I didn't know much about
3  correctional, and people there had been there for a
4  while, and I'm sure that they knew what their job
5  consists of, the job capacity.
6    Q.  Did you have any reason not to hire her as
7  a correction officer in 2019?
8    A.  Not during that time, no.
9    Q.  Do you know what rank she had?
10    A.  As far as I knew, she was lieutenant at
11  the time, I think.  She was lieutenant when I came.
12    Q.  And did you run for reelection again in
13  2023?
14    A.  Correct.
15    Q.  And did you run in the Democratic primary?
16    A.  I did.
17    Q.  And in the primary, how many people were
18  running?
19    A.  It was three.
20    Q.  Who were the three?
21    A.  Derrick Stampley, Sean Jones, and myself.
22    Q.  And did you know that Mr. Stampley was a
23  brother of Ms. Smith?
24    A.  Yes.  I knew that.  Had the same father.
25    Q.  And did you know that Ms. Smith and Sean

**Page 39**

1  Jones had worked together?
2    A.  Yeah.  Sean -- when the facility first
3  opened up, Sean was one of their -- the hires,
4  because they loaded up right out here and went to
5  Parchman for their training.  The bus picked them
6  up right here in front of the courthouse on the
7  square.
8    Q.  Back in?
9    A.  '97.
10    Q.  '97.  So you know Sean Jones had worked at
11  the correctional facility back -- as far back as
12  '97?
13    A.  '97, and he left there and went to the
14  state troopers.
15    Q.  Do you recall when it was he became a
16  state trooper?
17    A.  I do not.
18    Q.  Ms. Smith, do you recall how far back it
19  was she was working at the correctional facility?
20    A.  I think she might have been in '05, '06,
21  '07, somewhere in that area.
22    Q.  Okay.  You said when you met with Sheriff
23  Walker about him running for sheriff, and he asked
24  you don't tell anybody that he was pulling out, and
25  you told him that you had, what, spent about $3,500

**Page 40**

1  running for sheriff in 2019?
2    A.  I was kind of shocked when he told me
3  don't be telling nobody he going to drop out.  And
4  I'm like, You done qualified?  Yes, I done
5  qualified, but I don't know what I'm going to do
6  yet.
7       'Cause, see, I supposed to of ran four
8  years before that, and he came back to me, said he
9  needed another term.  So I pulled out.  And after
10  me and him had this conversation -- that was back
11  before '19 now, four years before that.
12    Q.  Back in 2015 --
13    A.  I was supposed to have ran then.
14    Q.  Well, but did you qualify?
15    A.  No.  I didn't qualify, 'cause he came to
16  me and said that he needed another term.
17    Q.  Okay.  So in 2015, you and Sheriff Walker
18  had the conversation --
19    A.  Correct.
20    Q.  -- about your running?
21    A.  Right.
22    Q.  Did he tell you back in 2015 he was going
23  to retire?
24    A.  He did.  He even spoke at my family
25  reunion.  I had a family reunion at my house.  He

**Page 41**

1  told my family that he was -- this is going to be
2  y'all's next sheriff.
3    Q.  Okay.  And he didn't retire in 2015?
4    A.  And so, I didn't put my name on the hat --
5  in the hat.
6    Q.  Then in 2019, you-all had the conversation
7  again?
8    A.  January 17th, coming out of Natchez, he
9  told me, Start getting out there.  Don't wait till
10  the last minute.  Two and a half years will be here
11  before you know it, and you need to start hitting
12  churches and letting people know you're going to
13  run.  I said, You not running?  He said, Nope, I'm
14  not running.
15    Q.  And how did that make you feel when he
16  wouldn't back out in 2019?
17    A.  It kind of knocked me off my feet because,
18  you know, I've been there for him.  I've been his
19  right-hand man.  I had his back the whole time.
20       And then when -- by him telling me that --
21  back in January of 2017 that he wasn't going to
22  run, told me to start getting out there, when in
23  January of '19, I can't even qualify.  I
24  registered, signed up, and never called to check
25  the circuit court's office anymore to see who had

Brooks Court Reporting
1-800-245-3376

**Page 42**

1  qualified, because I wanted to stay focused on me.
2  No one else; just me.
3      Q.  And you didn't like it that he didn't
4  support you for sheriff in 2019?
5      A.  No, 'cause he was running.
6      Q.  And do you recall campaigning for sheriff
7  at an event in Union Church?
8      A.  They had a -- they had a -- they had a --
9          MR. CARPENTER:  Just to quantify,
10     what year?
11         MR. RHODES:  I'm sorry, I'm sorry.
12     You're right.  2023.
13         MR. CARPENTER:  Got it.
14         THE WITNESS:  They had a -- they had
15     a -- they had a meet and greet the
16     candidates.
17  BY MR. RHODES:
18     Q.  And do you recall Ms. Carolyn Smith being
19  at that meeting to meet the candidates?
20     A.  She was there.
21     Q.  And do you know that she's also an elected
22  official in Jefferson County?
23     A.  Sure.  She school board.  I support her.
24     Q.  You support her for the school board?
25     A.  Yeah.  She was -- she in my district.

**Page 43**

1      Q.  Okay.  And do you recall when it was
2  about -- was it June, July when they had that meet
3  and greet in --
4      A.  I really don't --
5      Q.  -- Union Church?
6      A.  I don't want to tell you nothing concrete.
7  I really don't know, because they had several.
8      Q.  And do you recall candidates for sheriff
9  at that meet and greet?
10     A.  I know Derrick Stampley was there.  Yeah.
11  And Sean Jones was there.
12     Q.  Okay.
13     A.  And some of the supervisors were there.
14     Q.  And do you recall Carolyn Smith asking
15  questions to the supervisors about what they were
16  going to do about the correctional facility?
17     A.  She made some -- some type of statement,
18  but a lot of my employees was confused because they
19  think they county employees, and they not.  They
20  work for the facility.  They're not county
21  employees.  The county just cut their checks.
22         MR. CARPENTER:  Did you understand
23     this question?
24         THE WITNESS:  No.
25         MR. CARPENTER:  Go ahead.  I'm sorry

**Page 44**

1  because I didn't think that was quite --
2  do you want to go ahead, Carroll?  I'm
3  sorry.  I just want to make sure you got
4  your question answered.
5          MR. RHODES:  Yeah, yeah.
6  BY MR. RHODES:
7      Q.  I was asking:  Do you recall her asking
8  the supervisors a question about what they were
9  going to do about --
10     A.  The facility.
11     Q.  Yeah.
12     A.  Oh, okay.  Yeah.  She mentioned something
13  about that, but I don't know what she meant about
14  it.
15     Q.  Okay.
16     A.  Okay.  Yeah.
17         MR. CARPENTER:  Okay.
18  BY MR. RHODES:
19     Q.  And you said employees are confused?
20     A.  Yeah.
21     Q.  Did you consider her being one of those
22  confused employees?
23     A.  Well, a lot of them -- a lot of them keep
24  saying that they was a county employee.  I keep
25  saying y'all are not a county employee.

**Page 45**

1      Q.  Was Ms. Smith one of the ones that --
2      A.  Yeah.  She was one of them.  Yeah.  She --
3      Q.  Okay.  So you would consider her being
4  confused?
5      A.  Confused.
6      Q.  Let me ask about the other plaintiffs.  Do
7  you know Shaquita McComb?
8      A.  I do.
9      Q.  Was she one of those employees that was
10  confused about being a county employee?
11     A.  I really didn't talk to 'Quita too much.
12     Q.  What about Bonita Blake?
13     A.  I really didn't talk to her too much.
14     Q.  Sandra Sanders?
15     A.  I would see Sandra Sanders when I'd go
16  over there.  She would come up to me sometimes,
17  but. . .
18     Q.  Do you know if she was confused --
19     A.  I don't --
20     Q.  -- about being a county employee?
21     A.  She never came to me.
22     Q.  And James Ellis, Jr.?
23     A.  Never came to me.
24     Q.  And you said a lot of the correctional
25  facility employees --

James Bailey 4/29/2025

## Page 46

1    A. Well, some of them, you know, but neither
2  one of those.
3    Q. Except for --
4    A. Carolyn.
5    Q. Except for Carolyn. Okay. How did that
6  make you feel when she was asking the question
7  about supervisors, about what they're going to do
8  about the correctional facility?
9    A. It didn't -- it didn't harm me at all, I
10 mean, because the supervisors don't have anything
11 to do with the facility. And I was trying to --
12 and like Mr. King said, they don't have anything to
13 do with it because they don't have anything to do
14 with it. It's just accountability now, because
15 they paid for it, but they don't have any say over
16 it.
17    Q. Did you -- you and Sean Jones were in the
18 runoff --
19    A. Correct.
20    Q. -- in 2023?
21    A. Correct.
22    Q. Do you recall when that runoff was?
23    A. I think it -- I think it was around the
24 27th or 28th of August.
25    Q. And you won the runoff?

