# Carolyn Smith, et al. v. Jefferson County, Mississippi, et al.

**Bonita Blake**

**April 18, 2025**

All depositions & exhibits are available for downloading at
<<www.brookscourtreporting.com>>
Please call or e-mail depo@brookscourtreporting.com if you need a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION


CAROLYN SMITH, ET AL

                                                            PLAINTIFFS


V.        CIVIL ACTION NO. 5:24-CV-0072-DCB-ASH


JEFFERSON COUNTY,
MISSISSIPPI, ET AL

                                                            DEFENDANTS


DEPOSITION OF BONITA BLAKE


Taken at the instance of the Defendants at the Law
Offices of Carroll Rhodes, 119 Downing Street,
Hazlehurst, Mississippi 39083, on Friday,
April 18, 2025,
beginning at 11:26 a.m.


REPORTED BY:

ROBIN G. BURWELL, CCR #1651

### Page 2

```
 1   APPEARANCES:
 2
 3       CARROLL RHODES, ESQ.
         Law Offices of Carroll Rhodes
 4       Post Office Box 588
         Hazlehurst, Mississippi 39083
 5       crhode@bellsouth.net
 6
             COUNSEL FOR PLAINTIFF
 7
 8
         THOMAS L. CARPENTER, ESQ.
 9       Wise, Carter, Child & Caraway
         2510 14th Street, Suite 1125
10       Gulfport, Mississippi 39501
         tlc@wisecarter.com
11
12           COUNSEL FOR DEFENDANT
13
14   ALSO PRESENT:
15       Carolyn Smith
         Shaquita McComb
16       Sandra Sanders
         James Ellis, Jr.
17
18
19
20
21
22
23
24
25
```

### Page 3

```
 1              INDEX
 2   Style.........................1
 3   Appearances...................2
 4   Index ........................3
 5   Certificate of Deponent ..................44
 6   Certificate of Court Reporter .............45
 7            EXAMINATIONS
 8   Examination By Mr. Carpenter ...............4
 9   Examination By Mr. Rhodes .................39
10   Examination By Mr. Carpenter ..............41
```

### Page 4

```
 1            BONITA BLAKE,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4   EXAMINATION BY MR. CARPENTER:
 5       Q.  Ms. Blake, I'm Tom Carpenter.  And
 6   you've been here, so you've heard it all before.
 7           MR. CARPENTER:  So, we'll just go with
 8   the usual stipulations and read and sign.
 9           MR. RHODES:  Yes.
10       Q.  (By Mr. Carpenter)  Because you know
11   what that is by now.
12           So, we'll get started straight away with
13   your name, if you could give us that?
14       A.  Bonita Blake.
15       Q.  And what's your address?
16       A.  5247 Red Lick Road, Lorman, Mississippi
17   39096.
18       Q.  And that's here in Jefferson County?
19       A.  Yes.
20       Q.  Because I know Lorman can kind of creep
21   into another county.
22       A.  Claiborne.
23       Q.  Claiborne, that's right.
24           And what do you do currently?
25       A.  I work at Tigers Den.  And about a week
```

### Page 5

```
 1   ago I started working at the Sheriff's Department
 2   in Port Gibson.
 3       Q.  Okay.  From January the 1st of last
 4   year, 2024, to now, what was your first job?
 5       A.  I was working at the elementary school.
 6       Q.  Okay.  When did that start?
 7       A.  February of 2024.
 8       Q.  Got it.
 9       A.  And ended in April of 2024.
10       Q.  Okay.  And how much were you making
11   there?
12       A.  They say $10.
13       Q.  Okay.  They say.
14       A.  But it wasn't no $10.
15       Q.  Right.  I joke, and I sure don't want to
16   start a family dispute, but we can ask Ms. Smith.
17   She's right behind us.  President of the school
18   board can answer that question for you.  But we'll
19   do that on another day.
20           And what were you making at the
21   correctional facility?
22       A.  $10.41.
23       Q.  And in February of '24, where did you --
24   what was your next job?
25       A.  Nothing, until this year.
```

Page 6

1  Q. How about Tigers Den, when did that
2  start?
3  A. This year, 2025.
4  Q. And what is Tigers Den?
5  A. A food stand.
6  Q. And how much were you making there?
7  A. 8.75.
8  Q. And how long was that job?
9  A. I'm currently working, currently.
10 Q. But you've got an upcoming job?
11 A. I have two jobs at the same time.
12 Q. Gotcha.
13   So you're still working for Tigers, and
14 then you're also -- what's the job that you just
15 got?
16 A. Jailer at the Sheriff's Department in
17 Claiborne County.
18 Q. Okay. Port Gibson?
19 A. Yes, sir.
20 Q. Okay. And how much are you making
21 there?
22 A. $11.
23 Q. Got it. And so between April of '24 and
24 January '25, it looks like you weren't working?
25 A. No, I wasn't.