## Page 47

1    A. I did.
2    Q. Did you have any opposition in the general
3  election?
4    A. No. That was it.
5    Q. Once you won the runoff, you knew you were
6  going to be sheriff?
7    A. That's it.
8      MR. RHODES: Just mark it as we go,
9      but, yeah, that's no problem. No
10     objection to introduction. Got it.
11     (EXHIBIT 4 MARKED FOR THE RECORD.)
12 BY MR. RHODES:
13    Q. Sheriff, why don't you just take a moment
14 and look over that letter, because I'm asking you a
15 few questions about it.
16    A. (Witness reviews document.) Okay.
17    Q. Is that your signature on that?
18    A. That's it.
19    Q. Do you recall sending that letter to all
20 your --
21    A. All my employees.
22    Q. Again, when you say all employees, you
23 mean --
24    A. Sheriff's department and --
25    Q. Sheriff's department and correctional

## Page 48

1  facility?
2    A. Correct.
3    Q. And why did you send this letter to all
4  your employees?
5    A. Because positions might be coming
6  available. Some may be retiring, and it did --
7  some did retire, and some may want to apply for a
8  position that may be available. That's why I said
9  all positions is available.
10    Q. But all the employees had to reapply?
11    A. Correct.
12    Q. And if people were retiring, only those
13 positions were vacant; is that true?
14    A. That's true, but I think we had a
15 lieutenant slot, might have been. Might have been.
16 I don't know. I have to -- I know. . .
17    Q. How many employees were retiring?
18    A. You had Warden Kaho retired; deputy warden
19 retired; jail administrator, Sharon Rankin,
20 retired; nurse retired; and the captain retired.
21 Five of them retired.
22    Q. So why would the regular correctional
23 officers or Lieutenant Smith have to reapply if
24 they were satisfied with the positions they had?
25    A. Because I'm going to -- I'm going into a

## Page 49

1  new term.
2    Q. So you make all employees reapply?
3    A. Uh-huh. (Affirmative response.) Reapply.
4    Q. Was that a yes?
5    A. Say it again.
6    Q. Was that yes?
7    A. Yes.
8    Q. Okay. Did you have interviews with all
9  the employees?
10    A. I did.
11    Q. In those interviews, were they one-on-one
12 interviews?
13    A. Correct.
14    Q. And where were those interviews held?
15    A. In my office.
16    Q. At the sheriff's?
17    A. Correct.
18    Q. Now, the correctional facility and the
19 sheriff's office are not in the same building, are
20 they?
21    A. No, but the same umbrella.
22    Q. But they're not in the same building?
23    A. No.
24    Q. And the sheriff's office is in the
25 building where the county jail and the deputies

13 (Pages 46 to 49)

James Bailey 4/29/2025

**Page 50**

1  are?
2      A.  Correct.
3      Q.  The correctional facility is in a separate
4  building?
5      A.  Correct.
6      Q.  Now, the correctional facility employees,
7  did they have to come to the sheriff's office in
8  order to be interviewed?
9      A.  Correct.
10     Q.  You did not go to the correctional
11 facility?
12     A.  I did not.
13     Q.  And the warden was not involved in
14 interviewing any of the --
15     A.  No.
16     Q.  -- correctional facility's --
17     A.  No.
18     Q.  -- employees?
19     A.  No.
20     Q.  And the correctional facility's employees
21 do not wear the title of deputy, do they?
22     A.  They do not.
23     Q.  And under state law, the sheriff can hire
24 and fire all deputies; is that correct?
25     A.  Correct.

**Page 51**

1      Q.  But correction facility employees are not
2  deputies?
3      A.  They're not deputies, but I'm still the
4  CEO of it.  So I still can do that.
5      Q.  But they're not deputies?
6      A.  They're not deputies.
7      Q.  Their uniform doesn't say deputy sheriff?
8      A.  No.
9      Q.  Do you recall having a meeting during the
10 election with all the correctional facility
11 employees and deputies and telling the employees
12 that you needed them to vote for you and support
13 you?
14     A.  That's not true.
15     Q.  Why?  Tell me what's not true about it.
16     A.  Asking anyone on the site to support me in
17 my election, not true.  That's against the
18 handbook.
19     Q.  If there are employees who say they were
20 in that meeting --
21     A.  Yeah, but that wasn't what the meeting was
22 about.
23         MR. CARPENTER:  He's not finished his
24     question.
25 BY MR. RHODES:

**Page 52**

1      Q.  If there were employees in that meeting
2  and they say they heard you ask them to vote for
3  them (sic) and support them (sic), then you're
4  saying that those employees would be lying?
5      A.  Correct.
6         MR. CARPENTER:  Objection to
7     characterization.
8  BY MR. RHODES:
9      Q.  Then you would say those employees would
10 be lying?
11     A.  That's not true.  I didn't make that
12 statement.
13     Q.  How many meetings did you have with
14 employees of the correctional?
15     A.  Two.
16     Q.  And when were those meetings held?
17     A.  I had one in June of '23 -- no.  I'm
18 sorry.  June of 2020.  And I had the other one in
19 June of '23.
20     Q.  So I'm asking about the meeting in June of
21 2023.
22     A.  Okay.
23     Q.  Did you ask the employees to support you?
24     A.  I did not.
25     Q.  Did you ask the employees to vote for you?

**Page 53**

1      A.  I did not.
2      Q.  Did you tell the employees that you had
3  their back, and they should have yours?
4      A.  I did not.
5      Q.  And if any of the employees who attended
6  that meeting in June of 2023 say you said that,
7  then they would be lying?
8         MR. CARPENTER:  Same objection.  You
9     can answer.  This is discovery, but I'm
10    just noting it for the record.
11        THE WITNESS:  That's not true.  I
12    didn't make that statement.
13 BY MR. RHODES:
14     Q.  Okay.  The employees would be lying?
15     A.  Correct.
16        MR. CARPENTER:  Same objection.
17 BY MR. RHODES:
18     Q.  Was Clifton Kaho in that meeting?
19     A.  He was.  He was there.  Major Felton was
20 there.  Kenyatta Colenberg was there.  Debbie Mims
21 was there.  Ralph Mims was there.  And Terry Ware
22 was there.
23     Q.  Carolyn Smith was there?
24     A.  Sure, she was there.
25     Q.  Shaquita McComb was there?

14 (Pages 50 to 53)

**Page 54**

1    A.  Sure.  It was a mandatory meeting.
2    Q.  Bonita Blake was there?
3    A.  I'm going to say yes.
4    Q.  Sandra Sanders was there?
5    A.  Yes.
6    Q.  James Ellis, Jr., was there?
7    A.  Yes.
8    Q.  How many people were there total?
9    A.  That I don't know, 'cause I think it's,
10   like, 40-something employees I have over there.  I
11   think right now I have like 40, 44 employees over
12   there.  Altogether at one time I had, like, 68
13   employees on both sides.
14   Q.  Okay.  But I meant back in June of 2023.
15   A.  I don't know how many.
16   Q.  Why was the meeting a mandatory meeting?
17   A.  Because I was so happy that I had got my
18   per diem up on my inmates from -- from -- it was
19   $24 and some cents, and they gave me $1.26 raise.
20   I didn't get a raise then.
21        So back in June, we met with the
22   commission and all and were going back and forth to
23   the Capitol, and they gave me an increase.  So they
24   got me up to 31.12.
25        And I was so happy to be able to tell my

**Page 55**

1    employees because I told my employees that I was
2    going to try to get them an increase.
3    Q.  Now, you said sheriff deputies were there?
4    A.  No.  Sheriff deputies weren't there.
5    Q.  They weren't there at that meeting?
6    A.  No.
7    Q.  Only the correctional?
8    A.  Correct.
9    Q.  Where was the meeting held?
10   A.  In the lobby.
11   Q.  Lobby where?
12   A.  At the sheriff's office -- I mean, not
13   sheriff.  In the correction -- in the facility.
14   Q.  Let me ask you:  Back in 2020, did you put
15   out any sort of notice or anything that you were
16   hiring?
17   A.  At the facility?
18   Q.  Yes.
19   A.  No.
20   Q.  And in 2020, did you require all employees
21   to reapply?
22   A.  I did.
23   Q.  But you did not put out any notice or
24   anything that you were hiring?
25   A.  No, I didn't.

**Page 56**

1    Q.  In 2023, did you put out notice that you
2    were hiring?
3    A.  No.  But I had everybody do a new
4    application.
5        (EXHIBIT 5 MARKED FOR THE RECORD.)
6    BY MR. RHODES:
7    Q.  I'm going to ask you:  Do you recognize
8    that advertisement?
9    A.  I didn't put this out.  The warden might
10   have put it out.  I didn't put this out.
11   Q.  Okay.  How do you -- do you know the
12   warden put it out?
13   A.  This is my first time seeing this.
14   Q.  Could the warden put something out without
15   your approval?
16   A.  Sometimes.
17   Q.  What could the warden put out without your
18   approval?
19   A.  Well, one time he put out a -- I went over
20   there, and he put -- had a memo out saying no
21   political literature at the facility.
22   Q.  And which --
23   A.  And I --
24   Q.  And which -- was that Warden Kaho?
25   A.  Correct.