Page 7

1  Q. And what were you doing in terms of
2  looking for work?
3  A. I did applications and I went into
4  businesses asking about a job. I did a
5  application at the Family Dollar Tree in Fayette.
6  I did one at the supermarket. And that's it.
7  Q. Okay. And I didn't ask this of the
8  other -- of everybody else, but I think it's going
9  to apply to everybody. For $10.45 an hour, was
10 that 40-hour a week, overtime. What would a
11 typical number of hours be for working at the
12 Facility?
13 A. It was like seven days on, seven days
14 off.
15 Q. So it worked out to be -- when you
16 say -- so you're doing --
17 A. It was like we made 86 hours, you know,
18 every pay period. So it was like 43 hours every
19 week.
20 Q. Yeah, now I follow you.
21   So that's why there's A, B, C, D?
22 A. Yes, sir.
23 Q. Because you might have an A and B shift,
24 day shift, night shift, but then y'all are off for
25 a week.

Page 8

1  A. Yes, sir.
2  Q. And so then you got to have C and D to
3  fill the week in that you're off?
4  A. Yes, sir.
5  Q. And so at the end of two-week period,
6  you might have 80 hours in from the first week,
7  but it balances out to 40 hours a week --
8  A. Yes.
9  Q. -- over the two weeks?
10   Gotcha. Firefighters do the same thing.
11   All right. Let's see. And what is
12 current age?
13 A. 49.
14 Q. And when did you graduate from high
15 school?
16 A. May of 1994.
17 Q. Okay. Was it here in Jefferson County?
18 A. Yes, sir, it was.
19 Q. And did you go on to college?
20 A. No, sir, I didn't.
21 Q. Okay. As part of -- and I know I didn't
22 ask this from others. But as part of the training
23 as a correctional officer, did you have to go to
24 something like the LEA, Law Enforcement Academy or
25 something?

Page 9

1  A. Yes. We went under Sheriff Walker.
2  Q. Got it.
3    Do you get a certification for going to
4  LEA?
5  A. Yeah, we got certified. Yes, sir.
6  Q. And so when you started back with
7  Claiborne County, do you have to get recertified
8  there?
9  A. No. I didn't have to get certified.
10 Q. In other words, it sticks around for a
11 while, the certification?
12 A. Yes.
13 Q. I think in this case you didn't see any
14 medical providers?
15 A. No.
16 Q. That's why everyone is joking about you
17 being shorter than everyone else, because we don't
18 have 20 or so pages to go through.
19   All right. Looking -- there's some
20 questions about pumping gas and some things like
21 that.
22 A. Yes, sir.
23 Q. So we'll cover that. We'll start on
24 that.
25   As I understand it, you started in

Page 10

1  December of 2020?
2     A. Yes, sir, I did.
3     Q. All right. And what was your --
4     A. December the 16th of 2020.
5     Q. Got it.
6        And when you were there, you were
7  correctional officer?
8     A. Yes, sir.
9     Q. Did you have a particular function, like
10 tower operator with Ms. McComb, or was it a just a
11 general CO?
12    A. Well, I had different -- we did
13 different -- we didn't just have one title because
14 you could work the tower or you could work the
15 floor. So, I did control three. I worked control
16 three, four, one in tower.
17    Q. And when you say three, four and one,
18 what positions would they be?
19    A. Control one is the tower operator.
20    Q. Okay.
21    A. Control three is a tower operator.
22    Q. Okay.
23    A. Control four is a tower operator.
24       Control two is where all the officers
25 sit and monitor the zones that's in the back.

Page 11

1     Q. Okay. Are there specific COs whose job
2  is to not monitor, for example, video screens, but
3  actually walk the floors; or is that something
4  everybody does?
5     A. The COs do it. The one that's in
6  control of two.
7     Q. Control two.
8        So that would be the group that would be
9  responsible for not looking at the towers, but
10 getting down there and looking at stuff?
11    A. Yes, sir.
12    Q. And what was your -- as a CO you worked
13 all of those roles?
14    A. Yes, sir.
15    Q. Okay. Now, was there ever an occasion
16 in which you were working at the Facility when you
17 might have had a medical problem that you had any
18 ambulances called for; did that ever happen?
19    A. For me?
20    Q. Yes, ma'am.
21    A. No, sir.
22    Q. Okay. Fair enough. Now I know.
23 There's five folks and I'm getting that -- that
24 makes sense.
25       Were there any occasions when you were

Page 12

1  working with someone that someone was terminated
2  for harassment of inmates?
3     A. No.
4     Q. Okay. Were you a supervising CO, that
5  is to say when new COs started, were there any put
6  under you for oversight?
7     A. No.
8     Q. Did you ever receive any writeups at
9  all, that you know of?
10    A. Probably did, yeah.
11    Q. What for?
12    A. They wasn't handheld. We just went into
13 the office and, you know, different little things.
14    Q. Yeah. Can you give us some ideas?
15    A. Harassing of a inmate -- you know, like
16 talking crazy to a inmate, the inmate writing you
17 up because they want to write you up.
18    Q. Did that happen with you on any
19 particular occasion?
20    A. Yeah, it have.
21    Q. All right. Did the inmates -- did you
22 ever know which inmate?
23    A. No.
24    Q. Did they talk about more than just you,
25 but a bunch of folks who were harassing them?