**Page 57**

1    Q.  When was that?
2    A.  That was done in '23, and I wondered what
3    it was about, why'd he put it up.  I never
4    questioned him during the time, but I seen later on
5    that one of my employee's husband comes out in a
6    pickup sometime with a sign.
7    Q.  Now -- and this --
8        MR. CARPENTER:  Off the record for a
9    second.
10       (OFF THE RECORD.)
11   BY MR. RHODES:
12   Q.  You said in 2023, Warden Kaho put
13   something else out?
14   A.  Yeah.  They -- they put things out
15   sometime.  He was running it.  You know what I
16   mean?  He was -- let me see.
17       He was the warden, so if he sees something
18   that's going wrong, he had the ability -- well, I'm
19   going to say his authority to put up or take action
20   on whatever need to be take action on because he
21   was the warden.
22   Q.  Okay.  So if he saw that there were
23   political advertisements out at the correctional
24   facility, he had the authority to go ahead and put
25   something out on it?

James Bailey 4/29/2025

**Page 58**

1    A.  Correct.
2    Q.  And if he thought that there were going to
3  be vacancies for correction officers, sergeants and
4  lieutenants, he had the authority to go ahead and
5  advertise for it?
6    A.  That he -- that, he would probably run by
7  me.  A lot of them who retired on me didn't mention
8  anything until later.  Like I say, the warden, he
9  never told me that he was leaving.
10   Q.  Now, do you recall having a meeting with
11  Carolyn Smith where you asked Carolyn Smith who was
12  she going to vote for?
13   A.  No, I didn't.
14   Q.  Do you recall having to meet with Carolyn
15  Smith asking her if she was going to vote for you?
16   A.  No.
17   Q.  Do you recall having a meeting with
18  Carolyn Smith telling her that you needed her
19  support?
20   A.  No.
21   Q.  Do you recall Carolyn Smith telling you
22  that who she voted for was a private matter, and
23  you-all shouldn't be discussing that at the
24  correctional facility?
25   A.  I never knowed that she were even playing

**Page 59**

1  a part in political.  So I never asked her that.
2    Q.  Do you recall seeing Ms. Carolyn Smith and
3  Sean Jones and Sheriff Patten from Adams County at
4  an event?
5    A.  No.
6    Q.  And do you recall talking to Ms. Smith
7  about her being with Sheriff Jones?
8    A.  Being with who?
9    Q.  Sheriff Jones, at that event?
10       MR. CARPENTER:  Being with Patten --
11       MR. RHODES:  Being with Sean Jones.
12       MR. CARPENTER:  There you go.  Yeah.
13  BY MR. RHODES:
14   Q.  Sean Jones?
15   A.  No.  I ain't nobody -- I ain't never said
16  anything about that.
17   Q.  Let me turn you a copy of -- let me get
18  that marked.
19       MR. CARPENTER:  That'll be 6.
20       (EXHIBIT 6 MARKED FOR THE RECORD.)
21  BY MR. RHODES:
22   Q.  Now, I'm going to ask you, if you don't --
23  if you don't mind, if you could turn to the last
24  page, and I ask you if you recognize that
25  signature.

**Page 60**

1    A.  That's mine.
2    Q.  If you turn three pages up, I ask you do
3  you recognize that signature?
4       MR. CARPENTER:  You mean declaration
5       page?
6       MR. RHODES:  No.  The declaration is
7       the last page.
8       MR. CARPENTER:  Okay.  And so, you're
9       referring to the signature block?
10      MR. RHODES:  Yes.
11      MR. CARPENTER:  Okay.  So he's
12      referring to this page right here.  Well,
13      keep going.  There we go.
14  BY MR. RHODES:
15   Q.  Let me start back over.  The last page,
16  you recognize that?  You said that's your
17  signature, right?
18   A.  Correct.
19   Q.  Turn back those three other pages.  You
20  see the signature block?  Do you recognize your
21  signature on that page?
22   A.  Correct.
23   Q.  And so, you signed these answers to
24  interrogatories?
25   A.  (No verbal response.)

**Page 61**

1    Q.  If you turn to the first page, it'll tell
2  you what they are.
3    A.  (Talking is clear.)  Yes.  This is -- yes.
4    Q.  Okay.  On the first page, the
5  Interrogatory 1 asks about anybody that you knew or
6  believed to have knowledge or discoverable
7  information related to the complaint or answer.
8  And you listed Carolyn Smith, Sheriff James E.
9  Bailey, Warden Clifton Kaho, and Warden Felton as
10  the people that you knew that had knowledge about
11  this -- about the lawsuit, in your answer.
12       MR. CARPENTER:  Objection.  That's
13       not quite, but it's close enough.  You can
14       answer the question.
15       THE WITNESS:  I'm assuming he did
16       because he was the warden.
17  BY MR. RHODES:
18   Q.  Oh, no.  What I'm trying to find out:  Are
19  these all -- the only people you're saying that
20  have knowledge about it?
21   A.  Oh, no, no.  I have more.
22   Q.  Okay.  That's -- that's what I want to
23  find -- I don't want to find out at trial.
24   A.  Right.  I have more than the ones I just
25  named.

**16 (Pages 58 to 61)**

**Page 62**

1        MR. CARPENTER: Yeah.
2    BY MR. RHODES:
3        Q. All right. I want to hear those names.
4        A. Okay. You got Warden Felton, Henry
5    Felton.
6        Q. I think Warden Felton might have been --
7            MR. CARPENTER: He's listed.
8            THE WITNESS: He's listed? You got
9        Terry Ware.
10    BY MR. RHODES:
11        Q. Tell me what Terry Ware know.
12        A. He knows that I didn't mention that --
13    about in the meeting, the mandatory meetings I had
14    to announce that they were going to be getting an
15    increase in pay come October 1. That's what that
16    meeting was about.
17        He knows that -- he was there, and he
18    knows that I didn't act openly -- to ask any of my
19    employees at that meeting to support me in my
20    election, which I did not do. Same thing for
21    Kenyatta Colenberg. She can attest to that I did
22    not ask that in an open meeting.
23        Ms. Debbie Mims, she can attest that I did
24    not ask anyone to support me in that meeting. You
25    have Ralph Mims. He can attest to that, that I

**Page 63**

1    didn't ask no one to support me in that meeting.
2    That meeting was all about the increase in pay.
3        Q. Now, I'm going to ask you, why you had 30
4    days after these were served on you to list all
5    those people you just listed that had knowledge,
6    you didn't list a one of them in your answers that
7    you swore an answer to that all this was true and
8    correct. Why didn't you do it back then?
9        A. Not sure.
10            MR. CARPENTER: Off the record.
11            (OFF THE RECORD.)
12    BY MR. RHODES:
13        Q. Anybody else?
14        A. I've been trying to think some more
15    because they -- they -- they ship out. They --
16    they in and out. You know, the employees are just
17    in and out of that facility, but those I know was
18    there at that meeting.
19        Q. But it was a mandatory meeting?
20        A. Yes. A mandatory meeting to give them the
21    good word.
22        Q. And it might have been between 60 and 80
23    people there?
24        A. However many was hired at the facility
25    during that time.

**Page 64**

1        Q. And if you turn over to Interrogatory
2    Number 7, I'm going to ask you: Did any of -- did
3    either Ms. Carolyn Smith, Shaquita McComb, Bonita
4    Blake, Sandra Sanders, or James Ellis ever make any
5    statements to you basically stating that you did
6    not ask them to support you?
7        A. I didn't ask any of my employees to
8    support me.
9        Q. Okay. You didn't ask Shaquita McComb?
10        A. No, I did not.
11        Q. You didn't ask Bonita Blake?
12        A. I did not.
13        Q. You didn't ask Sandra Sanders?
14        A. Did not.
15        Q. You didn't ask James Ellis, Jr.?
16        A. I did not.
17        Q. And you didn't ask Carolyn Smith?
18        A. I did not.
19        Q. Did you call Bonita Blake about Sean Jones
20    supposedly pumping or paying for her gas illegally?
21        A. No. I didn't call her.
22        Q. Did you talk to her about Sean Jones
23    supposedly paying for her gas illegally?
24        A. There's a conversation came up dealing
25    with -- about the letter that the warden had put up

**Page 65**

1    about no campaign literature on the grounds or
2    nothing -- anything dealing with that effect.
3        And the conversation came up about that
4    he'd be at the Shell station, and he'd pump
5    people's gas. And I told her, That's nice. I
6    heard he pumped yours.
7        Q. Okay. You said a conversation came up?
8        A. Yeah.
9        Q. And that conversation came up with
10    Ms. Blake?
11        A. Blake, right.
12        Q. And when was that conversation?
13        A. I don't know when it was.
14        Q. Where were you-all when that conversation
15    came up?
16        A. Uptown somewhere. I can't really recall.
17    I know it wasn't on the premises.
18        Q. And you told Ms. Blake that you had heard
19    that he pumped her gas?
20        A. Yeah. I told her nice, that was nice of
21    him, because he'd been up at that Shell station up
22    there pumping gas for a lot of people.
23        Q. Okay. Did you tell her you had heard that
24    he was pumping gas -- he was paying for people's
25    gas?