Page 13

1        MR. RHODES: Object to the form.
2     Q. (By Mr. Carpenter) If you know.
3     A. No, I don't.
4     Q. And I'll sort of clarify by that. For
5  example, did you ever have a complaint from a
6  supervisor where an inmate might have said hey,
7  Ms. Blake and two other COs were bothering me?
8     A. No.
9     Q. All right. How many -- how many times
10 do you recall being asked by a supervisor or
11 someone over you regarding harassing an inmate?
12    A. Probably once or twice.
13    Q. Gotcha.
14       And tell me, on those occasions, do you
15 recall the supervisor that talked to you?
16    A. I went to talk to the warden.
17    Q. And that's Warden Kaho?
18    A. Yes.
19    Q. What did he say?
20    A. He just told me not to tone my voice,
21 the way I talked to the guys.
22    Q. So it was more -- and he didn't say
23 anything about what you were saying to them?
24    A. No, he just told me I need to get -- you
25 know, just control my mouth.

4 (Pages 10 to 13)

Bonita Blake 4/18/2025

Page 14

1  Q. And because I've been in military, I
2  kind of know what that means. Did he mean you
3  were saying things to them that were bothering
4  them or was it just your -- like drill sergeant?
5  A. Yeah, the way I deliver it. My
6  delivery.
7  Q. Was it too forceful or too light?
8  A. It's like I'm more aggressive.
9  Q. Did he ever say that there was a
10 question about ever using any cussing or --
11 A. No.
12 Q. None of that. Got it.
13    And what was your response to that?
14 A. I just told him, okay, I'll get better.
15 Q. Fair enough.
16    And you never got anything in writing
17 from anybody at the Facility?
18 A. No. Nothing but that termination
19 letter.
20 Q. But nothing regarding discipline --
21 A. No.
22 Q. Okay. And no -- the Sheriff, himself,
23 never came down and said anything about this?
24 A. No. Never did come over there, talk to
25 you.

Page 15

1  Q. All right. Now, this is what I was --
2  when I mentioned pumping gas. Tell me about the
3  pumping gas incident.
4  A. Well, one day I was pumping gas. And
5  this other guy that used to work there, his name
6  is Sergeant Robinson, he was on the opposite side
7  of the pump. And I had my grandbaby in the car.
8  But upon me getting out of my car, Mr. Jones
9  pulled up. And I got ready to walk in the store,
10 but I was talking to Sergeant Robinson at the same
11 time.
12 Q. Right.
13 A. And when I was walking in the store,
14 Mr. Jones was interacting with Sergeant Robinson,
15 and he asked me did I want him to -- he say he'll
16 pump my gas. He didn't ask me. He said I'll pump
17 your gas for you while you gone in the store. And
18 I say hold up, let me see how much I'm going to
19 get before you pump it. And I told him $9. And I
20 went on in the store and pumped the gas. When I
21 came back out, Mr. Jones was back in his truck.
22 He didn't say anything else to me.
23 Q. Right.
24 A. At about 6:42 that evening, my phone
25 rung. It was Sheriff Bailey. He said, I got a

Page 16

1  call that Shawn Jones paid for your gas. I say,
2  what? I said, paid for my gas? I say no, that
3  man didn't pay for my gas.
4  Q. Right.
5  A. And he said, you got me. I was like,
6  this man ain't pay for my gas. And my thing is
7  this, he didn't know whether I'm screwing this man
8  or not. That wasn't a job of his to call me and
9  ask me a question.
10 Q. Right. But that didn't have -- that
11 particular thing had no ways, nothing to do with
12 him being a nice guy and pumping your gas at the
13 gas station?
14 A. That's it.
15 Q. And he didn't pay for any of it?
16 A. He didn't pay for nothing. My grandbaby
17 was in the car and that was a help for me, for him
18 to stand there and pump my gas and make sure my
19 grandbaby was safe too.
20 Q. Did you know Mr. Jones before?
21 A. Yes, we are classmates. We went to
22 school together.
23 Q. Now, Sheriff Bailey was not in y'all's
24 class?
25 A. No.

Page 17

1  Q. Shawn was?
2  A. Yes.
3  Q. Gotcha.
4    So you -- and there's nothing wrong with
5  this. You've been friends off and on with Shawn
6  because you were classmates?
7  A. Yes.
8  Q. So he comes up and he offers to pump the
9  gas; and as you told him, don't do it until I tell
10 you how many dollars?
11 A. Yes.
12 Q. $9. And then you got a call from
13 Sheriff Bailey about it?
14 A. Sheriff Bailey.
15 Q. And basically, you told him what you
16 told him. And at that point, he was left with the
17 impression that he did not pay for your gas?
18 A. That's it.
19 Q. Was that the end of that conversation?
20 A. That was the end of that conversation.
21 Q. Now --
22 A. No, he went on asking me did I have his
23 support -- did he have my support and I told him
24 yeah.
25 Q. Because at that point, he's just pumping

5 (Pages 14 to 17)

Bonita Blake 4/18/2025

Page 18

1  gas.  It wasn't like he was paying for your car?
2      A.  No.
3      Q.  And so was there anything -- because
4  that would have been, as I read paragraph 62, that
5  was between the -- when I say then primary
6  general -- first primary election and then the
7  runoff?
8      A.  Yes.
9      Q.  When the runoff was down to the Sheriff
10 and Shawn Jones?
11     A.  Yes.
12     Q.  And so after the runoff was over with,
13 it says paragraph 63, "Sheriff Bailey said he was
14 going to have Bonita Blake drug tested."  Did he
15 tell you that?
16     A.  No.
17     Q.  Okay.  Who did he tell?
18     A.  Somebody came to me and told me that
19 Sheriff Bailey said he was going to have me drug
20 tested.
21     Q.  Were you drug tested?
22     A.  No.
23     Q.  All right.  Because it also goes on to
24 say Sheriff Bailey was going to use the drug test
25 as a pretext for firing you.