**17 (Pages 62 to 65)**

James Bailey 4/29/2025

## Page 66

1   A.  No.  I don't know if he was paying
2   people's gas or not.  I didn't see that.  I didn't
3   see that.  I just heard someone say -- they said
4   he's up there pumping their gas.  I didn't see it
5   with my own eyes.
6   Q.  Who did you hear it from?
7   A.  I don't know who I heard it from.  People
8   saying that he'd be at the Shell station pumping
9   people's gas.
10  Q.  When you say "people," that's more than
11  one person.
12  A.  Right.
13  Q.  So --
14  A.  What I mean by people, he'd be at the
15  Shell station, and he pumping --
16  Q.  Did more than one person tell you that?
17  A.  No.  That was just one person told me
18  that, but who it was, I don't know.
19  Q.  What did Ms. Blake say in response?
20  A.  Yeah, he pumped my gas.  I said -- I said,
21  that was nice of him.  And that was it.
22  Q.  Now, you don't have any written reprimands
23  or warnings in Ms. Carolyn Smith's personnel file,
24  do you, that you've done?
25  A.  No.

## Page 67

1   Q.  You don't have any in there that the
2   warden has done?
3       MR. CARPENTER:  Objection.  Which
4       warden?  Because she served for 20 --
5       20 -- over 20 years.
6   BY MR. RHODES:
7   Q.  During the time you've been -- you've been
8   sheriff.
9   A.  Okay.  No.
10  Q.  Major, captain, or deputy warden, during
11  the time you've been sheriff, you don't have any --
12  A.  No.
13  Q.  -- any written reprimands or warnings?
14  A.  No.
15  Q.  You don't have any written reprimands or
16  warnings concerning Mr. James Ellis, Jr., during
17  the time you've been sheriff?
18  A.  No.
19  Q.  And you don't have any written reprimands
20  or warnings in the personnel file for Ms. Sandra
21  Sanders since the time you've been sheriff?
22  A.  No.
23  Q.  You don't have any written reprimands or
24  warnings in the file of Bonita Blake since the time
25  you've been sheriff?

## Page 68

1   A.  I don't know if they did one on her or
2   not, but it was an incident that happened, and they
3   did an interview with her, and it should have been
4   something in her file.  I wasn't in the interview.
5   I was not in the interview.  Ms. Smith was in that
6   interview.  Warden Kaho was in the interview.
7   Q.  But do you know if there's any written
8   warning or reprimand?
9   A.  No.
10  Q.  And do you know if there's a written
11  warning of reprimand from you in the personnel file
12  of Shaquita McComb?
13  A.  There was one in the file on her.
14  Q.  From you?
15  A.  Not from me.  From the warden there.
16  Q.  Now, I want you to turn Interrogatory
17  Number 15.  I want you to read that interrogatory
18  out loud.
19  A.  Number 50?
20  Q.  15.
21  A.  Oh, 15.
22  Q.  And read your answer out loud?
23  A.  15.  Sheriff Bailey and Warden Clifton
24  Kaho.
25  Q.  Interrogatory Number 15.

## Page 69

1       MR. CARPENTER:  He's asking about --
2       MR. RHODES:  If you'll read that out
3       loud.
4       MR. CARPENTER:  -- this question
5       right here.  That.
6       THE WITNESS:  "State in specific
7       detail each written warning and reprimand
8       given to Carolyn Smith, Shaquita McComb,
9       Bonita Blake, Sandra Sanders, and James
10      Ellis concerning their respective jobs at
11      the Jefferson-Franklin Correctional
12      Facility.
13      "Include the" -- "Include in your
14      response the date the warning was given,
15      the person giving the warning, the reason
16      the warning was given, and witnesses to
17      the warning being given."
18  BY MR. RHODES:
19  Q.  Could you read your answer?
20  A.  Oh.  Reply, give Smith --
21  Q.  No, no.  Answer to number 15.
22      MR. CARPENTER:  He's talking about --
23      MR. RHODES:  Right up under there.
24      MR. CARPENTER:  -- the two lines
25      right here.

18 (Pages 66 to 69)

**Page 70**

1    THE WITNESS: Right here, right?
2    MR. CARPENTER: Uh-huh. (Affirmative
3  response.)
4    THE WITNESS: "Other than (sic) given
5  Smith in 2006, no written warning was
6  provided."
7  BY MR. RHODES:
8    Q.  So you -- when you signed your Answers to
9  Interrogatories on March 17th of this year, you
10  stated that other than a reprimand given to Smith
11  in 2006, there was no warnings given to Carolyn
12  Smith, Shaquita McComb, Bonita Blake, Sandra
13  Sanders, or James Ellis, Jr., and that was a month
14  ago.
15    A.  Rephrase that.
16    Q.  I'm --
17    MR. CARPENTER: There's not a
18  question there.
19  BY MR. RHODES:
20    Q.  A month ago --
21    A.  Uh-huh. (Affirmative response.)
22    Q.  -- you did not say there was a warning
23  on -- given to Shaquita McComb.
24    A.  No.
25    Q.  In that answer?

**Page 71**

1    A.  No. Yes, yes, yes. Yeah.
2    Q.  All right. Read the answer to number 15
3  again.
4    A.  "Other than a reprimand given to Smith in
5  2006, no written warning was provided."
6    Q.  So in March of this year, you said no
7  written warning was provided to Shaquita McComb.
8    A.  The warden had written her up.
9    Q.  But you did not put that in your answer to
10  interrogatories.
11    A.  No.
12    Q.  Why not?
13    A.  Slipped my mind.
14    Q.  And you happen to remember it now?
15    A.  Yes.
16    Q.  You had 30 days to read over these and
17  think about your answers before you answered them,
18  didn't you?
19    A.  Yeah, but it slipped my mind.
20    Q.  What warning did the warden give Shaquita
21  McComb?
22    A.  He reprimanded her because she came to
23  work one day with a knife and a set of brass
24  knuckles in there, on the grounds. You can't do
25  that. That's a facility. And brass knuckles is

**Page 72**

1  illegal anyway.
2    Q.  And when did he give her that warning?
3    A.  He -- I don't know. I'd have to look back
4  in -- I can't keep all them dates like that now,
5  but it should be in your file somewhere.
6    MR. CARPENTER: I'll see if I can't
7  find it for everybody. By the way, I got
8  them on paper if you need them.
9    MR. RHODES: I need his memory.
10    MR. CARPENTER: Okay. Fair enough.
11  All right. Yeah, because I forget --
12  yeah. Off the record.
13    (OFF THE RECORD.)
14  BY MR. RHODES:
15    Q.  Now, each one of the plaintiffs -- Carolyn
16  Smith, Shaquita McComb, Bonita Blake, Sandra
17  Sanders, James Ellis, Jr. -- reapplied for their
18  positions, didn't they?
19    A.  Correct.
20    Q.  And you said you conducted interviews with
21  them?
22    A.  I did.
23    Q.  Individual interviews?
24    A.  I did.
25    Q.  What -- when did you conduct those

**Page 73**

1  interviews?
2    A.  I had everyone to have all their
3  applications in by December 1st.
4    Q.  Okay. And when did you --
5    A.  After that, I started interviewing because
6  I had so many to do, plus with my work. That's
7  when I started doing it, after the December 1st.
8    Q.  And during the interview, did you tell any
9  employees that they'd likely be brought back or not
10  likely to be brought back?
11    A.  Never.
12    Q.  You didn't tell that to any of the
13  employees?
14    A.  No.
15    MR. RHODES: I'm going to have this
16  marked as the next exhibit number. I got
17  to find out. I'm looking for those
18  copies.
19    MR. CARPENTER: What's that? If I've
20  got it, I'll share it.
21    MR. RHODES: Oh, I found it. I found
22  it. Okay. Let's see. That's Exhibit 7?
23    MR. CARPENTER: Yep, 7.
24    (EXHIBIT 7 MARKED FOR THE RECORD.)
25

**19 (Pages 70 to 73)**

James Bailey 4/29/2025

**Page 74**

1  BY MR. RHODES:
2      Q.  Sheriff Bailey, I just handed you a letter
3  you had sent to Ms. Carolyn Smith.
4      A.  Correct.
5      Q.  And it looks like it's a form letter, and
6  it states that, "I regret to inform you after much
7  consideration, your application for re-employment
8  has been denied."
9      A.  Correct.
10     Q.  Will you tell us why you denied her
11 application for re-employment?
12     A.  Well, after speaking with Ms. Smith -- and
13 she was sitting in the office, we were talking, and
14 she said, Sheriff, you know, in the back, the
15 inmates be back there running wire from the
16 microwave, charging, running wire outside the wall
17 and paint it, and they keep throwing the breaker
18 back there.
19         And by her being a lieutenant, she knew
20 this was happening, why didn't she do anything to
21 correct it?  So I asked the question, Well, how is
22 it getting in?  She go like, Sheriff Bailey, it's
23 coming in through MAGCOR.  And then she admitted we
24 half patting them down.  She can't pat them down.
25 She is the lieutenant.  She could stand there and