Page 19

1      A.  Okay.
2      Q.  But he didn't tell you that?
3      A.  No, he didn't.
4      Q.  I know it's a close knit community.  Who
5  basically did say --
6      A.  My son, DeAnthony Blake.
7      Q.  Now, did your son work there?
8      A.  No, he heard -- people was talking to
9  him about it.
10     Q.  Gotcha.
11         This is the way every small town in the
12 state of Mississippi works.  It should be in the
13 city charter.
14         And so he -- but it did get back to you
15 --
16     A.  Yes, it did.
17     Q.  -- because that's where it was going?
18         But, in fact, he didn't do the drug
19 test?
20     A.  No.  And I was still employed at the
21 time.
22     Q.  That's right.  Because this would have
23 been before December 31?
24     A.  Yes.
25     Q.  Got it.  Okay.

Page 20

1          All right.  So then he says, "Sheriff
2  Bailey told people in the community he had to get
3  rid of the snakes in the Facility."
4      A.  Yes.
5      Q.  Did you hear him say that?
6      A.  No.  Too many peoples in the community
7  and peoples in the office came to me and told me.
8      Q.  Okay.  And then -- and the reason -- and
9  Carroll knows -- we're looking to see what you
10 heard and then what others heard.  Who in the
11 community told you that that's what the Sheriff
12 had said?
13     A.  Samantha Jackson.  She's the tax
14 assessor.  Gene Stampley.  He owns a little corner
15 store right beside the Sheriff Department.
16     Q.  Now, is he related to Derrick Stampley?
17     A.  No, I don't think so.
18     Q.  Because if I'm not mistaken, he was also
19 running.  There was a Derrick Stampley running?
20     A.  Yes, Derrick Stampley.  That's another
21 classmate.
22     Q.  But there's no relation?
23     A.  No.
24     Q.  All right.  Fair enough.
25     A.  I can't answer that question because I

Page 21

1  don't know who's kin and who's not.
2      Q.  Now, it indicates, paragraph 66, "Bonita
3  Blake actively supported another candidate other
4  than James Bailey."  Is that -- do you recall?
5      A.  No.
6      Q.  You voted?
7      A.  Yes.
8      Q.  Whatever you voted, and it really
9  doesn't matter, but you just voted?
10     A.  Yes.
11     Q.  But no yard signs?
12     A.  No.
13     Q.  Because as Carroll knows, door knocking,
14 no phone --
15     A.  No.
16     Q.  Gotcha.  Okay.
17     A.  And Lieutenant Terry Ware, with the
18 statement about he was getting rid of the people,
19 because we would go on a run, transportation, and
20 he would be talking about it.
21     Q.  And Lieutenant Terry Ware, he's in
22 charge of transportation?
23     A.  Yes.
24     Q.  And where would he be in the chain of
25 command?

6 (Pages 18 to 21)

Page 22

1     A.   He's a lieutenant.
2     Q.   Okay.  Because we were saying before,
3  there's --
4     A.   He comes up under -- he comes after --
5  it's the sergeant, the lieutenant.  Then you got
6  the captain, the major, the deputy warden and the
7  warden.
8     Q.   Correct.
9          And so what was his job role as
10 lieutenant?
11    A.   He did -- he was a night shift
12 lieutenant.
13    Q.   I follow you.  So whereas you've got
14 Ms. Smith as lieutenant for that shift, he was a
15 lieutenant for another shift?
16    A.   Yes, sir.
17    Q.   Follow you.
18         And then he would report to the captain
19 and on up the chain from there?
20    A.   Yes, sir.
21    Q.   Okay.  Now, after the primary election,
22 the runoff -- because as we were saying before,
23 just like in Long Beach, if it's the republican
24 primary, there ain't no general election.  So in
25 Fayette, in Jefferson County, in the democratic,

Page 23

1  there ain't no general election here.  So that was
2  it after the primary was over?
3     A.   Yes, sir.
4     Q.   Did Sheriff Bailey mention anything to
5  you between the end of that runoff election and
6  December 31st about your participation, helping
7  him out in an election?
8     A.   No.
9     Q.   Were you in attendance -- because I know
10 Ms. McComb just mentioned that there was -- and I
11 think it was Ms. McComb -- that there was a
12 mandatory meeting?
13    A.   Yes, sir.
14    Q.   Were you present for that?
15    A.   Yes, sir.
16    Q.   What did he say?
17    A.   Well, he was talking about the ACA, the
18 election, and he was talking about the raise,
19 about the amount of inmates he needed to get to
20 get the raise for us.
21    Q.   Right.
22    A.   He was going to some kind of meeting in
23 Jackson and all these different places to get
24 raises for us.  And talking about the support that
25 he needed from his workers for him in the