**Page 75**

1  watch the CO and the sergeant to pat them down and
2  make sure they're doing it right.
3         Because that is what you call protecting a
4  county resource.  If an inmate get back there and
5  get shocked because this wire is running from a
6  microwave to charge up a cell phone, then that
7  could be a lawsuit.
8      Q.  Now, when she interviewed, she was a
9  lieutenant.
10     A.  Correct.
11     Q.  And lieutenants don't pat down inmates?
12     A.  Lieutenant do.  She is a female.
13     Q.  Up under lieutenants are sergeants.
14     A.  You got sergeants.
15     Q.  And up under the sergeants are officers?
16     A.  COs, correct.
17     Q.  COs.
18     A.  Correct.
19     Q.  And did you terminate all the COs who were
20 working at the correctional facility after you say
21 Ms. Smith told you that?
22     A.  But I haven't --
23     Q.  Did you terminate all the COs?
24     A.  I didn't terminate them.  They just
25 weren't rehired.

**Page 76**

1      Q.  Did you not -- so there was no CO working
2  at the correctional facility that was rehired?
3      A.  Some of them were rehired; some of them
4  wasn't.
5      Q.  But now, you say you believed her that
6  inmates were running the wires and --
7      A.  She said that.
8      Q.  But you believed her?
9      A.  Yes.
10     Q.  And you used that as a grounds to
11 terminate her.
12     A.  Yeah.  Because if you knew this kind of
13 activity was going on, what we doing to correct it?
14 And then she also mentioned -- say, like, I'm
15 supposed to issue out the uniforms, and I issue a
16 uniform, and another officer go behind me and issue
17 out a uniform, and that's not the way it's supposed
18 to be.
19         I said, What do y'all do to correct it?
20 Well, it happens -- sometimes it be happening at
21 night shift, blah, blah, blah.  Correct it, because
22 that's costing me money.  It already costs me money
23 with the MPIC -- the MAGCOR building over there.
24     Q.  When you say costing you money, you mean
25 money out of your pocket?

**Page 77**

1      A.  Out of my budget ordering more uniforms.
2         THE COURT REPORTER:  Are you saying
3  MAGCOR?
4         THE WITNESS:  Yeah.  That was a
5  recycling place next to us.  MAGCOR.
6         THE COURT REPORTER:  Okay.  Thank
7  you.
8  BY MR. RHODES:
9      Q.  Now, I'm going to get back, though, to
10 this earlier one about running the wires.  Did you
11 not rehire -- or did you rehire any sergeants?
12     A.  Yes.
13     Q.  And sergeants are up under lieutenants?
14     A.  Correct.
15     Q.  And you did rehire some correctional
16 officers?
17     A.  I did.
18     Q.  How many correctional officers did you
19 rehire?
20     A.  I can't tell you off the top of my head.
21     Q.  How many correctional officers did you not
22 rehire?
23     A.  Five.
24     Q.  How many correctional officers did you
25 have in December 2023?

James Bailey 4/29/2025

<table>
<tr><td>

**Page 78**

1      A.  You talking about what the sergeants and
2  all, or just --
3      Q.  Correctional officers.
4           MR. CARPENTER:  COs.
5           THE WITNESS:  I really don't know off
6      the top of my head.  Like I say, I might
7      have 50 today, and tomorrow I might have
8      46.
9  BY MR. RHODES:
10     Q.  If you look at their organizational chart,
11  can you tell me -- on the organization chart, could
12  you tell how many -- I know we have slots for
13  officer -- correctional officers, but could you
14  tell me for each shift, could you tell how many you
15  had in each shift?
16     A.  It's either seven or eight supposed to be
17  on a shift that I know of.
18     Q.  And how many shifts did you have?
19     A.  Two shifts.  Night, morning --
20     Q.  Seven or eight, let's say for seven, and
21  two shifts, that's 14 shifts.
22     A.  Right.  You got some that work from 6:00
23  to 6:00 in the morning, 6:00 in the morning to 6:00
24  that evening, then 6:00 p.m. to 6:00 a.m.
25     Q.  And so, out of 14, you said five of them

</td><td>

**Page 80**

1      Q.  Who supervised the correction officers?
2      A.  The warden -- I mean, the warden -- the
3  warden and anyone in the chain of command can
4  supervise the CO.
5      Q.  Okay.  Isn't the CO's immediate supervisor
6  a sergeant?
7      A.  Sergeant, right.  That's the one that's on
8  the shift.
9      Q.  And the sergeant's immediate supervisor is
10  the lieutenant?
11     A.  Correct.
12     Q.  And isn't it true that Ms. Shaquita McComb
13  was a correctional officer?
14     A.  Correct.
15     Q.  And Ms. Carolyn Smith was a lieutenant?
16     A.  Correct.
17     Q.  Ms. Carolyn Smith was not Shaquita
18  McComb's immediate supervisor; is that correct?
19     A.  Correct.
20     Q.  And the sergeant would have been
21  Ms. Shaquita McComb's immediate supervisor; isn't
22  that correct?
23     A.  Sure.
24     Q.  And you did not have Ms. Shaquita McComb's
25  immediate supervisor, who was that sergeant, in

</td></tr>
<tr><td>

**Page 79**

1  you did not rehire?
2      A.  Well, if you're not counting her as a
3  correction officer --
4      Q.  Only COs.
5      A.  So you got Blake, Sandra Sanders, McComb,
6  and Ellis.  Four.
7      Q.  There's only four you didn't?
8      A.  Correct.
9      Q.  All the other COs you rehired?
10     A.  Correct.
11     Q.  And you thought that -- you believed
12  Ms. Smith that inmates were running wires?
13     A.  That's what she said.  I didn't see it.
14     Q.  But you said that's one -- that's one of
15  the grounds you fired -- you did not rehire her.
16     A.  That, and then when I questioned her about
17  her niece.  I met with her niece one time.  Some
18  contraband was trying to get in the facility.
19     Q.  Okay.  Who's her niece?
20     A.  McComb.
21     Q.  And what position did Shaquita McComb
22  have?
23     A.  She was a CO.
24     Q.  Correction officer?
25     A.  Correct.

</td><td>

**Page 81**

1  that meeting when you had Ms. Smith in the meeting,
2  did you?
3      A.  Because that's her niece.
4      Q.  You need to --
5      A.  No.
6      Q.  -- answer yes or no.
7      A.  No.
8      Q.  No.  You said no, and you said because
9  that's her niece?
10     A.  No.  I said I didn't have a sergeant there
11  during the time I had the meeting.
12     Q.  Why didn't you have Ms. Shaquita McComb's
13  sergeant in the meeting with Ms. Shaquita McComb
14  instead of having Ms. Smith in the meeting?
15     A.  Because it was her niece, and I wanted her
16  to be there when I talked to her niece.  I could
17  have had the sergeant, but by her being the
18  lieutenant and her niece, I brought her in.
19     Q.  Okay.  Any other reason you did not rehire
20  Ms. Carolyn Smith?
21     A.  Ms. Carolyn is a lieutenant and a
22  lieutenant is supposed to be on the floor all the
23  time, walking that floor, making sure things are
24  all right.  Most of the time she'd be in the
25  warden's office.  Okay?  Couple of times that

</td></tr>
</table>

**21 (Pages 78 to 81)**

James Bailey 4/29/2025

**Page 82**

1    Ms. Smith had left that ground and didn't punch
2    out.
3        Q.  Let me ask you this:  Where is your
4    office?
5        A.  My office is over in the sheriff's
6    building.
7        Q.  Your office is not in the correctional
8    facility, is it?
9        A.  No.
10       Q.  So you wasn't there to see what all those
11   employees were doing in the correctional facility,
12   were you?
13       A.  I walk my facility every day.
14       Q.  How often do you walk and how long?
15       A.  I be there for a minute, for a while.
16       Q.  What about the sheriff's department?  Do
17   you walk that facility?
18       A.  Oh, yeah.
19       Q.  You can't be in two places at the same
20   time.
21       A.  I understand that, but I walk the facility
22   every day.
23       Q.  Do you have a log showing how often you
24   walk, a written log?
25       A.  When I goes in the facility, they signs