Page 24

1  election.
2     Q.   That's what I wanted to focus on.
3          So he specifically mentioned the
4  support -- and let me ask this question:  When was
5  that meeting?
6     A.   I can't recall it.
7     Q.   Sometime in '23?
8     A.   Yeah, sometime in '23.
9     Q.   Okay.  And then there was -- okay.  And
10 he did mention support election?
11    A.   Yes.
12    Q.   And that -- did he also mention that he
13 needed support in the running of the Facility so
14 he could go lobby for more cash?
15    A.   Yes.
16    Q.   More specifically, a higher per diem for
17 the inmates?
18    A.   Yes, to get us a raise.
19    Q.   That's right.
20         Was he able to do that, in terms of
21 giving y'all a raise?
22    A.   Yes, I received one.
23    Q.   Gotcha.  All right.
24         And once -- other than that mandatory
25 meeting, though, he didn't say anything more to

Page 25

1  you about supporting him?
2     A.   No.
3     Q.   Did anybody else?
4     A.   No.
5     Q.   Okay.  And so when you got -- and did
6  you have to reinterview?
7     A.   Yes.
8     Q.   And did he mention the election in that
9  interview?
10    A.   Yes.
11    Q.   What did he say?
12    A.   Well, see, my interview, I had to go
13 over for a complaint about another person.
14    Q.   What was that?
15    A.   I was having a problem with Ms. McComb.
16    Q.   Okay.
17    A.   And when I went in, I was telling him
18 about the problem, and he made the statement that
19 he had been getting complaints about Ms. McComb.
20    Q.   Okay.
21    A.   And that I wouldn't have that problem to
22 worry about no longer because he was going to take
23 care of the issue.
24    Q.   Did he say how he was going it take care
25 of it?

7 (Pages 22 to 25)

Bonita Blake 4/18/2025

**Page 26**

1    A.  He didn't say how he was going to take
2  care of it.  He said he was going to take care of
3  it.
4    Q.  And what were the complaints?
5    A.  Scandalizing my name.
6    Q.  Let me make sure I understand that.  I
7  think I do, but let me make sure.
8        So, you were telling the Sheriff that
9  she was saying negative things about you?
10   A.  Yes, that wasn't true.
11   Q.  All right.  And his response was -- and
12 was it related to your work at the Facility?
13   A.  Yes.
14   Q.  And his response was, "I'm going to take
15 care of that"?
16   A.  Yes, sir.  He said he had been getting
17 too many complaints about Ms. McComb.
18   Q.  And did he mention what those complaints
19 were?
20   A.  No.
21   Q.  Now, did -- and I'm putting all this
22 together in terms of who worked for what, where.
23       Were you on the same shift with
24 Ms. McComb?
25   A.  No.

**Page 27**

1    Q.  But you were hearing these from other
2  correction officers?
3    A.  What?
4    Q.  You were hearing things that Ms. McComb
5  might have been saying about you from other
6  officers?
7    A.  Yes.
8    Q.  To your knowledge, none of this was
9  written up that you ever saw by anybody, like a
10 document?
11   A.  No.
12   Q.  And we were talking about when you were
13 with the warden he was like use an indoor voice.
14 I'm joking because I'm thinking Barney the
15 Dinosaur.  But, you know, use a softer tone.  That
16 wasn't written up either.
17   A.  No.
18   Q.  And you just said you'll work on it and
19 that was the end of that?
20   A.  Yes.
21   Q.  Did the Sheriff say anything to you
22 after -- I say termination, but after you weren't
23 rehired?
24   A.  The day we -- I worked the whole shift.
25 And right before we got ready to get off, the

**Page 28**

1  deputy came over.  And he called Mr. Ellis first.
2  And after Mr. Ellis went down there, he called for
3  me to come down there to intake.  And when we made
4  it to intake, he said I have a letter for you.  He
5  say you sign right here, so I signed for the
6  letter.  And when I opened the letter, I read it.
7  And it said that my termination -- and then it
8  said if you have any questions, you can contact
9  Sheriff Bailey.
10   Q.  Right.
11   A.  So I asked my sergeant could I go up
12 front to use the phone to call Sheriff Bailey.  No
13 answer.  I called him the next day.  No answer.  I
14 still have yet to this day to talk to Sheriff
15 Bailey about why he terminated me.
16   Q.  Right.
17       Okay.  Did anyone else, other than
18 Sheriff Bailey, give you an idea of why you might
19 have been terminated?
20   A.  Because I didn't vote for him.
21   Q.  Okay.  Now, as I understand it, did he
22 ask you before the election if you were going to
23 vote for him?
24   A.  Yes, he did.
25   Q.  Where was that?  Because I know

**Page 29**

1  somewhere around the gas pumping incident.
2    A.  He asked me during the gas -- when he
3  called me on the phone.  And then one day I was
4  parking my car and he had walked out there, but he
5  was talking to someone else.  And then he walked
6  over to my car and he said, I've got your vote,
7  right, Hometown.  Because we stay in the same
8  little hometown.  And I answered yes.  And that
9  was it.
10   Q.  And I'm being picky, because that's what
11 lawyers do.  You know, so that's all right.
12 Carroll's good at it too.
13       So, you actually told him that you were
14 supporting him?
15   A.  Yeah.
16   Q.  But if I understand it, somehow, some
17 way he found out you weren't?
18   A.  Yes.
19   Q.  And that's what he acted on?
20   A.  Yes.
21   Q.  Fair enough.  I get it.
22       Do you recall writing any letters or
23 anything, because I'm not seeing it, but I want to
24 make sure.  Did you file a grievance?
25   A.  No.  Because it was after the timeframe,