**Page 83**

1    in.  They'll sign in.
2        Q.  Do you have a sign-in log?
3        A.  No.
4        Q.  Do you sign in every time you go in?
5        A.  No, I do not.
6        Q.  So you don't have any proof that -- of the
7    times you walked the facility, the correctional
8    facility?
9            MR. CARPENTER:  Objection.
10           THE WITNESS:  (No verbal response.)
11   BY MR. RHODES:
12       Q.  Do you?  You don't have any documented
13   written proof showing the times -- the dates and
14   times you walked the correctional facility?
15       A.  When I goes in the facility --
16       Q.  You can answer yes or no.
17       A.  Yes.
18       Q.  If you have any written documentary proof
19   of the dates and times that you walk the
20   correctional facility.
21       A.  It should be.  I sign the books when I go
22   in, in the back.
23       Q.  Okay.  What are those books called so we
24   can subpoena those books?
25       A.  I let them -- it's a --

**Page 84**

1            THE WITNESS:  What y'all call them,
2    Carolyn?
3            MR. CARPENTER:  She can't answer any
4    questions.
5            MR. RHODES:  She can't answer
6    questions.
7            THE WITNESS:  It -- it -- it keep up
8    with all the details that goes on.
9    Everything.  Everything that goes on at
10   the facility.  When they go on yard call,
11   they'll do that.  When they -- when they
12   do count of the facility, all that goes in
13   there.
14   BY MR. RHODES:
15       Q.  Does everybody sign?
16       A.  Anybody that -- if you go in that facility
17   and you walk in with me, we both have to sign the
18   book.
19       Q.  Okay.  Now, for the books that were in
20   20 -- from 2020 to 2023, where would those books
21   be?
22       A.  I don't know.  They keep them somewhere.
23   I don't know where they keep them at.
24       Q.  Who keep them?
25       A.  I guess the warden or deputy warden.

**Page 85**

1        Q.  'Cause you don't know where they get them?
2        A.  That's why they're in there for.
3        Q.  I thought you the head.
4        A.  The head?
5            MR. CARPENTER:  Objection;
6    argumentative.  Go ahead.
7            THE WITNESS:  I'm the head, but you
8    have -- I have people in place.  That's
9    what the warden and the majors and all
10   them is for.
11   BY MR. RHODES:
12       Q.  So if we needed to subpoena the books from
13   2020 through 2024, who we need to issue that
14   subpoena to?
15       A.  I guess you'd have to go to the deputy
16   warden, I guess.  I don't know what it -- when
17   the -- when the book's filled out, that's a
18   question I have to ask.
19       Q.  Okay.
20       A.  Because --
21       Q.  Who's the warden now?
22       A.  Henry Felton.
23       Q.  And who is the deputy warden now?
24       A.  Cassandra Robinson.
25       Q.  Okay.  There's nothing in Ms. Carolyn

Brooks Court Reporting
1-800-245-3376

**James Bailey 4/29/2025**

**Page 86**

1    Smith's personnel file that she did not do her job
2    while you were the sheriff, is there?
3        A.   In her file?
4        Q.   Written.  Any --
5        A.   While I was sheriff or the whole time she
6    was there?
7        Q.   While you were sheriff.
8        A.   No.
9        Q.   So all this stuff you're telling me about
10   now, there's no written documentation in her
11   personnel file to back it up?
12       A.   No.
13           MR. RHODES:  Okay.  Would that be 8?
14           MR. CARPENTER:  It would be.
15           MR. RHODES:  Yes.  See, I told you.
16       Told you don't be too mad.
17           (EXHIBIT 8 MARKED FOR THE RECORD.)
18   BY MR. RHODES:
19       Q.   I want to ask you about Ms. Shaquita
20   McComb, where you stated that you regret to inform
21   her that you weren't going to rehire her and could
22   you -- did you -- you didn't put the reasons in
23   Exhibit 8 why you were not rehiring her, did you?
24       A.   No.
25       Q.   And in Exhibit 7, you did not put the

**Page 87**

1    reasons in there why you were not rehiring
2    Ms. Smith, did you?
3        A.   No.
4        Q.   Okay.  So give me the reasons you did not
5    rehire Ms. McComb.
6        A.   Ms. McComb, for one, she came to work with
7    a set of brass knuckles and a knife.  That is a
8    no-no on the grounds.  And she was reprimanded for
9    that.  The other one was the contraband.
10       Q.   Tell me about the contraband.
11       A.   It was some contraband, which was trying
12   to get in the facility.  Big black garbage bags got
13   hung over the fence.  They're trying to get throwed
14   in the facility, and the only way that it could get
15   in there is that you had to open that side door to
16   get it in.
17           And by her being the tower operator of
18   Control 3, the way that that young man would run up
19   to the back door and run it back outside the wall,
20   get on top of the top bunk, pointing like this, get
21   back down, and run back down there again, and they
22   kept back and forward.
23           By her being the tower operator, she
24   should have noticed that and called and said, Hey,
25   someone need to go outside, do a running check.  I

**Page 88**

1    got an inmate on top of the rack, keep pointing at
2    somebody on the outside saying -- like somebody
3    telling him to throw something somewhere.  That
4    didn't happen.
5        Q.   Now, how do you know that happened?
6        A.   I got a recording.
7        Q.   You said I saw a recording, which I have
8    not been given a copy of that recording.
9            MR. CARPENTER:  That's the same as
10       the rest.
11   BY MR. RHODES:
12       Q.   And we need to copy that recording because
13   I want to ask you about the time.  Does it have the
14   date and time stamped on that recording?
15       A.   I don't know.  I got it -- they have it.
16   I don't know if it was on there or not, but she was
17   at work that day.
18       Q.   Isn't it true that Ms. McComb had gotten
19   off at the time that showed when the bag was
20   supposed to have been thrown over and the inmate
21   was running?
22       A.   It was during the time that the shift
23   would change.  At Control 3, they always would be
24   slow about getting over there.
25       Q.   Isn't it true that Ms. McComb was not on

**Page 89**

1    duty when that actually happened?
2        A.   She was on duty.
3        Q.   And she was not written up for that, was
4    she?
5        A.   No.  She wasn't written up, because I
6    brought the lieutenant over in the office and had
7    the conversation with them.
8        Q.   And isn't it true that they proved to you
9    that she was not on duty and that's the reason you
10   did not write her up?
11       A.   No, that's not.
12       Q.   Isn't it true that it was someone else's
13   shift --
14       A.   No.
15       Q.   -- that that would happen on?
16       A.   No.
17       Q.   Isn't it true that Ms. McComb was really
18   off that day?
19       A.   No.  She worked that day.
20       Q.   And I understand that the -- we had asked
21   for all documents they had, especially any proof
22   that you're saying that they -- the plaintiffs --
23       A.   That's why --
24       Q.   -- but we weren't given that -- that
25   recording, but I understand the recording has the

**Brooks Court Reporting**
**1-800-245-3376**

<table>
<tr><td>

**Page 90**

1  date and timestamp on it.
2     MR. CARPENTER: Okay. In response --
3  because you're looking at me on that
4  one -- I'm not sure if it has the time. I
5  do know there were photographs that were
6  submitted that were a part of the video,
7  but we'll go look for the video.
8     But I do know that the photographs
9  from that are present, and they're just
10  defendants' 264 to 276.
11     MR. RHODES: I know.
12     MR. CARPENTER: But I will check for
13  you.
14     MR. RHODES: And the reason being, we
15  have -- we have --
16     MR. CARPENTER: I know what you're
17  looking for.
18     MR. RHODES: -- we have proof on she
19  was not at work at that time.
20     MR. CARPENTER: That was a
21  contention. Sure. Okay. Yeah. We'll
22  track it down for you.
23  BY MR. RHODES:
24   Q. Any other reason you did not rehire her?
25     MR. CARPENTER: Shaquita McComb?

</td><td>

**Page 92**

1  the warden that.
2   Q. Oh, well, I thought you said you had the
3  authority to hire and fire.
4   A. I had her rehired. She came to me and
5  wanted her job back, because the previous sheriff
6  had fired her. I rehired her. Had Kaho and them
7  to rehire her.
8   Q. Now, when you say "her," I'm talking
9  about --
10   A. Nikita (sic) Blake.
11   Q. Bonita Blake?
12   A. Bonita Blake, Bonita Blake.
13   Q. I thought you were talking about
14  Ms. Johnson.
15     MR. CARPENTER: He's talking about
16  Antoinette Johnson.
17  BY MR. RHODES:
18   Q. Antoinette Johnson?
19   A. Okay. Now, see what happened now?
20   Q. Yeah.
21   A. Okay, okay.
22   Q. All right. I want to back up. You said
23  she was fired?
24   A. Yeah. They -- they -- they dismissed her.
25   Q. When you say "they" --

</td></tr>
<tr><td>

**Page 91**

1     MR. RHODES: Shaquita McComb.
2     MR. CARPENTER: There you go. Okay.
3  All right.
4     THE WITNESS: Not that I can think
5  of.
6     (OFF THE RECORD.)
7     (EXHIBIT 9 MARKED FOR THE RECORD.)
8  BY MR. RHODES:
9   Q. You know where I'm going. Give me every
10  reason -- Exhibit 9 -- every reason you did not
11  rehire Bonita Blake.
12   A. One reason is that we had one female that
13  had been hired, and Bonita was the trainer to
14  showing this young lady what to do. Two of them
15  was involved. They had an inmate to pull out his
16  privates, because Bonita said, I heard you were
17  working with something. Let me see what you're
18  working with, and he pulled the privates out.
19     And they did an interview with both of
20  them and only one that was terminated, and that was
21  Angenette (sic) Johnson was the one that was
22  terminated, and Bonita wasn't.
23   Q. Why was Angenette (sic) Johnson
24  terminated?
25   A. You'd have to ask the lieutenant that and