8 (Pages 26 to 29)

Brooks Court Reporting
1-800-245-3376

Page 30

```
 1   you know, the 10 days you have to file a
 2   grievance.
 3        Q.  Right.
 4        A.  And when I found out about it, it was,
 5   you know, past the timeframe for you to file your
 6   grievance.
 7        Q.  Got it.  All right.
 8        A.  And then they was talking about
 9   something in the handbook, that you -- dealing
10   with the grievance and stuff like that.
11        Q.  Absolutely.
12            Going to your interrogatories -- and
13   yeah, we're going to be done by noon.
14            (Off the record conversation.)
15        Q.  (By Mr. Carpenter)  Who is Joyce Lee?
16        A.  She was the nurse.
17        Q.  The nurse at the Correctional Facility?
18        A.  Yes, sir.
19        Q.  Did she tell you that she'd heard that
20   Sheriff Denton{sic} was going to do something to
21   you?
22        A.  She was just talking in general about
23   the -- Sheriff Bailey, how he was going to get rid
24   of the snakes.
25        Q.  Okay.
```

Page 31

```
 1        A.  Because when I went for my interview, he
 2   sat with his phone just like this (indicating).
 3   He was talking, "I got to get rid of the people
 4   that's not here to support me."
 5        Q.  And he told you that?
 6        A.  Yes.
 7        Q.  And that would have been in the
 8   reinterview?
 9        A.  Yes.
10        Q.  And did he elaborate when he said
11   "didn't support me," as in?
12        A.  People that didn't have his back.
13        Q.  Did he mention the election?
14        A.  No.
15        Q.  All right.  But that's what you
16   understood him to mean?
17        A.  Yes.
18        Q.  Now, in 2024, you were in a traffic
19   accident with a log truck?
20        A.  In 2019.  I had a case.  My case went to
21   court in 2024.
22        Q.  I got it.
23            What happened -- and what happened in
24   that lawsuit?
25        A.  I won my case.
```

Page 32

```
 1        Q.  And how were you injured?
 2        A.  My knee, my shoulder and my head.
 3        Q.  All right.  Was there a period of time
 4   you couldn't work because of those injuries?
 5        A.  No.  When I had my surgery on my knee I
 6   couldn't work.
 7        Q.  And that was for about two weeks or a
 8   month?
 9        A.  Yeah, two weeks.
10        Q.  And did that have to go to court, like
11   went to a trial?
12        A.  Yes, we went to trial.
13        Q.  All right.  And you recovered?
14        A.  Yes, sir.
15        Q.  Who was the attorney on that one for
16   you?
17        A.  Morgan and Morgan.
18        Q.  Oh, I know them well.
19            Do you know the attorney that worked for
20   you?
21        A.  Will -- I had Will, Paul and -- Paul
22   Ott, Will -- it was another one.  I had one more.
23        Q.  Gotcha.  Yeah, I know them.
24            (Off the record conversation.)
25        A.  And Rocky.
```

Page 33

```
 1        Q.  Rocky Wilkins.
 2        A.  Yeah.
 3        Q.  He does a lot of premises work, too.
 4            Now, in Interrogatory Number 13 -- these
 5   are interrogatories you recall answering.  And it
 6   said, "I supported candidate Shawn Jones for
 7   sheriff" when it says, "Please identify the
 8   candidate you supported instead of Sheriff
 9   Bailey," because you had mentioned that in your
10   answers.  But you supported him, but you didn't
11   say anything about it?
12        A.  No.
13        Q.  Which is fine.  Because as I think
14   Ms. McComb said, "Who I vote for is my own doggone
15   business."
16        A.  Yeah.
17        Q.  Did you do any -- and you also
18   mentioned, other than voting, you didn't get
19   actively involved in the election?
20        A.  Huh-huh.  (Negative response.)
21        Q.  Now, one of the claims that you had made
22   is for emotional distress.  When did you feel your
23   emotional distress get better?
24        A.  It hasn't gotten better.
25        Q.  Okay.  So we do this for physical pain,
```

9 (Pages 30 to 33)

Bonita Blake 4/18/2025

Page 34

1  and having been in a truck accident you'll know
2  exactly because your lawyers probably did it too.
3  You use a term 0 to 10, 0 being I never had that
4  accident; I'm fine. 10 of 10, I need to be in
5  emergency today but I got to be here instead. And
6  it's a range that we use to try to gather the
7  intensity of pain. You can use it for physical,
8  but you can use it for emotional too.
9       In January of 2024, what would you feel
10 your anxiety, your depression, your emotional
11 distress was relating to the Facility?
12     A. Sleep.
13     Q. What?
14     A. Sleep. I can't sleep. My body is set
15 to a time.
16     Q. Right.
17     A. And it was like 4:00 in the morning I'm
18 getting for work to get to be at work at 5:45.
19 And my body's still having to adapt to, you know,
20 everyday life. You know, at 4:00, I'm up. I
21 can't go back to sleep. I'm -- you know, and it's
22 depressing because I'm not getting enough hours of
23 rest.
24     Q. And on a scale of 0 to 10 -- and we're
25 going to try to figure out if it's getting better,