</td><td>

**Page 93**

1   A. Warden Kaho and the interview board.
2   Q. Okay. I thought you were the person who
3  had the authority to hire and fire the people in
4  the correctional facility.
5   A. They can do it. If they doing something
6  wrong, they can get rid of them.
7   Q. So you're not the only person that has --
8   A. Right.
9   Q. -- the authority to hire and fire?
10   A. Right. The warden, he had that.
11   Q. Have you delegated that authority --
12   A. Yes.
13   Q. -- to the warden?
14   A. Yes.
15   Q. Okay. So you had that authority, but you
16  delegated it to the warden?
17   A. Right, correct.
18   Q. And you said a correctional board?
19   A. They had an interview board. They went in
20  and interviewed. They did an investigation on
21  this.
22   Q. I'm going to ask about the interview. Who
23  set that interview board up?
24   A. The warden -- he's the warden, and they --
25  they -- they did an investigation on it.

</td></tr>
</table>

**24 (Pages 90 to 93)**

James Bailey 4/29/2025

**Page 94**

```
 1        Q.  Did you approve of that?
 2        A.  I didn't have to approve of that because
 3   he was running it.  That was an incident that
 4   happened with an inmate having -- having an inmate
 5   to pull out his privates.  So the warden and them
 6   did an interview on it.
 7        Q.  But -- but I'm asking you about hiring and
 8   firing employees.  You said you the one who had
 9   that authority to hire and fire employees at the
10   correctional facility.
11        A.  I do.
12        Q.  And now you're saying the warden had the
13   authority, but I asked did you delegate the warden
14   that authority?
15        A.  Yeah, yeah.  They can do that.
16        Q.  But if the warden terminates somebody, do
17   you review that since you his supervisor?
18        A.  Sometimes I do, and sometimes I don't.
19        Q.  So this Ms. Johnson that was terminated, I
20   was going to ask you why -- the reason she was
21   terminated.
22        A.  I don't know why they didn't terminate
23   both of them.
24        Q.  But I want to know the reason they
25   terminated Ms. Johnson.
```

**Page 95**

```
 1        A.  Because they had the inmate to pull out
 2   his privates.
 3        Q.  And you said "they."
 4        A.  Anita Blake -- Bonita Blake and
 5   Ms. Antoinette Johnson.
 6        Q.  Do you know if Ms. Johnson said something
 7   that Ms. Blake didn't?  Why the difference in the
 8   distinction of why Ms. Johnson was terminated, but
 9   Ms. Blake was not terminated?
10        A.  You'd have to ask the lieutenant that, and
11   you have to ask the warden that, and whoever sits
12   on that board.
13        Q.  There is nothing in Ms. Bonita Blake's
14   personnel file about this incident, is there?
15   Written?
16        A.  It should have been if they did an
17   interview.
18        Q.  If you look back at your answers to
19   Interrogatory Number 15 --
20        A.  I'm going to say no.
21        Q.  -- there are no written warnings or
22   reprimands on Ms. Bonita Blake.
23        A.  I'm going to say no.
24        Q.  So why wasn't there anything written in
25   Ms. Bonita Blake's file?
```

**Page 96**

```
 1        A.  Slack on -- slack on the warden's behalf.
 2        Q.  And who -- which warden?
 3        A.  Warden Kaho, and the deputy warden.
 4        Q.  Did you terminate either one of them?
 5        A.  No.  The warden left.  Didn't let me know.
 6   And the deputy warden retired.
 7        Q.  When did this incident happen involving
 8   Ms. Johnson and Bonita Blake?
 9        A.  You have to look in -- we have to look in
10   Ms. Johnson's file to find that out, the exact
11   date, because I think it might be something in her
12   file, 'cause she was terminated.  Should be.  They
13   terminated her.
14        Q.  Well, that incident with Ms. Johnson
15   happened several months before Warden Kaho retired.
16        A.  Yes.  He was the warden during that time.
17        Q.  But you did not terminate Warden Kaho?
18        A.  No.
19        Q.  And I was trying to figure out what was
20   the distinction.  Why was Ms. Johnson terminated
21   and Ms. Blake not terminated?
22        A.  I wasn't in the interview.  I didn't do no
23   investigation on it.  My warden, and I assume my
24   deputy warden and the lieutenant, did an
25   investigation on it.  They had a hearing with both
```

**Page 97**

```
 1   of them in Warden Kaho office.  So they the one
 2   made the determination.  Not me.
 3        Q.  And you indicated there is a written
 4   reason in Ms. Johnson's file as to why she was
 5   terminated.
 6        A.  It should be.  They terminated her.
 7        Q.  Now, when you say it should be, do you
 8   know if there's anything in there?
 9        A.  I do not know.
10            MR. CARPENTER:  You want that?
11            MR. RHODES:  Yes.
12            MR. CARPENTER:  Making notes.  The
13        Johnson file.  Okay.
14   BY MR. RHODES:
15        Q.  Any other reason you did not rehire Bonita
16   Blake?
17        A.  Because Bonita talked to the inmates so
18   rough.  The inmates would come up to me and say,
19   Sheriff Bailey, you need to talk to Ms. Blake.  She
20   come back here and call us, Get your punk ass
21   upside the wall.  You short dick, MF, and all of
22   that.
23            And that's not the way you talk to an
24   inmate.  And them inmates was talking about hurting
25   her.
```

**25 (Pages 94 to 97)**

James Bailey 4/29/2025

**Page 98**

1   Q.  And you don't -- you didn't put anything
2   in writing in her file about giving her a warning
3   or a reprimand about how she talked to the inmates?
4       A.  The warden knew about it.
5       Q.  But you didn't do it?
6       A.  I did not.  No.
7       Q.  Now, who is over all the employees of the
8   correctional facility?
9       A.  Who over it?
10      Q.  Yeah.  Who's over it?
11      A.  The warden.
12      Q.  Oh --
13      A.  He's the --
14      Q.  -- I thought you were.
15      A.  I am, but the warden runs it for me.
16      Q.  Yeah, but I thought you said you make
17  these rounds all the time.
18      A.  I make my rounds.  I goes up to the front
19  every day.  I walk through the PIC place.  I even
20  walk around the facility every day on the grounds.
21  I does that.
22      Q.  But you didn't enter anything in
23  Ms. Blake's personnel file?
24      A.  No.  Let me get --
25      Q.  And that's 10 -- you said do something.

**Page 99**

1       A.  Yeah.
2       (EXHIBIT 10 MARKED FOR THE RECORD.)
3   BY MR. RHODES:
4       Q.  Sheriff, I'm going -- same question.  I
5   need you to tell me every reason you did not rehire
6   Sandra Sanders.
7       A.  Sandra Sanders have a history of passing
8   out.  One time she went off to transport inmates to
9   the -- to a health facility, and she ended up
10  having to get a heart test herself.  Something
11  dealing with her heart.
12          And then another occasion, something
13  happened in the jail, and she was able to call for
14  some assistance.  Then when they get over there,
15  she done passed out.  So they had to call the
16  ambulance out there for her.
17          And that particular time, they took her to
18  the hospital.  They took her to Jefferson County
19  out here.  And then another time, it happened maybe
20  a month or two months after that happened, I had to
21  call the ambulance out again.
22          And she got in the ambulance, but then I'm
23  thinking she going to the hospital.  I leave; she
24  didn't go.  She went on back to work.  So Sandra
25  had a -- had a -- I don't know.  I don't know if

**Page 100**

1   she have a pacemaker, something dealing with the
2   heart, and she passes out.
3          And if she in that facility back there and
4   passes out and hit her head on that -- on that door
5   back there, steel door, or that concrete, and
6   something's going on in the facility, how would we
7   know if she can't get on the -- on the radio and
8   call a code red for a fight, a code blue for
9   someone sick, or C51 for a fire if she's passed
10  out?
11          That's protecting county resources.  Her
12  health is not well enough.  She couldn't even get
13  between a fight and break it up.  If they hit her
14  in the chest, she might pass out.  When she get
15  upset, she passes out.
16      Q.  So you didn't rehire Ms. Sandra Sanders
17  because of health issues?
18      A.  Yeah, health issues, right.  Reliability
19  and protecting -- taking care of the resources.
20      Q.  Last one.
21          MR. CARPENTER:  Let me guess.
22          MR. RHODES:  Yeah.
23      (EXHIBIT 11 MARKED FOR THE RECORD.)
24  BY MR. RHODES:
25      Q.  Okay.  Sheriff, I want to ask you the same