Page 35

1  if it's not getting better, where the intensity
2  is. But the month after this happened, where
3  would you have been on anxiety and depression? 0
4  of 10 being okay; 10 of 10 being I need to be in a
5  emergency room. Where would you fit --
6     A. About a seven.
7     Q. And we're just going arbitrarily
8  numbers. There's no -- but it's a good signpost.
9       So we get from January '24, December
10 '24. Now we're a year away from when this
11 happened. What would you say the intensity of it
12 would be in December of '24, yeah, end of '24?
13    A. Getting better?
14    Q. Yes.
15    A. It's not getting better.
16    Q. So, we're still at a seven?
17    A. Yeah.
18    Q. We are now in April of '25. Would you
19 still say it's a seven?
20    A. It's a seven.
21    Q. Have you been to any -- and I know we
22 talked about you have no medical records?
23    A. No.
24    Q. So, how are you dealing with it?
25    A. Everyday just get on up and start my

Page 36

1  everyday life. Get prepared. Because I have a
2  grandbaby and I gets her up for school. So, I get
3  up and get her prepared for school. Because my
4  daughter, she works at night. That's my -- I just
5  balance my everyday life with whatever I have to
6  do.
7     Q. Now, in the log truck accident, with
8  Rocky and everybody, did you have to give a
9  deposition?
10    A. Yes, sir, I did.
11    Q. All right. Has that case settled?
12    A. Yes, sir, it has.
13    Q. All right. Did you have to give live
14 testimony when you went to trial?
15    A. No, I didn't -- we went to trial and we
16 just settled out of court before. The other --
17 the plaintiff{sic} testified. They went up first.
18 And then when it got to be -- we just settled out
19 of court.
20    Q. Were you a plaintiff in that trucking
21 case in the log truck case?
22    A. Yes.
23    Q. Was there more than one plaintiff?
24    A. Just me.
25    Q. Just you. Okay.

Page 37

1       So, typically -- usually plaintiff goes
2  first, then defense. But you didn't get to the
3  point in your case, your side of the case, where
4  you had to testify?
5     A. Yes.
6     Q. In other words, they settled on the
7  courthouse steps?
8     A. Yes.
9     Q. So the only thing that would be there
10 would have been a deposition taken at some point?
11    A. Yes.
12    Q. And where was that filed?
13    A. The case?
14    Q. The lawsuit, yeah.
15    A. In Claiborne County.
16    Q. Claiborne County. Okay.
17       All right. Now, were you -- again,
18 we're going specifically from December 31 of '23,
19 when you got let go, to, let's say, throughout
20 2024. Were you still having physical pain from
21 that trucking accident?
22    A. Yes, I still have it now.
23    Q. Gotcha.
24       Where does it hurt now?
25    A. In my leg and in my back.

Bonita Blake 4/18/2025

Page 38

1    Q.  Has your shoulder gotten better?
2    A.  Yes.
3    Q.  All right.  And are you treating
4  medically for your physical pain from the trucking
5  accident?
6    A.  No.
7    Q.  All right.  When's the last time you
8  went to a doctor regarding your -- the log truck
9  case?
10   A.  It's been a long -- it's been a minute.
11   Q.  Because it was back in 2019?
12   A.  Yes, sir.
13   Q.  Have you had, between 2019 and now, any
14  workers' comp injuries?
15   A.  No, sir.
16   Q.  So this is really the only one you had?
17   A.  Yes, sir.
18   Q.  And do you -- do you have children that
19  live with you?
20   A.  Yes, sir.
21   Q.  How many children do you have?
22   A.  I have three kids.  But my daughter and
23  granddaughter stay with me.
24   Q.  So while you're at work, they're taking
25  care of the kids?

Page 39

1    A.  Yes.
2    Q.  And does your daughter work?
3    A.  Yes.
4    Q.  So you're working and she's working and
5  y'all are maintaining the household?
6    A.  Yes, sir.
7    Q.  Excellent.  All right.
8        I think that's all I've got.
9        MR. CARPENTER:  Carroll?
10  EXAMINATION BY MR. RHODES:
11   Q.  Let me ask you about the Sheriff.
12       Why do you think he thought that you did
13  not support him?
14       MR. CARPENTER:  Objection.
15       THE WITNESS:  The day Shawn Jones pumped
16  my gas.
17       MR. CARPENTER:  Objection, but of course
18  you can go ahead and answer.  He already knows.
19   Q.  (By Mr. Rhodes)  When did the sheriff
20  call you, that next morning?
21   A.  That same that day, that evening.  At
22  6:42 that evening.
23   Q.  Tell us exactly what he said to you
24  about that incident about Shawn Jones pumping your
25  gas.