**Page 101**

1   question about James Ellis, Jr., every reason you
2   did not rehire him.
3       A.  Same way, kind of echoing about Sandra
4   Sanders.  He have a history of passing out.  Not --
5   not on the job, but at his house, he had passed out
6   several times.  Like, he have a heart problem.  And
7   I suspicious of him bringing contraband into the
8   facility.
9       Q.  Now, you say you were suspicious?
10      A.  Yes.
11      Q.  Did you ever meet with him and talk to him
12  about it?
13      A.  I wanted to catch him.
14      Q.  And you don't have -- you didn't document
15  anything in his personnel file?
16      A.  No.
17      Q.  Did you ever catch him bringing
18  contraband?
19      A.  No.
20      Q.  Do you have contraband coming in now?
21      A.  It's slow.  They did a shakedown last
22  week, and they found one phone.
23      Q.  But Mr. Ellis is not working out there?
24      A.  No.
25      Q.  Now, have you given me every reason that

**26 (Pages 98 to 101)**

James Bailey 4/29/2025

Page 102

```
 1    you did not rehire any of the plaintiffs, Carolyn
 2    Smith, Shaquita McComb, Bonita Blake, Sandra
 3    Sanders, and James Ellis, Jr.?
 4        A.   That's it.
 5        Q.   Did you ever talk to any of them, Carolyn
 6    Smith, Shaquita McComb, Bonita Blake, Sandra
 7    Sanders, or James Ellis, Jr., about supporting you
 8    for reelection for sheriff?
 9            MR. CARPENTER:  Objection.
10            THE WITNESS:  Again, I never asked
11        any of my employees to support me.
12    BY MR. RHODES:
13        Q.   So that would be, no --
14        A.   No.
15        Q.   -- you didn't ask them again?
16        A.   No.
17        Q.   And did you ask any employees in the
18    mandatory meeting you had in June of 2023 to
19    support you?
20        A.   No.
21        Q.   Do you recall seeing any of the Carolyn
22    Smith, Shaquita McComb, Bonita Blake, Sandra
23    Sanders, or James Ellis, Jr., at any political
24    events where other candidates for sheriff were
25    there?
```

Page 103

```
 1        A.   The only one I can really recall was
 2    Carolyn.  That was the one in Union Church at the
 3    fire station.  I had one in my house.  So that's
 4    the only one I seen her at.
 5        Q.   Do you recall ever seeing any of -- any
 6    campaign signs for any other candidate for sheriff
 7    in the yards of either Carolyn Smith, Shaquita
 8    McComb, Bonita Blake, Sandra Sanders, or James
 9    Ellis, Jr.?
10        A.   I didn't see one, but my deputy seen one
11    in Sandra Sanders's yard.
12        Q.   Which candidate sign did he see?
13        A.   Sean Jones.
14        Q.   Your deputy told you about it?
15        A.   He did.  We was over by the shop, and
16    he -- I was over there, and Henry Felton, who is
17    the warden now but he was a major, and Green go,
18    like, and I seen a sign in Sandra Sanders's yard,
19    Sean Jones sign in her yard.
20            And Henry go, like, What?  She got a sign?
21    He said, Yeah.  He said, I'm going to say something
22    to her.
23            I said, Look, Henry, don't say nothing to
24    that woman about that sign.  I said, Sign don't
25    vote.  Sign only let someone -- let people know who
```

Page 104

```
 1    are running.  Don't go say nothing to that woman.
 2            A couple days later, he came back, said, I
 3    said something to her.  I never even asked him what
 4    did she say.  He said, I said something to her.
 5    She say, You can put a sign in her yard.  I say,
 6    Henry, I told you do not go say anything to that
 7    woman about that sign.  Again, sign do not vote.
 8    Sign let people run.  That's what I told him.
 9        Q.   What is Henry's last name?
10        A.   Sandra Sanders.
11            MR. CARPENTER:  No.  Henry's last
12        name.
13            THE WITNESS:  Oh, Henry.  Henry
14        Felton.
15    BY MR. RHODES:
16        Q.   And do you know his address?
17        A.   No, but we can get it.  That won't be no
18    problem to get it.
19            MR. CARPENTER:  I think we may --
20    BY MR. RHODES:
21        Q.   What is his position?
22        A.   He warden now, but back then, he was a
23    major.
24        Q.   Was there someone else in that --
25        A.   Anthony Green.
```

Page 105

```
 1        Q.   Anthony Green was a deputy?
 2        A.   He was a deputy.  He the one mentioned it
 3    about the sign, because I had never seen it.
 4        Q.   Now, is he a deputy sheriff?
 5        A.   He a deputy sheriff.  He's still employed
 6    now.
 7        Q.   Okay.  Do you know his address?
 8        A.   No.  But it's in Stampley.  It won't be
 9    hard to get.
10        Q.   In Stampley?
11        A.   In Stampley.  The same way where Warden
12    Felton is from, same community.
13            MR. CARPENTER:  We'll get it.
14            MR. RHODES:  Okay.
15    BY MR. RHODES:
16        Q.   James Ellis, Jr., do you ever recall
17    seeing him -- his car, his personal vehicle at Sean
18    Jones's house?
19        A.   No, I didn't.
20        Q.   You don't recall seeing it?
21        A.   No.
22        Q.   You've never said anything to him about
23    his car?
24        A.   I ain't never talked to none of my
25    employees about no politics.  On the grounds, off
```

27 (Pages 102 to 105)

James Bailey 4/29/2025

## Page 106

1 the grounds. No.
2    Q.  Talked to the employees. What about
3 people in the community? Have you told people in
4 the community that you were going to get rid of the
5 snakes who didn't support you?
6    A.  I didn't say nothing like that. What's a
7 snake? I ain't never said nothing like that.
8    Q.  Did you tell anybody in the community that
9 you were going to fire the people who did not
10 support you?
11    A.  I didn't know any of my people was
12 involved in politics.
13    Q.  Do you know Connie Hollands?
14    A.  Connie Hollands?
15    Q.  Hollands.
16    A.  Yeah, I know Connie.
17    Q.  Did you recall Connie Hollands calling you
18 and talking to you about rehiring Carolyn Smith?
19    A.  She did.
20    Q.  And do you recall telling her that -- she
21 asked -- you said she should ask for any favor other
22 than that?
23    A.  Possibility.
24    Q.  And do you recall telling Connie Hollands
25 did you not rehire Carolyn Smith because she did

## Page 107

1 not support you for sheriff?
2    A.  Again, I don't know who supported me. I
3 didn't go in no poll with no one to vote. I don't
4 know. I didn't ask any of my employees to support
5 me.
6    Q.  Do you recall telling someone that you
7 were not going to rehire them because they did not
8 support you?
9    A.  No. No.
10    Q.  Do you recall telling Connie Hollands that
11 she could ask you for a favor for anything in the
12 world other than to rehire Carolyn Smith?
13    A.  I can't recall that. I can't recall that.
14        MR. RHODES:  Give me a minute.
15        MR. CARPENTER:  No sweat.
16        MR. RHODES:  We going to supplement,
17    too.
18        MR. CARPENTER:  I got you. I got you
19    covered. You're right. But before we
20    go --
21        THE COURT REPORTER:  Off the record?
22        MR. RHODES:  Off the record.
23        (OFF THE RECORD.)
24        MR. RHODES:  That's it. That's all I
25    have.

## Page 108

1        MR. CARPENTER:  And I don't have any.
2        THE COURT REPORTER:  Do you want to
3    do the same with him?
4        MR. CARPENTER:  Do you want to read
5    and sign? Are you good with your answers?
6        THE WITNESS:  I'm good.
7        MR. CARPENTER:  No. We'll waive.
8        THE COURT REPORTER:  Okay. Do you
9    still need a copy?
10        MR. CARPENTER:  Oh, yeah.
11        (DEPOSITION CONCLUDED AT 4:00 P.M.)
12
13 ORIGINAL: CARROLL E. RHODES, ESQ.
14 COPY: THOMAS L. CARPENTER, JR., ESQ.
15
16
17
18
19
20
21
22
23
24
25

## Page 109

1        CERTIFICATE OF COURT REPORTER
2    I, Ella J. Hardwick, CVR-M, CCR #1749, Court
3 Reporter and Notary Public in and for the State of
4 Mississippi, hereby certify that the foregoing
5 contains a true and correct transcript, to the best
6 of my ability, as taken by me in the aforementioned
7 matter at the time and place heretofore stated.
8    I further certify that under the authority
9 vested in me by the State of Mississippi the
10 witness was placed under oath by me to truthfully
11 answer all questions in the matter. I further
12 certify that I am not in the employ of or related
13 to any counsel or party in this matter and have no
14 interest, monetary or otherwise, in the final
15 outcome of this matter.
16    Witness my signature and seal this the 13th day
17 of May, 2025.
18
19                    _Ella J. Hardwick_
                    Ella J. Hardwick, CVR-M, CCR #1749
20
21 My Commission Expires:
   February 8, 2029
22
23
24
25

**28 (Pages 106 to 109)**