Page 40

1    A.  What I can remember is, when the phone
2  rung, I answered the phone.  And I say -- well,
3  when I seen the number, I say Sheriff Bailey, what
4  he want, what I done did.  So when I answered the
5  phone, he say, Hey, Ms. Blake.  I say, Hey,
6  Sheriff Bailey, how you doing.  I say what I done
7  did wrong.  He say, nothing.  He say, I got
8  something to ask you.  I say, what is it.  He say
9  I got a call that Mr. Jones paid for your gas.  I
10  say, what.  I say, no, he didn't pay for my gas.
11  I said, I paid for my own gas.  I say Sergeant
12  Robinson was standing on the other side and that
13  man pulled up.  He was talking to Sergeant
14  Robinson at first.  And when I got ready to go in
15  the store, he told me he will pump my gas.  And I
16  say he pumped my gas and that was it.  Me and him
17  didn't talk to each other.
18       That was it.  That was the end of the
19  conversation.
20   Q.  Did Sheriff Bailey say anything else?
21   A.  That's it.
22   Q.  And who do you recall telling you that
23  he said he was going to get rid of the snakes?
24   A.  My son, the tax assessor, Samantha
25  Jackson, Gene Stampley, and, like I say,

Page 41

1  Lieutenant Ware.  He would say when we would go on
2  the runs, like the transportation.
3    Q.  And did all of them tell you at one
4  meeting or at different times?
5    A.  At different times.
6    Q.  Over what period of time did you hear
7  that?
8    A.  The whole time --
9    Q.  The election was --
10   A.  Yeah.
11   Q.  So, over a two or three-month period?
12   A.  Two or three-month period, six months.
13  Still until this day you hear it.  When you go in
14  the store you still hear it.
15   Q.  Okay.
16  EXAMINATION BY MR. CARPENTER:
17   Q.  Which raises a good question: Are you
18  claiming that you have any humiliation or loss of
19  reputation from this?
20   A.  Yes.
21   Q.  But on the other hand, everyone you know
22  is telling you that you were let go not for
23  anything you did, but because you didn't -- you
24  just didn't happen to support him?
25   A.  Yes.

11 (Pages 38 to 41)

Brooks Court Reporting
1-800-245-3376

**Page 42**

1  Q. And that by itself, in your mind, is not
2  something that's wrong, because you have the right
3  to choose whomever you want?
4  A. Yes.
5  Q. But you're hearing about that from
6  people saying he let you go because you didn't
7  support him?
8  A. Yes.
9  Q. Okay. And if I understand you
10 correctly, you have a right to support whoever you
11 want to?
12 A. Yes.
13 Q. Okay. Fair enough.
14    That's all the questions I have.
15 A. And I went to the library Friday, this
16 Friday just passed. Nancy Green was there. And
17 she was talking about how the peoples been coming
18 in the library talking about how Sheriff Bailey
19 did the workers. It's still going on. It's not
20 hush, hush. Everybody is still talking about it.
21 Q. That's right. I follow you.
22    And your understanding that, from Nancy
23 Green is, it's Sheriff Bailey that's doing things
24 wrong?
25 A. Yes.

**Page 43**

1  Q. She's not coming back to report that
2  you're doing anything wrong?
3  A. No.
4  Q. Fair enough. That's all I got.
5    (Time Noted: 12:05 p.m.)
6       SIGNATURE/NOT WAIVED
7
8  ORIGINAL: MR. CARPENTER, ESQ.
9  COPY: MR. RHODES, ESQ.

**Page 44**

1       CERTIFICATE OF DEPONENT
2  DEPONENT: BONITA BLAKE
   DATE:  April 18, 2025
3  CASE STYLE:  Smith, et al vs. Jefferson County,
   Mississippi, et al
4  ORIGINAL TO:  MR. CARPENTER, ESQ.
      I, the above-named deponent in the
5  deposition taken in the herein styled and numbered
   cause, certify that I have examined the deposition
6  taken on the date above as to the correctness
   thereof, and that after reading said pages, I find
7  them to contain a full and true transcript of the
   testimony as given by me.
8       Subject to those corrections listed below,
   if any, I find the transcript to be the correct
9  testimony I gave at the aforestated time and place.
   Page   Line         Comments
10 ____   ____   _____
11 ____   ____   _____
12 ____   ____   _____
13 ____   ____   _____
14 ____   ____   _____
15 ____   ____   _____
16 ____   ____   _____
17
18    This the ____ day of _____, 2025.
19
          _____
20           BONITA BLAKE
   State of Mississippi
21 County of _____

   Subscribed and sworn to before me, this the
22 ____ day of _____, 2025.
23 My Commission Expires:
24 _____  _____
25              Notary Public

**Page 45**

1     CERTIFICATE OF COURT REPORTER
2     I, Robin G. Burwell, Court Reporter and
3  Notary Public, in and for the State of Mississippi,
4  hereby certify that the foregoing contains a true
5  and correct transcript of the testimony of BONITA
6  BLAKE, as taken by me in the aforementioned matter
7  at the time and place heretofore stated, as taken by
8  stenotype and later reduced to typewritten form
9  under my supervision by means of computer-aided
10 transcription.
11     I further certify that under the authority
12 vested in me by the State of Mississippi that the
13 witness was placed under oath by me to truthfully
14 answer all questions in the matter.
15     I further certify that, to the best of my
16 knowledge, I am not in the employ of or related to
17 any party in this matter and have no interest,
18 monetary or otherwise, in the final outcome of this
19 matter.
20     Witness my signature and seal this the
21 30th day of April, 2025.
22
23             _____
             ROBIN G. BURWELL, #1651
24             CRR, RPR, CCR
   My Commission Expires:
25 April 6, 2029

12 (Pages 42 to 45)