# Carolyn Smith, et al. v. Jefferson County, Mississippi, et al.

## Carolyn Smith

## April 18, 2025

All depositions & exhibits are available for downloading at
<<www.brookscourtreporting.com>>
Please call or e-mail depo@brookscourtreporting.com if you need  a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

EXHIBIT 9

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION


CAROLYN SMITH, ET AL

                                        PLAINTIFFS


V.            CIVIL ACTION NO. 5:24-CV-0072-DCB-ASH


JEFFERSON COUNTY,
MISSISSIPPI, ET AL

                                        DEFENDANTS


DEPOSITION OF CAROLYN SMITH


Taken at the instance of the Defendants at the Law
Offices of Carroll Rhodes, 119 Downing Street,
Hazlehurst, Mississippi 39083, on Friday,
April 18, 2025,
beginning at 8:53 a.m.


REPORTED BY:

ROBIN G. BURWELL, CCR #1651

Carolyn Smith 4/18/2025

**Page 2**

```
1    APPEARANCES:
2
3      CARROLL RHODES, ESQ.
       Law Offices of Carroll Rhodes
4      Post Office Box 588
       Hazlehurst, Mississippi 39083
5      crhode@bellsouth.net
6
              COUNSEL FOR PLAINTIFF
7
8
       THOMAS L. CARPENTER, ESQ.
9      Wise, Carter, Child & Caraway
       2510 14th Street, Suite 1125
10     Gulfport, Mississippi 39501
       tlc@wisecarter.com
11
12            COUNSEL FOR DEFENDANT
13
14   ALSO PRESENT:
15
       Shaquita McComb
16     Bonita Blake
       Sandra Sanders
17     James Ellis, Jr.
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                INDEX
2    Style.......................................1
3    Appearances...............................2
4    Index  .....................................3
5    Certificate of Deponent  .................80
6    Certificate of Court Reporter .............81
7              EXAMINATIONS
8    Examination By Mr. Carpenter ...............4
9    Examination By Mr. Rhodes .................72
10   Examination By Mr. Carpenter .............76
11              EXHIBITS
12   Exhibit 1 Notice ..........................57
13   Exhibit 2 Medical Records .................57
14   Exhibit 3 Org Chart .......................73
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1            CAROLYN SMITH,
2    having been first duly sworn, was examined and
3    testified as follows:
4    EXAMINATION BY MR. CARPENTER:
5      Q.  Ms. Smith, I'm Tom Carpenter.  I
6    represent Sheriff Bailey and Jefferson County.
7      A.  Okay.
8      Q.  And this deposition, we are going to
9    push to go for an hour.
10     A.  Yes, sir.
11     Q.  Because we have every one on one day.
12   I've spent a few hours going through everything so
13   that we can sort of get to, I think, what the
14   important stuff is.
15         You'll hear a couple of things in a
16   minute with Carroll and it's what's going to be
17   called as the "usual stipulations."
18       MR. RHODES:  Yes.
19     Q.  (By Mr. Carpenter)  And Carroll says
20   yes.  What that means is, because we don't have a
21   judge here today, we're waiving all of the
22   objections that we would make in trial, like
23   hearsay.  He said this, you said this.  You know,
24   hear say.  Well, it's okay today because we're
25   here to get information and so whoever said
```

**Page 5**

```
1    whatever, that's perfectly fine.  And since we
2    don't have a judge, we got no one to make
3    decisions anyway about whether something's
4    admissible.
5         So we waive everything but for two
6    things.  Number one, privilege.  You have a legal
7    privilege so that anything you discuss about with
8    Mr. Rhodes, other than like the facts of the case,
9    like your last day of employment, you might have
10   mentioned that to him, but that's something we can
11   find out about.  Legal theories, what he thinks
12   about the case, that's between you and him, isn't
13   my business.  So we won't be asking that.
14        And as far as medical goes, I've looked
15   at your complaint and see what you're looking for.
16   Certain things would be waived by that, like
17   emotional distress.  A lot of things won't.  So
18   we'll really be focusing -- I know you've had some
19   -- you mentioned that you've had upset stomach and
20   things like that, so we might cover it.  We won't
21   cover likes that are at issue.
22        Like, if you have a foot pain, well,
23   unless you tell me the foot pain happened because
24   of this, then I'm not going to be getting into
25   your foot pain.
```

2 (Pages 2 to 5)

Carolyn Smith 4/18/2025

**Page 6**

1    A. Yes, sir.
2    Q. So that's privilege.
3        The other thing is form. And we may
4  object and we may say "form" and maybe even a
5  couple of words like "argumentative" or
6  "speculative." All that means is me and him are
7  putting objections, which are placeholders. So
8  when we read your deposition, we'll go ah-ha, I
9  know I said something about that, and then we can
10  mark it. But we'll waive all of that.
11        But a form objection is a badly worded
12  question, and we fix those as we go. So if I were
13  to ask you five questions, and here we go: Name,
14  age, Social Security number, address. Now,
15  starting from the top -- and he's going to say
16  well, I'm going to object to the form. That's a
17  multiple question and people can't keep all that
18  in their head, and he would be right. So that's
19  just a badly worded question.
20        And the other thing you will hear is
21  something called read and sign. And --
22        MR. RHODES: We'll read and sign.
23        Q. (By Mr. Carpenter) And you've got to
24  read and sign. So what that means is our court
25  reporter will take down what we're saying here

**Page 7**

1  today and she'll give you a nice book at the end
2  of it. You get to review it, and if there's
3  things that you think you said that differ than
4  what the court reporter has, you can say what
5  page, line and I meant to say "no" and it's got
6  "not" and it's supposed to be "no." And you
7  annotate and that gets notarized and becomes a
8  part of the overall deposition.
9        So that's what reading and signing's all
10  about.
11        A. Yes, sir.
12        Q. With that having being said, I think we
13  can get started. If you'll give me your full
14  name, Ms. Smith.
15        A. Carolyn Smith.
16        Q. And where do you live in terms of your
17  address now?
18        A. I live at 16 Barnes Lane in Union
19  Church, Mississippi in Jefferson County.
20        Q. How long have you lived there?
21        A. All of my life.
22        Q. Very good.
23        And what do you do currently as an
24  occupation? And I know you're on the school
25  board; in fact, you're the president of the school

**Page 8**

1  board?
2        A. Yes, sir.
3        Q. What else do you do?
4        A. Right now I work at Alcorn State
5  University as a greeter.
6        Q. And when did you start with Alcorn
7  State?
8        A. I started September the 1st of 2024.
9        Q. Okay. And your position is greeter?
10        A. Is a greeter.
11        Q. Very good.
12        And how much does that pay?
13        A. 10.65.
14        Q. Okay.
15        A. No, 10.30 -- I think 10.35. I'm sorry.
16        Q. That's no problem.
17        And in December of 2023, which is the
18  last month I understand you worked for
19  Jackson{sic} County --
20        A. Jefferson.
21        Q. JC -- correct. I'm thinking Jackson --
22  I see JC and I think that's correct.
23        JFCO, Jefferson Franklin Correction
24  Office. How much were you making in December of
25  '23?

**Page 9**

1        A. Approximately about 18 or $19, because I
2  had just got a raise before I left.
3        Q. Okay. All right. And how much do you
4  make as a school board member?
5        A. $300 a month, and that is tax.
6        Q. I received a school board stipend for a
7  long time, so I'm familiar with that.
8        Is there any -- and I wouldn't think
9  there is. But is there any addition monthly pay
10  you get from that for being the president, or just
11  you get what every other --
12        A. Everybody gets the same as a member.
13        Q. Okay. Now, I understand -- well, we'll
14  start with some other just basic background.
15        Some of these questions, by the way,
16  because -- we call this a private deposition,
17  which is when this thing's over with these, things
18  are on their way to the City dump, after they've
19  been shredded. So when I ask you for like age,
20  don't worry, we ain't putting it on Facebook.
21        But how old are you now?
22        A. 57.
23        Q. Okay. And your educational background.
24  I think you graduated from high school?
25        A. Yes, sir.

3 (Pages 6 to 9)

Carolyn Smith 4/18/2025

## Page 10

1    Q. Did you attend any other schools, like
2  either at Alcorn or Co-Lin?
3    A. No. I went to Co-Lin one semester for
4  EMT.
5    Q. Got it. Now, between December the 31st
6  of 2023 and September the 1st of 2024, did you
7  work anywhere?
8    A. No, sir.
9    Q. And in that period of time, did you
10  apply to places to work?
11    A. I did.
12    Q. And where was that?
13    A. I applied at Sanderson Farms. I applied
14  at Wal-Mart distribution. I applied at Wal-Mart
15  store. I applied for -- at Adams County
16  Correctional Facility. That's the federal prison
17  on Highway 84. And, of course, I applied twice at
18  Alcorn State University.
19    Q. Okay. And so ultimately in September of
20  2024, you started with -- you started there?
21    A. Yes, sir.
22    Q. Okay.
23    A. But I did have an interview at the
24  correctional facility in Adams County.
25    Q. Okay. I used to represent that sheriff

## Page 11

1  as well. Roosevelt. That's been a long time ago.
2  That's been 20 years ago.
3    A. Yes, sir.
4    Q. Okay. Now, for medical bills. Do you
5  know how much your medical bills are?
6    A. Well, my medical bill ran up. I
7  couldn't afford to pay my medical bills --
8      MR. RHODES: Object as to the form.
9    Q. (By Mr. Carpenter) If you know.
10      MR. RHODES: The only reason, you
11  limited it to medical bills related to treatment
12  for --
13    Q. (By Mr. Carpenter) Oh, of course.
14  Correct. Yeah. And you can assume when we talk
15  about medical records or bills, we're concerned
16  about related medical records and bills.
17      Do you know what your medical bills are
18  related to what happened in late the 2023 at JC --
19  Jefferson Franklin?
20    A. Well, I only had insurance one month
21  after that. After that, my insurance decreased
22  and I could only afford to go to a comprehensive
23  clinic where I paid $25. And the medicine that
24  was so expensive that I couldn't afford my
25  medicine because I didn't have insurance.

## Page 12

1    Q. Okay. Did you also go at times to
2  Bounds Family Medicine?
3    A. I did.
4    Q. So it would have been Bounds Family
5  Medicine that had seen you during this period of
6  time?
7    A. Yes, sir.
8    Q. And Jefferson County Health --
9    A. Jefferson Comprehensive Health Clinic.
10    Q. Got it. Excellent.
11      And I may have asked this question. Do
12  you know what your medical bills are in terms of a
13  dollar amount related --
14    A. I really don't, because I've got sick
15  during the course of time and I had to go to
16  King's Daughters Medical Center and I know that
17  bill ran up.
18    Q. Now, when you went to King's Daughters
19  Medical Center, did that have to do with --
20    A. Very stressful, yes, sir.
21    Q. Okay. So what did they treat you for?
22    A. They treated me for anxiety, stress,
23  loss of weight. It was just a number of things I
24  was...
25    Q. Who did you see there?

## Page 13

1    A. It was a doctor in the emergency room.
2    Q. All right. And how many times did you
3  go to King's Daughters?
4    A. Once.
5    Q. Okay. Do you know when -- about when
6  that was?
7    A. Approximately, it must have been in May
8  or June, something like that.
9    Q. 5, 6 of '24. And what did they
10  prescribe for you or suggest for you?
11    A. Well, they gave me a whole list of
12  medicine. It was some anxiety medicine, sleeping
13  medicine. During that time I think I had a sinus
14  infection. Stuff like that.
15    Q. Okay. So when you went to King's
16  Daughters you were dealing both with anxiety,
17  depression and sinusitis?
18    A. Yes, sir.
19    Q. Gotcha. Okay.
20      Now, just some general questions that
21  will be questions that everybody will get, and
22  then we'll go specifically into your contentions
23  from the complaint, through disclosures, through
24  your discovery and then through medical bills,
25  too, or medical records, which we have.

**4 (Pages 10 to 13)**

Carolyn Smith 4/18/2025

**Page 14**

1    Because of what happened -- and I'm just
2    going to say at JF, Jefferson Franklin.  Because
3    of what happened at JF, other than this period of
4    time that you were out of work, do you feel
5    physically or emotional unable to work in any way?
6        A.  Yes, because it was something that I had
7    to learn to do all over.  Which on this job, I had
8    been there for 27-and-a-half years.  It made me
9    mentally embarrassed, emotional distress.  I
10   couldn't think, couldn't eat, couldn't sleep, loss
11   of weight, loss of hair.
12       Q.  Okay.  All right.  And because of that
13   you treated with King's Daughters once in
14   Brookhaven?
15       A.  Yes.
16       Q.  And I think you said you went once to
17   Jefferson County Comprehensive because of
18   insurance issues?
19       A.  Yes, sir.
20       Q.  Got it.  Okay.
21       As far as physical pain, in your
22   interrogatories you mentioned, well, diarrhea?
23       A.  Yes, sir.
24       Q.  How long did that go?
25       A.  Diarrhea lasted me than like two weeks

**Page 15**

1    or three weeks.  I couldn't hold anything down.
2    Couldn't eat, couldn't think of nothing, couldn't
3    sleep.  Normally times that -- where I was
4    sleeping when I was employed eight hours, sleep
5    narrowed down to three or four hours a night.
6        Q.  Right.
7        A.  I couldn't -- I couldn't barely do
8    anything but just sit and think where my next
9    income was coming from.
10       Q.  Okay.  During the period of time, the
11   nine months between the beginning of '24 and when
12   you started work for Alcorn State, what did you do
13   for income in the absence of a job?
14       A.  Well, I had opportunity to draw my
15   unemployment.  It was $235 a week.
16       Q.  Okay.  So about 900 a month or
17   thereabouts?
18       A.  Yes.
19       Q.  How long did that last?
20       A.  I think I got that for 24 or 25 weeks,
21   something like that.
22       Q.  So about six months?
23       A.  Yes, sir, and it came to an end.
24       Q.  Okay.
25       A.  And it still wasn't enough to pay bills.

**Page 16**

1        Q.  But the job with Alcorn State, that's
2    working out?
3        A.  It's working out, but it's not what I
4    was used to making there.  It's like now I'm
5    living from paycheck to paycheck.  Because every
6    time I get a check I have to pay a bill or try to
7    get caught up from things that I was behind on.
8        Q.  All right.  Do you have any plans to --
9    because I know -- upon reviewing your discovery,
10   you're working like in -- you had your school
11   board salary, you were working for JF, and you
12   were also working in other -- did you have more
13   than one job during that period of time while you
14   were at JF, or were you only working there?
15       A.  While I was inside the building?
16       Q.  Yes.
17       A.  I had multiple positions and roles that
18   I was taking on inside the facility.
19       Q.  I'm sorry.  I mean were you working
20   anywhere other than the facility?
21       A.  No, sir.
22       Q.  All right.  Are you looking for a second
23   job to supplement the income you get as a greeter?
24       A.  Well, it's hard to try to get another
25   job to fit in with the schedule that I'm on now.

**Page 17**

1        Q.  Okay.
2        A.  I mean, I'm going to need some time to
3    still rest, and I'm already overwhelmed in trying
4    to do the things that I'm doing now.  So it would
5    be very hard for me to try to fit a second job
6    into my schedule.
7        Q.  Let's see.  Beyond the stomach
8    complaint -- pain that you had and beyond the
9    diarrhea, were there any other physical issues
10   that arose from this?  You mentioned you couldn't
11   sleep and that's an emotional type thing.  But
12   anything else that you can think of?
13       A.  Well, yes, I mean I couldn't eat.
14       Q.  Okay.
15       A.  I mean half of the time when I got home
16   I couldn't think about what I had to do.  I had to
17   try to take care of my mom.  She's 84 years old,
18   trying to take care of her.  So that put a very
19   lot of strain and stress on me.  I couldn't do the
20   things that I really wanted to do that I once was
21   doing.
22       Q.  Right.  And I think you said that went
23   on for at least three or four weeks thereafter?
24       A.  After --
25       Q.  After you were let go.  And I use the

**5 (Pages 14 to 17)**

Brooks Court Reporting
1-800-245-3376

Carolyn Smith 4/18/2025

**Page 18**

1    term -- you could say fired or not rehired or let
2    go.
3        A.  Well, after I got terminated, that
4    stress went on for a long time.
5        Q.  Okay.  How long?
6        A.  Probably until I got another job.
7    Because I didn't have any source of income to
8    really take care of my needs that I really wanted
9    to take care of.
10       Q.  So that would have been until September
11   of '24?
12       A.  Yes, sir.  Somewhere along that time.
13       Q.  All right.  Going into, you know, the
14   issues, your particulars.  I'm going to be looking
15   at things, and I can let you see them if you need
16   them.
17       A.  Yes, sir.
18       Q.  But I'll start with the complaint.  And
19   because every person in the complaint has their
20   section, and yours is first.  So, I've got
21   paragraphs 15 to almost 100 that we'll be going
22   through with everybody.  But starting with you,
23   because you're the first one up in the complaint
24   --
25       A.  Yes, sir.

**Page 19**

1        Q.  -- you began work at the facility on
2    April of '97?
3        A.  Yes, sir.
4        Q.  And looks like Peter Walker was the
5    sheriff at that time?
6        A.  Yes, sir.
7        Q.  And he served, as I understand it, until
8    -- would have been 2019 was the election for him.
9    Because he would have come on in -- because state
10   officers are elected the year before the
11   presidentials, like '23.
12       A.  Yes, sir.
13       Q.  So he was on until 2019?
14       A.  Yes, sir.
15       Q.  Okay.  And at that point, that's when
16   Sheriff Bailey came in?
17       A.  Yes, sir.
18       Q.  Okay.  And did you work for anyone in
19   that particular campaign, the 2019 campaign,
20   whether it be Peter Walker or Sheriff Bailey?
21       A.  No.
22       Q.  All right.  And at some point -- in
23   paragraph 17 it says, "Carolyn Smith was promoted
24   to sergeant and later promoted to lieutenant."
25   When did you make sergeant?

**Page 20**

1        A.  Oh, that had been some years ago.
2        Q.  Yes, ma'am.
3        A.  It has been.
4        Q.  Okay.  And how long have you been
5    lieutenant by the end of '23?
6        A.  By the end of 23, I may have been
7    lieutenant maybe over 8 to 10 years, probably over
8    10 years.
9        Q.  Okay.  And that job paid 18 to 19 per
10   hour?
11       A.  No.
12       Q.  How much did lieutenant pay?
13       A.  It was before then -- see, I first
14   started off as a correction officer.
15       Q.  Correct.
16       A.  And I moved up to sergeant.
17       Q.  Correct.
18       A.  Then I moved to up lieutenant.  When I
19   was the lieutenant I think I had moved up to about
20   16, $17.
21       Q.  Okay.
22       A.  That was with the raise that he had
23   given us the month before I got terminated.
24       Q.  Okay.  So when you say the raise he,
25   "he" being Sheriff Bailey?

**Page 21**

1        A.  Sheriff Bailey.
2        Q.  Gotcha.  Okay.
3            And coming down to paragraph -- and a
4    lot of this, lawyers writeup so we don't have to
5    ask about it so we can get to the lick-log.
6        A.  Yes, sir.
7        Q.  Paragraph 32, "May 21, 2023, Ms. Smith
8    attended a town hall community forum where
9    everyone" -- because every candidate for elective
10   office in Jefferson County, Mississippi attended.
11   You recall going to that forum or town hall?
12       A.  When was it, May when?
13       Q.  May 21st?
14       A.  I think it was around May 2nd or
15   something.  It was on a Tuesday night.
16       Q.  Okay.
17       A.  I want to say May 2nd or May 5th.  It
18   was on a Tuesday night.
19       Q.  Gotcha.
20           And if I read that paragraph correctly,
21   that was like an all candidates forum?
22       A.  Yes, sir.
23       Q.  Did all the candidates for sheriff show
24   up to your knowledge, or do you remember?
25       A.  Yes, sir.

Brooks Court Reporting
1-800-245-3376

Carolyn Smith 4/18/2025

**Page 22**

1    Q.  All right.  Now, at that particular
2  meeting -- and we'll say May 2nd, that's what you
3  were saying -- do you recall saying anything for
4  any candidates in that one or you were there just
5  to be there and watch?
6    A.  I was just there to support.  Because it
7  was a town hall meeting that was held in my
8  district, and I was just there to listen to
9  candidates.
10    Q.  Gotcha.
11      Now, we just finished municipal
12  elections, and I'm sure Fayette had its elections
13  too, and so we had those town halls all over Gulf
14  Coast.
15    A.  Yes, sir.
16    Q.  And so it says on paragraph 33, "On
17  May 31st of 2023, Sheriff Bailey called Carolyn
18  Smith" -- in other words, you -- "into his office
19  and impliedly threatened to take adverse
20  employment action against her because he said he
21  heard you're not for me."
22    A.  Yes.
23    Q.  Tell me what happened.
24    A.  On the day after the town hall meeting,
25  the next morning at about 8:30 or 9:00 I was

**Page 23**

1  called into Sheriff Bailey's office.  I think
2  Ms. Kolenberg(phonetic), she called back and she
3  said Sheriff Bailey wanted to see you in his
4  office.
5    Q.  Gotcha.
6    A.  Upon arriving in his office, he said
7  take a seat.  And I said yes, sir.  He said I'm
8  hearing the community people saying that you're
9  not supporting me.
10    Q.  Okay.
11    A.  I said I don't get into election until
12  it's my time to get into my own election.  He said
13  well, I can't have nobody on my team that's not a
14  supporter of me.
15    Q.  Okay.
16    A.  He also asked me on that last night,
17  which was the town hall meeting, "Who did you talk
18  to on your phone, who did you call?"  I think I
19  told him it must have been -- I recall talking to
20  my mom.  He said, "Who else did you call?"  Then
21  that's when I told him this was my personal phone.
22  It's not Jefferson phone.  I didn't think that I
23  owe him an explanation of who I talked to
24  personally on my own cellphone.
25    Q.  Okay.  Now, in this conversation --

**Page 24**

1  because it says May 31st, but it sounds like this
2  was the day after the town hall meeting that
3  Sheriff Bailey called you in?
4    A.  It was after the town hall meeting, that
5  day.  I don't think it was that far down in May.
6  Because it was held in my community of Union
7  Church.
8    Q.  Right.  Okay.
9      Was anyone in that meeting other than
10  him and you?
11    A.  No, sir.
12    Q.  Okay.  Did anybody take an audio or -- I
13  know there wasn't no video.  But any audio or
14  anybody take any notes at the time?
15    A.  No, sir.
16    Q.  Okay.  When that occurred on May 3rd,
17  Ms. Smith, did you mention that to anyone else at
18  the time, that hey, whether it be a supervisor or
19  the Secretary of State or anybody saying I've got
20  a sheriff that I work for that is, I feel --
21  that's asking me, you know, am I supporting him
22  and I've got to have people who support me.  Did
23  you remember talking to anybody about that?
24    A.  I didn't call anyone at a Secretary of
25  State office.  I went back and I talked to my

**Page 25**

1  supervisor about the conversation that I had with
2  Sheriff Bailey.
3    Q.  And who was that?
4    A.  Clifton Kaho.
5    Q.  And what did he say?
6    A.  He wanted to know why would he call you
7  to talk to you about that.  I said I don't know.
8  Because he was saying that -- I said he told me
9  that he didn't need nobody on his team that was
10  not going to support him.
11    Q.  Okay.  Let me ask you a question very
12  closely on that phrase.  "He didn't need anyone on
13  his team that did not support him."  Did he use
14  the term "support his election?"
15    A.  Well, that's basically what he was
16  talking about, supporting his election.
17    Q.  I understand.  I understand that's what
18  you picked it up from.  But I'm trying to get as
19  exact words as possible as to what the sheriff
20  said to you about "I need everybody on my team
21  that's supporting."  Did he use the term
22  "supporting me" or "supporting me in my election?"
23    A.  It's supporting me in my election
24  because I don't need know backbiters.
25    Q.  All right.  And you basically told

7 (Pages 22 to 25)

Carolyn Smith 4/18/2025

## Page 26

1    Warden Kaho that the sheriff had come and asked
2    basically asked about your participation?
3        A.  Yes, sir.
4        Q.  And that he basically said, I don't need
5    anybody that will not support me in my election?
6        A.  Yes, sir.
7        Q.  And then you've already told me what
8    Warden Kaho said.  Was there anything that was
9    done with that?
10       A.  No, sir.
11       Q.  Did you double-back to Warden Kaho and
12   say look, I didn't hear back from you, what's
13   going on?
14       A.  I didn't.
15       Q.  Did the sheriff say anything else
16   between that encounter in December of '23 about
17   the election to you?
18       A.  Yes, sir, I've had several meetings.
19       Q.  All right.  Well, let's discuss the next
20   meeting after that.  When was that?
21       A.  The next meeting that I had with him, we
22   had to redo our applications.
23       Q.  Okay.
24       A.  I never got an interview.
25       Q.  Okay.  All right.

## Page 27

1        Now -- I didn't want to cut you off, but
2    I was asking as far as what was the month and
3    year, if you can say, of the next time you spoke
4    with Sheriff Bailey about reapplying or keeping
5    your job?
6        A.  Well, when the rumors got out that --
7    from the community, the people said that you are
8    going to be terminated.  I went several times to
9    speak with him, call him and ask him for a meeting
10   to talk to him about that.  I've even talked to
11   him and asked him about an inmate family member
12   called me one day -- she was checking on her
13   husband, and she called me and she said oh -- I
14   answered the phone.  And she said oh, you're still
15   employed.  I say why would you say that.  She
16   said, well, I spoke with Sheriff Bailey about that
17   you was going to be gone, you and your niece.
18   Just give him a little time, y'all will be gone.
19       Q.  And who that was lady?
20       A.  She was an inmate's wife.
21       Q.  Okay.  And what was her name?
22       A.  I can't think of her name right now.
23       Q.  Okay.
24       A.  I really can't.  I should have written
25   it down.

## Page 28

1        Q.  Do you know who the inmate was?
2        A.  McCullom.  His last name was a McCullom.
3        Q.  Okay.  All right.  So where I'm going is
4    on May -- some time a couple of days or a few days
5    after the first -- the town hall, you had the
6    discussion with Sheriff Bailey, what was the next
7    occasion which you had to speak with Sheriff
8    Bailey regarding your job or that election?
9        A.  If you said that was in May.  I've had
10   several encounters with him maybe in July.
11       Q.  Okay.
12       A.  July, coming up to it.  Because it was
13   still, everybody was saying that I was going to be
14   terminated.  Each time that I've gone to him and
15   I've talked to him, he told me I don't know where
16   you're getting your information from.  That's not
17   true.  I never said anyone was getting fired.  He
18   said I only asked you-all to redo your application
19   for the same reason.  Four years ago everybody
20   else did their -- all of you-all reapplied for
21   your job.  He said I never had any intention of
22   getting rid of anyone.
23       Q.  Okay.
24       A.  Numerous occasions he have told me that.
25       Q.  Okay.

## Page 29

1        A.  I've gone in Sheriff Bailey's office at
2    least about three or four times to discuss whether
3    he was going to fire me.
4        Q.  Right.
5        A.  You know, because it was so many --
6    people knows me in the street and they would tell
7    me, you know, what he's saying.
8        Q.  Okay.
9        A.  And I noticed that there was a change in
10   my sheriff, because you're the leader of my county
11   and I have a position in your office.  You will
12   need things to come and ask me.  But when you come
13   over there to see things, you will walk in and you
14   never speak to me.  I could see you out and you
15   never would speak to me.
16       Q.  Okay.  I will sort of tell you where I'm
17   coming from.  Because if we go to trial, Carroll
18   will be asking -- because Carroll's good at this,
19   he's going to be asking you please tell me each
20   and every occasion that you spoke with the sheriff
21   and what he had said about the election or your
22   job.
23       A.  Yes, sir.
24       Q.  And so that's kind of what I'm doing,
25   because I've got to prepare a defense and let

Brooks Court Reporting
1-800-245-3376

Carolyn Smith 4/18/2025

**Page 30**

1    everybody know. And so, you've mentioned several
2    occasions. If I were to break this down month by
3    month between May of '23 and December of '23,
4    would that help? Because what I'm looking for are
5    dates and who was in the room, and what was said
6    by each party on each one of those occasions where
7    he brings up what you had to say.
8        A.  Each time that I've gone into his office
9    it's only been me and him.
10       Q.  Okay.
11       A.  It was no one else taking notes. It was
12   always me and him. Either any time that he calls
13   you in his office for anything, it would only be
14   just him in the office with you.
15       Q.  Okay. And we'll kind of -- we'll start
16   this way. Between May of the first meeting that
17   we talked after the town hall, and December 31st
18   of 2023, on how many occasions do you recall him
19   talking to you about your support for someone else
20   and/or the job?
21       A.  About five times I've gone to him. I
22   can't say what month, but I just know that it was
23   all about five times that I've had to call and ask
24   him can I meet with him about certain things that
25   I was hearing in the streets about my job, my

**Page 31**

1    employment. I've even told him that my job --
2    this job is where I make my living. This is my
3    life here. And I say any other -- all of our
4    coworkers here, because a lot of them that was
5    there, a lot of those people were living from
6    paycheck to paycheck. Because I can attest they
7    was not making the money that I was probably
8    making. Some of them was less.
9        Q.  Okay.
10       A.  And I've spoke to him on numerous -- I
11   don't know the exact date, but I've gone to him
12   several times.
13       Q.  Okay. And you mentioned five times?
14       A.  Yes.
15       Q.  Is that a good number?
16       A.  Yes, sir.
17       Q.  We'll go at it kind of this way. Within
18   those five occasions, is there anything that he
19   said or you said that was different than this
20   first one, which is "I hear you're not supporting
21   me," "I need people to support me"?
22       A.  He told me that if I -- if we cannot --
23   if I can't get my act together in supporting him,
24   that he didn't need nobody on his team that was
25   against him.

**Page 32**

1        Q.  Okay. And that's exactly how he put it?
2        A.  That's exactly how he said it.
3        Q.  Okay. And you took that to mean the
4    election?
5        A.  The election, and he was going to
6    terminate.
7        Q.  Did he say he was going to terminate
8    you?
9        A.  He didn't say it exactly. But the terms
10   of him telling me that "I don't need nobody on my
11   team that's not supporting me," that's -- as me as
12   being an elected official, that's what I would
13   think it would be.
14       Q.  But I'm trying to get as exact as
15   possible what the words were. And the reason
16   being is if we go to trial and you say that and
17   there's something different, if I didn't ask these
18   questions I'd kind of be out in left field. So, I
19   want to make sure as best you recall this is how
20   he put it?
21       A.  That is how he put it.
22       Q.  Got it.
23          And then you understood it the way you
24   described it?
25       A.  Yes, sir.

**Page 33**

1        Q.  Yes, ma'am. Okay.
2           Is there anything else in those
3    conversations that you can recall that he might
4    have said?
5        A.  I had gone to a funeral one time. And
6    as acquainted with other sheriff and long as I've
7    been in the building, I've had the opportunity to
8    talk to sheriffs all over the state of
9    Mississippi. At one funeral I had an encounter to
10   run into Sheriff Patton of Adams County. And he
11   and I sat together. And after the services,
12   didn't think of nothing, because even Shawn Jones,
13   I've had the opportunity to work in the prison
14   with him for several years before he went to state
15   trooper school.
16          He asked Sheriff Patton -- we took a
17   picture together and Mr. Jones at a funeral.
18   Sheriff Bailey was there. He asked me about why
19   did you take a picture with them at the funeral.
20   I said these are people I've been knowing for
21   years. It doesn't mean anything.
22       Q.  Okay.
23       A.  Sheriff Patton is a person that I
24   changed his Pamper. I held him on my side for
25   many years. Being acquainted with his mother --

**9 (Pages 30 to 33)**

Carolyn Smith 4/18/2025

## Page 34

1  was my manager of my group. So I basically knew
2  these guys from day one, birth one.
3      Q. Right.
4      A. I didn't have any reason that if you
5  asked to take a picture -- it wasn't nothing.
6      Q. Right. Did Sheriff Bailey say anything
7  about that?
8      A. Yes, sir, he did.
9      Q. What did he say?
10     A. He asked me, he said the day at the --
11  well, he mentioned -- this is how he say, "The day
12  at J.L. Hammet's mother funeral I saw you take a
13  picture with Sheriff Patton and Jones. What was
14  that about?" I said, it wasn't nothing, it was
15  just a picture.
16     Q. Right.
17     A. I said, these guys -- Jones, I worked
18  with for years in the prison. Sheriff Patton,
19  basically, if you would talk with him he will tell
20  you I'm his auntie. Because that's how close we
21  were. You know, I said it really didn't mean
22  nothing. It was just people I knew.
23     Q. Gotcha.
24        And what did he say in response?
25     A. Well, he didn't like it.

## Page 35

1      Q. Well, what did he say?
2      A. He said it was like disrespecting me as
3  your sheriff and disrespecting me as you working
4  for me.
5      Q. Okay. And when was that?
6      A. That was -- it was one of the times -- I
7  can't -- I know the Hammet's mother passed away,
8  it was in '23. It was before election.
9      Q. Gotcha.
10        And when we say "before election," are
11  we talking primary election or general election?
12     A. The primary election.
13     Q. Because I'm guessing in Jefferson County
14  the democratic primary election is the election?
15     A. Yes, sir.
16     Q. Got it. All right.
17        Anything else that you can recall
18  Sheriff Bailey saying to you about your job or
19  your participation in his campaign prior to
20  December of '23?
21     A. Nothing that I could recall. Because,
22  actually, after those meetings he shut down and
23  stopped talking and speaking to me.
24     Q. All right.
25     A. He even came to my family reunion out in

## Page 36

1  Union Church, Mississippi. Didn't interact with
2  my own family with my being there. Didn't speak
3  or talk with me there.
4      Q. What did you -- or did you really do
5  anything for anybody's campaign?
6      A. No, sir, I didn't do anything.
7      Q. Because if you attended town halls, and
8  there might be a couple of them, you were just
9  there to watch everybody?
10     A. I was just there to watch.
11     Q. And, you know, he did ask you if you
12  would support him and you were basically that's my
13  business?
14     A. I told him I'm going to vote, but I
15  didn't say who I was going to vote for.
16     Q. Right. And so in your mind he just
17  assumed that it was going to be Shawn or somebody
18  else?
19     A. Right.
20     Q. Got it. After the election -- well,
21  strike that.
22        After December of '23, did Sheriff
23  Bailey tell you anything directly about what
24  happened?
25     A. I never spoke with him. After I got my

## Page 37

1  letter -- once I got my letter on December -- I
2  think it was December the 31st. When a deputy
3  delivered my letter, he said you can -- but the
4  deputy told me he had a letter for me. He said,
5  Sheriff said do not give you this letter if you
6  don't sign for it. I said, well, I will have
7  to -- I'm going to read things before I sign for
8  it. He said you've got to sign for it. I said I
9  will not sign it.
10     Q. Okay.
11     A. So the deputy said well, okay,
12  Ms. Smith, I'll let you read the letter and you
13  will sign it. So, he gave me the letter and I
14  read the letter. I did not sign it.
15     Q. Okay. And when he said, or the deputy
16  said sign, it was just signed for receipt of it
17  like a certified receipt letter or --
18     A. It's signed that I agreed to that I got
19  the letter.
20     Q. Okay. All right. I got it.
21        And so -- and nevertheless, you got the
22  letter, you didn't sign for it, and Sheriff Bailey
23  never talked to you about it?
24     A. He never talked to me. I never called
25  him.

10 (Pages 34 to 37)

Carolyn Smith 4/18/2025

Page 38

1    Q. Gotcha.
2       Did you file a grievance?
3    A. I did.
4    Q. With whom?
5    A. From where in the facility that we
6 worked, if an employee has a grievance matter, you
7 will file that grievance with your supervisor.
8    Q. Right. And that would have been the
9 chief of security?
10    A. That would have been -- or Warden
11 Kaho -- well, the chief of the security, which
12 would have been Henry Felton.
13    Q. Right. Was he a major?
14    A. He was a major then.
15    Q. All right. And then what, if anything,
16 happened as a result of your filing the grievance?
17    A. Well, it didn't go through the proper
18 way. Because initially, when I tried to tell the
19 board of supervisors how I supposed to file my
20 grievance, they told me that you are supposed to
21 file your grievance with the sheriff. I said
22 that's not the facility protocols, because why
23 would I file the grievances and give it to the
24 person that I'm filing the grievances on. It
25 should have gone to my immediate supervisor and

Page 39

1 worked its way up the ladder to the sheriff.
2       So, times went on by and we did file a
3 grievance -- well, I did file a grievances. I
4 gave it to -- Henry Felton, at the time, was a
5 major. And he told me he would get back with me.
6 After weeks and months went by, Ms. Roberson, a
7 lady that had gotten there, she said let her --
8 she had to read the policy to see how the
9 grievances go. So she told me that -- she called
10 me back and she said Ms. Smith, I'm going to
11 certify letter you another grievances because the
12 one that y'all did, it wasn't done right. She
13 said it was just like you said, it were supposed
14 to have gone to Major Felton. She said but I'm
15 going to give you an opportunity to do another
16 one. She sent it out. At that time, I had hired
17 a counsel.
18    Q. So, I guess the end result of that was
19 you got a second form. But at that point, you had
20 Carroll?
21    A. Because a grievance has to be filed
22 within the 10 days of your termination.
23    Q. Right. Gotcha. Okay.
24       Now, are you familiar with an incident
25 in January of '23, around January 23rd, with some

Page 40

1 contraband that had been thrown over a wire?
2    A. No, sir.
3    Q. Okay. Do you recall being in a room
4 with your niece, who's here, Ms. McComb?
5    A. Yes, sir.
6    Q. How did that -- and so tell me how that
7 went. Just, generally, from first to last, what
8 do you recall?
9    A. Just randomly whenever he had -- must
10 have had -- well, he had her in a meeting over
11 there. The phone rang. He called me, said Ms.
12 Smith, I need you in a meeting over here. So, I
13 got up to go over to his desk, over to his office,
14 to see what the meeting was about. He
15 interacting, putting me something I had nothing --
16 no recollection of what was going on. He told me,
17 he say, well, I got your niece in here. He say
18 Ms. McComb was -- contraband came over the fence.
19 And the inmates told him the contraband was
20 supposed to have been -- she was supposed to catch
21 the contraband. But I said Sheriff, that's a day
22 that she wasn't at work. You know, that didn't
23 add up to make very much sense. If she was going
24 to have contraband to come in, why would you have
25 contraband to come in on a day that you're not at

Page 41

1 work?
2    Q. How did you know she was not at work if
3 she's not in your line?
4    A. Because I'm the lieutenant at the
5 prison. Any time that a person is out or not
6 coming to work, their supervisor will bring the
7 form up to me and say hey, Ms. Smith or --
8 Shaquita McComb didn't come to work or she wasn't
9 at work. During that time I think she was at work
10 but she had gotten off. Her shift had ended.
11    Q. Okay.
12    A. The contraband came after she had gone
13 home. So I asked him if the contraband came after
14 she had gone home, how can you say it was for her
15 and another person that was on duty had already
16 arrived.
17    Q. Okay.
18    A. He said, because the inmate told me.
19    Q. Right. How did you know when, exactly,
20 the contraband had been thrown on the wire that
21 got hooked onto it?
22    A. When the sheriff called and told me
23 about it in a meeting. I didn't know anything
24 about it.
25    Q. Because that's what I'm trying to get

11 (Pages 38 to 41)

Carolyn Smith 4/18/2025

**Page 42**

1    at. He was saying that an inmate had told him
2    that Ms. McComb was involved in an incident where
3    contraband was thrown over a wire?
4        A.  Uh-huh.  (Affirmative response.)
5        Q.  You indicated that it didn't happen at a
6    time when it she was on duty?
7        A.  Yeah, that's what I was trying to
8    understand, why did it come -- if it was for
9    her --
10       Q.  Right.
11       A.  -- why didn't it come while she was at
12   work if she was supposed to catch it?
13       Q.  When was it thrown over the wire?
14       A.  After she had gone home, sometime late
15   that evening or that night.
16       Q.  Okay.
17       A.  She worked at a day shift.  And that was
18   my question to him.  If it was for Ms. McComb
19   working on a day shift, why would you schedule a
20   package to come in when you're gone home.
21       Q.  Okay.  Who mentioned when it was thrown
22   over the wire?
23       A.  Sheriff Bailey did.
24       Q.  All right.  So he was claiming that it
25   was thrown over at night?

**Page 43**

1        A.  It was thrown over in the evening shift.
2    It was.
3        Q.  Okay.  Now, I'm going to ask you this:
4    I hear you saying that Sheriff Bailey told you
5    that it had been thrown over at night.
6        A.  Right.
7        Q.  Do you have any independent recollection
8    outside of what he told you as to when it was
9    thrown over?
10       A.  Of any outside?
11       Q.  Sure.
12           Other than Sheriff Bailey saying that,
13   did you have any other information that supported
14   that it had been thrown over at night?
15       A.  I think that if our -- once we get on
16   down into it, if I can say her name, Ms. Sanders,
17   she was on duty that night when it came in.  And
18   if I'm not mistaken, Ms. Sanders was over there --
19   over on that side.
20       Q.  Okay.
21       A.  That was at the sheriff department side
22   in the back county jail.  Basically, I work over
23   at the prison.  I go over there only if they need
24   me to go over there to supervise something.  She
25   has an immediate supervisor that was on duty.  He

**Page 44**

1    skipped over her supervisor and came directly to
2    me.  He skipped over the major, the captain, the
3    warden and the deputy warden.  But you came
4    directly to me and you came directly to me
5    because, I guess, she was my niece.
6        Q.  Well, you're the second tier supervisor
7    over her, as I understand the chain of command.
8    She was in section -- shift B or shift A?
9        A.  What shift was that?  I think it was
10   shift B.  I think it was B shift.
11       Q.  And there would be a shift commander for
12   the facility for -- that was her direct
13   supervisor?
14       A.  She had a -- direct supervisor was
15   Sergeant Walters.
16       Q.  Very good.  And you, as lieutenant, were
17   over Sergeant Walters?
18       A.  Yes, sir.
19       Q.  And then you reported to chief of
20   security, at that time, Major Felton?
21       A.  Well, after I came back.  Because I
22   really didn't know what I was going over to the
23   meeting for.
24       Q.  Well, I'm looking at chain of command on
25   the organizational chart.  So on that day it would

**Page 45**

1    have been the sergeant over Ms. McComb?
2        A.  Yes, sir.
3        Q.  From there, it would have been you?
4        A.  Yes, sir.
5        Q.  And from there, it would have been
6    Warden Felton as chief of security -- not warden,
7    but Major Felton?
8        A.  We had a captain.  It would have been
9    the captain, which was Captain Duveaux(phonetic).
10   From Captain Duveaux, it would have went up to
11   Major Felton.  From Major Felton, it would have
12   been to the warden -- or the deputy warden and
13   then the warden.
14       Q.  Who was the -- the warden at the time
15   was?
16       A.  Clifton Kaho was the warden at the time.
17       Q.  And Major Felton reported directly to
18   him?
19       A.  No, Major Felton reported to a deputy
20   warden, Deputy Warden Brenda Doss(phonetic).
21       Q.  And what was Deputy Warden Brenda Doss'
22   rank?
23       A.  She was a deputy warden and she was the
24   office manager.
25       Q.  Because when you look at the

12 (Pages 42 to 45)

Brooks Court Reporting
1-800-245-3376

Carolyn Smith 4/18/2025

**Page 46**

1    organizational chart, the office manager doesn't
2    go between the chief of security. It's one of the
3    ones in the horizontal line, of which chief of
4    security's here and office manager's here.
5        A.  Yes, sir.
6        Q.  Case manager's on the other side.
7        A.  Yes, sir.
8        Q.  But what you're indicating is that in
9    actuality, the office manager also functioned as
10   another layer in the chain of command between the
11   two?
12       A.  Yes, sir.
13       Q.  Okay.  So do you know if the sheriff had
14   talked to any of these people?
15       A.  I don't know.
16       Q.  All right.  Fair enough.
17           So you're in the meeting, and it turns
18   out that the discussion is -- who brought the
19   idea, or who brought the point up that this
20   happened at night and Ms. McComb was working day
21   shift?
22       A.  Well, Sheriff Bailey gave me the time
23   that it was thrown over the fence.
24       Q.  Gotcha.
25       A.  He gave me the time that it was thrown

**Page 47**

1    over the fence.  And I said Sheriff Bailey, well,
2    McComb was gone home by then.  He said well, the
3    inmates said it was for her.
4        Q.  Okay.  And then what happened?
5        A.  And he said well, I'm just going off
6    what the inmates said, it's for her.  I said well,
7    if she's gone home and the other officer or the
8    supervisor there that does a parameter check at
9    night, they would have saw that -- the package
10   wouldn't have stayed there until she gotten back
11   the next morning.  Because if you're doing your
12   parameter every night of the facility, you're
13   going to pick it up.
14       Q.  Okay.  Do you know when it was found?
15       A.  I don't know.
16       Q.  Okay.  All right.
17       A.  When it was found, as of the time, it
18   was found after McComb was gone home.
19       Q.  I understand.  But do you know if it was
20   in the night or in the next morning?
21       A.  It was during that night.  It didn't
22   happen over in the next morning.  It was during
23   the course of that night after McComb had gotten
24   off.
25       Q.  Okay.  And that's when it was thrown.

**Page 48**

1        A.  Yes, sir.
2        Q.  I was wondering -- the question would
3    be, do you know when it was found?
4        A.  After she was gone home.  On the next
5    shift.  It wasn't on her shift.  It was on the
6    next shift.
7        Q.  So some time during the night it was,
8    both, thrown over and found?
9        A.  Yes, sir.
10       Q.  All right.
11           As lieutenant -- well, we'll continue
12   through.
13           So, what happened after that discussion?
14   Was that pretty much the end of it at that point?
15       A.  That was the end of it.  I didn't hear
16   anything else about it.  I didn't -- you know, my
17   question, if it was for her and you was the
18   sheriff, why didn't you do action on -- take
19   action on it right then and there, if you had all
20   your information, you should have done action on
21   it.
22       Q.  Well, let me ask a couple -- while we're
23   relating on that point.
24           So tell me what a lieutenant would do at
25   the facility, because that's the role you had.

**Page 49**

1    What was your job function?
2        A.  As a lieutenant, my job was to -- first
3    thing, maintain safety and control of all inmates.
4        Q.  All right.
5        A.  My job would be, I would go around, I
6    would do a research of the zone, inspect
7    everything, make sure that my officer, the
8    correction officer -- well, they wasn't my
9    immediate -- my supervisor -- if I went down and
10   found something that was out of the ordinary, I
11   will come back and I will have a meeting with the
12   supervisor of that shift.
13       Q.  Right.
14       A.  And from that supervisor of that shift,
15   I will do a report.  And then I will go through
16   the chain of command to get it to my captain.  I
17   will speak with my captain about it.
18       Q.  Right.
19       A.  And the captain will go on up the chain
20   of command.
21       Q.  Okay.
22       A.  But at that prison I've had several
23   roles.  I was the lieutenant.  My job was to -- on
24   a day shift if an inmate rolled in or rolled out,
25   a lot of time it was my responsibility to take

13 (Pages 46 to 49)

Carolyn Smith 4/18/2025

**Page 50**

1    them in and out of the system to put them to where
2    they was going.  I was also over the clothing of
3    the inmates, to make sure that every six months
4    that they will get their issue.  I will have to
5    keep up with the inventory of when I need to order
6    clothes, when I need to order shoes or underwear,
7    everything.  I would report those order to the
8    young lady up front and tell her this is what
9    we're short of.
10        Just, basically, constantly doing
11   walk-throughs during the course of the day to make
12   sure that everything -- make sure -- my main thing
13   was to make sure that my count was clear.  We had
14   a timeframe of my count should clear within no
15   more than seven or eight minutes.  If it's
16   anything over the seven or eight months that I
17   couldn't get my count clear, then I would call
18   everybody in from their destination to send them
19   back to their dorm, do a head count by paper every
20   day.
21      Q.   Right.  And that's an inmate count that
22   you're referring to?
23      A.   That's an inmate count, yes, sir.
24      Q.   How many people directly, or indirectly,
25   were under you at the facility?

**Page 51**

1      A.   Just the supervisors.
2      Q.   And how many COs did they have under
3    them?
4      A.   It was hard to tell because some nights,
5    some days they will have two and three people on
6    shift.  We never was staffed -- whenever they are
7    not there we couldn't staff it, I will have to
8    fill in the place of a correction officer to do
9    the thing that they did, walk around, count,
10   transport inmates to and from medical, transport
11   them to lunch or where they needed to go.
12        On a daily full shift, I would say it
13   would have taken at least 7 to 10 people to run a
14   shift.
15      Q.   Okay.
16      A.   And it never was that.
17      Q.   Right.  And while you didn't -- you were
18   basically over the supervisors, the shift
19   supervisors?
20      A.   Yes, sir.
21      Q.   And they, in turn, supervised the
22   correctional officers?
23      A.   Yes, sir.
24      Q.   And they reported to you.  And as I
25   understand, you then reported to the office

**Page 52**

1    manager, who might have had a second hat as the
2    captain, Brenda Doss?
3      A.   No, Brenda Doss was the deputy warden.
4      Q.   Deputy warden.
5      A.   The captain was Captain Michael Duveaux.
6      Q.   So you reported to Captain Duveaux?
7      A.   Yes, sir.
8      Q.   And then he reported --
9      A.   -- to Major Henry Felton.
10     Q.   Major Henry Felton, who was chief of
11   security?
12     A.   He was the chief of security.
13     Q.   So, he was a major, and he reported to
14   Brenda Doss?
15     A.   Brenda Doss.
16     Q.   Who was a captain?
17     A.   She was a deputy warden.
18     Q.   So she didn't have a rank?
19     A.   She had a rank of deputy warden.  She
20   was the office manager and the deputy warden.
21     Q.   I'll let you see where I'm going.  You
22   had lieutenant, then you reported to a captain,
23   who then reported to --
24     A.   No -- yes, I would report it to the
25   captain, the captain would report to the major,

**Page 53**

1    the major would have reported to the deputy
2    warden, and the deputy warden would report to the
3    warden.  Then the warden -- if they have to go any
4    further, the warden will report it to the sheriff.
5      Q.   Got it.
6           Did anyone over the rank of major, which
7    would be Major Felton, have a rank, or after that
8    was just all title, like deputy warden, warden and
9    sheriff?
10     A.   That's all we had there.
11     Q.   Got it.
12          Other than office manager -- well, we'll
13   start with Captain Duveaux, because that's who you
14   reported to?
15     A.   Yes, sir.
16     Q.   What was his title?
17     A.   He was the captain.
18     Q.   Okay.
19     A.   He was the dietician.
20     Q.   Okay.
21     A.   And -- well, I wouldn't say -- well,
22   dietician because -- his office was in the
23   kitchen.  He was responsible for ordering the
24   food, make sure the inmate measure up the food,
25   serve the right amount of food, check in trucks

14 (Pages 50 to 53)

Brooks Court Reporting
1-800-245-3376

Carolyn Smith 4/18/2025

**Page 54**

1    that comes in, and he was the one that order food.
2       Q.   All right.  And was he in charge of
3    security?
4       A.   At times, he were.  That should have
5    been his major job as a captain, to be in
6    security, but he had several hats to wear and
7    other jobs to do.
8       Q.   Got it.
9            If there was a problem that you needed
10   help in resolving within the facility that related
11   to security, contraband, those kinds of things,
12   you would report your concerns to him?
13      A.   I was supposed to report everything to
14   him.  But he was a captain that didn't come out of
15   the kitchen so I will have to go over to Major
16   Felton or my warden.  Those were the peoples that
17   would help me out.  Because we had a captain that
18   was on duty, but his major job was in the kitchen.
19   He never helped us on the floor with anything.
20      Q.   I follow you.
21           And I think you testified earlier you
22   could also speak to the warden?
23      A.   Yes, sir.
24      Q.   Okay.  And if you had concerns, you'd
25   tell him, too, make sure he knew?

**Page 55**

1       A.   Yes, sir.
2       Q.   Fair enough.
3       A.   In my role as a lieutenant, there was
4    nothing that I will have to go to the sheriff for.
5    I will be stepping over the rest of them -- the
6    change{sic} of command if I stepped over and went
7    straight to the sheriff.
8       Q.   Right.
9            But did you on occasion?
10      A.   No.
11      Q.   Okay.  So if I understand what you're
12   telling me -- because I understood that you spoke
13   to the sheriff on numbers of times before you were
14   finally -- before the end of December of '23.  If
15   I'm understanding at this point you're saying that
16   if you ever had any concerns you would report,
17   perhaps not the captain because he was holding a
18   lot of hats, but you would let Major Felton know
19   who then would either report it to the office
20   manager/deputy warden or to Warden Kaho himself?
21      A.   Yes, sir.  That was anything pertaining
22   to inmates that I couldn't handle.
23      Q.   Got it.
24           And did you have the ability to
25   basically come up with solutions yourself if you

**Page 56**

1    saw problems?
2       A.   Yes, sir.
3       Q.   Okay.  And then you would, basically,
4    inform the chain of command up the chain, this is
5    what I did, so if you see --
6       A.   Yes, sir.
7       Q.   -- something different --
8       A.   Long as it was in the guidelines of
9    MDOC, the policy.
10      Q.   And to your knowledge that was never a
11   problem.  No one ever said you can't do that?
12      A.   No, sir.
13      Q.   Got it.
14           Did Sheriff Bailey get your advice
15   and/or the advice of the shift supervisors at any
16   particular time about particular issues, whether
17   it be a microwave or water intrusion or some --
18   the count didn't go out, anything like that?
19      A.   No, sir.
20      Q.   All right.  Ms. Smith, I've got some
21   medical records.  I'm going to basically let --
22           MR. CARPENTER:  If you want to get a
23   copy of those, Carroll, that will be perfectly
24   fine.  I'm just going to ask her some questions
25   about medical records that we produced.  But I can

**Page 57**

1    give you a chance to look at it first if you want
2    to.
3           MR. RHODES:  I think Cheryl --
4           MR. CARPENTER:  Cheryl -- that's right.
5    She sent them.
6           MR. RHODES:  I think she sent them to me
7    so I won't hold up on trying to get a copy.
8           MR. CARPENTER:  No sweat.
9           And what we'll do is we'll just make
10   that -- we'll do notice of deposition as Exhibit 1
11   and then this will be Exhibit 2.
12           (Exhibit 1 marked for identification.)
13           (Exhibit 2 marked for identification.)
14           MR. RHODES:  I went through these
15   yesterday when Cheryl sent them.  Are you going to
16   have all of them?
17           MR. CARPENTER:  Sure.  I'll make them
18   collectively.  That way it's easier than going
19   page by page with exhibit numbers.
20           MR. RHODES:  Are those Bates numbers at
21   the bottom?
22           MR. CARPENTER:  They do have numbers,
23   and I'll refer to them.  They have medical page
24   numbers so we can use them.  So I'll do that so
25   that when we're looking at this down the road

15 (Pages 54 to 57)

Carolyn Smith 4/18/2025

**Page 58**

1    we'll be able to identify what they are.
2        Q.  (By Mr. Carpenter) Ms. Smith, I'm going
3    to let you look at this as well.  But what I have
4    is -- as I understand it, the last day of your
5    employment was December the 31st, 2023?
6        A.  Yes, sir.
7        Q.  I have a medical record from Jefferson
8    Comprehensive Health Center.
9        A.  Yes, sir.
10       Q.  This is going to be dated January the
11   3rd of 2024, so it would have been a few days
12   after your last day of work.  Do you recall going
13   to the facility at that time?
14       A.  Yes, sir.
15       Q.  What do you recall going for?
16       A.  Anxiety, stress.
17       Q.  This is what I want you to look at.
18   Were you depressed at the time?
19       A.  Depressed.
20       Q.  Do you recall filling out a depression
21   screening?
22       A.  We didn't sign anything when we went
23   there -- well, I didn't sign any depression screen
24   when I went to see --
25       Q.  Do you recall anyone asking you about a

**Page 59**

1    depression screening form?
2        A.  No, sir.
3        Q.  Okay.  Because that indicates that there
4    was -- that you had a total score of 0, that you
5    were not feeling down, depressed or hopeless.
6        A.  What doctor is this from?
7        Q.  This would be with Crystal Cook?
8        A.  Crystal Cook.  Do you have one from
9    Turner?
10       Q.  I have one from Matthew K. Bounds, would
11   be the next visit.  Who would Turner be?  Because
12   these are the records from Jefferson
13   Comprehensive.
14       A.  Okay.  They're not saying that they put
15   me on any medicine for depression or anything?
16       Q.  Well, we'll probably get to some of
17   that.  Because there are other records we'll roll
18   through.  I just basically wanted to see if you
19   recall filling out a depression inventory, which
20   they have on there?
21       A.  No, sir, I didn't sign any depression
22   form.  Only thing that -- when I went there and
23   they asked me how do I feel and everything, they
24   offered to send me to some place in Jackson.  I
25   told her this month was the last month of my

**Page 60**

1    insurance.  I could not afford to accumulate a
2    bill that I couldn't afford to pay.
3        Q.  Right.
4        A.  This was the only primary insurance that
5    I had.  So I couldn't afford to go to see any
6    psychiatrist or anything that they wanted me to go
7    see.
8        Q.  Right.
9        A.  So both of those doctors gave medicine
10   for depression.  Dr. Bounds gave me some kind of
11   psychotropic something that he said take it
12   at night.  Because once you take it, in five
13   minutes you'll be sleep.
14       Q.  Okay.  I'm only focusing on this visit
15   for January 3rd of 2024 for Crystal Cook.  And I
16   would agree with you, that form doesn't require
17   signing.  That's a depression intake form that --
18   and by the way, for Jefferson Health Center, they
19   do that every visit, as well as a respiratory,
20   which is also there.
21       A.  Yes, sir.
22       Q.  Do you recall Nurse Cook asking you any
23   questions about depression?
24       A.  Yes, sir.
25       Q.  Now, it indicates in the depression

**Page 61**

1    screening that you -- that in an answer to the
2    question, little interest or pleasure in doing
3    things, the response was not at all.  And feeling
4    down depressed or hopeless, it said not at all.
5    But you don't recall actually telling her these
6    tings?
7        A.  No, sir.
8        Q.  All right.  Do you recall her ever
9    asking, or any intake nurse ever asking, you these
10   questions when you went to Jefferson?
11       A.  She asked me how did I feel.  I told her
12   very depressed.  Now she said, do you feel that
13   you have the depression of wanting to do something
14   to yourself or someone else.  I said to myself,
15   because this is the lowest I've ever been.
16       Q.  Right.
17           Because in this particular medical note,
18   there's nothing about depression or where you were
19   saying you might -- you know, you might have
20   suicidal, passive or active.  And so that's why I
21   was asking if you recall saying that on this
22   particular occasion on January 3rd.
23       A.  Right.
24       Q.  There are other records, but for this
25   one do you recall?

16 (Pages 58 to 61)

**Page 62**

1    A. Yes, I've told each -- both of them.
2   Each when I've been to Dr. Turner, and I told to
3   Dr. Cook.
4    Q. And Dr. Cook, by the way, is a nurse;
5   she's a family nurse prac --
6    A. She a nurse practitioner.
7    Q. Uh-huh. (Affirmative response.) You
8   got it.
9    A. Both of them.
10    Q. All right. Because it does mention
11   hypertension and that you were visiting her for a
12   medication refill on January 3rd; do you recall --
13    A. I did because my blood pressure pills
14   had ran out.
15    Q. Right. Okay. That's all I've got for
16   that.
17    A. Thank you.
18    Q. You're welcome. That is Pages 39
19   through 44 of 211 of your medical records.
20    This is on January the 22nd of 2024.
21   And this would be with Nurse Bounds at the Bounds
22   Family Clinic. Do you recall telling him anything
23   about depression?
24    A. Yes, sir, I do.
25    Q. Okay. I will say there's nothing in

**Page 63**

1   this particular medical note about depression.
2   But I want you to look at it first because I can
3   overlook stuff, being 60 years old.
4    A. (Reviewing.)
5    Q. But you do recall telling Nurse Bounds
6   that you were depressed?
7    A. Yes, sir, I do.
8    Q. And what did he tell you in response?
9    A. He wrote me out a prescription that
10   would give me sleep time. Because I told him I
11   was not sleeping at all.
12    Q. Because there's a lot of medications, as
13   you can tell, down the list. Do you remember what
14   the name of that medication was?
15    A. I don't recall, but I can -- I mean I
16   should have gone to my drug store and got it. But
17   I do have some of my medicine here that I'm on.
18    Q. Now, he did mention -- it does say
19   insomnia, which is can't sleep?
20    A. Yeah, I think that's what it was.
21    Q. And you had mentioned -- or he had
22   prescribed something called Zopiclone. Does that
23   sound familiar?
24    A. Yes, sir.
25    Q. But you were clear with him this was as

**Page 64**

1   a result of your being let go?
2    A. Yes, sir. Because he asked me what was
3   you depressed about. I said I just lost my job
4   and not knowing where else to start at.
5    Q. Gotcha.
6    And did he recommend any medication
7   specifically for depression?
8    A. Yes. Whatever the medication that he
9   give, I'm assuming that that's what it was for.
10    Q. Do you recall anything else about that
11   visit with Nurse Bounds?
12    A. No, sir.
13    Q. Fair enough.
14    Now we're going to get to January the
15   31st of 2024.
16    MR. CARPENTER: And to put on this
17   record, just in case, these records are numbered a
18   little differently because they're coming from
19   Bounds Family Medicine. So these pages would be
20   19 to 21 of 50, which means there's 50 total
21   pages.
22    Q. (By Mr. Carpenter) Now we're back to a
23   Jefferson Comprehensive Heath Center medical note.
24   This one's dated January 31st of 2024. And in
25   this case you had a depression screening, and you

**Page 65**

1   were seeing -- this would have been with Nurse
2   Turner. Do you recall LaKeitha Turner?
3    A. Yes, sir.
4    Q. All right. And in this case, this is a
5   depression screening. Do you recall filling that
6   particular one out?
7    A. I remember she's asking me a question
8   about depression and stuff like that and how I
9   feel.
10    Q. Did you mention any suicidal thoughts?
11    A. I told her sometime I thought about it.
12    Q. Okay.
13    A. But I didn't know whether I would do it
14   or not.
15    Q. Okay. Now, when these -- because
16   obviously none of us, other than you, were in on
17   this meeting. Did you get like a computer screen
18   where you hit -- because you can look at the form
19   and it's got checkmarks?
20    A. No, sir, I never touched a computer
21   screen when I went in that doctor's office.
22    Q. Got it.
23    So if anybody's doing the checkmarks on
24   this, it's going to be Nurse Turner?
25    A. Must have been them after I left. I

17 (Pages 62 to 65)

Carolyn Smith 4/18/2025

**Page 66**

1    never touched a screen.
2        Q.  When you were seeing her, did she have a
3    computer screen up or an iPad?
4        A.  Yes.  They have a computer screen that
5    once you're there, she'll go look at it and see
6    what medicine that you're on and what she's going
7    to prescribe me.
8        Q.  And I know you -- did you see her maybe
9    check these forms as you were there?
10       A.  No, sir.
11       Q.  Okay.  And I guess where I'm getting at,
12   she might have, she might not have, but you
13   weren't watching her do it?
14       A.  Right.
15       Q.  There you go.  Okay.
16           And it indicates that in this depression
17   screening on March 31st that you're down nearly
18   ever day?
19       A.  Yes, sir.
20           MR. RHODES:  Is it March or --
21           MR. CARPENTER:  I'm sorry, January 31st.
22   Thanks, Carroll.  That's right.
23       Q.  (By Mr. Carpenter)  So in this case she
24   said treatment was for anxiety disorder,
25   unspecified type.  Obviously, I'm -- you told her

**Page 67**

1    that you weren't working at the facility anymore
2    and that was causing you this problem?
3        A.  Very stressful.  Yes.
4        Q.  And it looks like she had prescribed
5    Celexa and Hydroxyzine?
6        A.  Yes, sir.
7        Q.  Did you take those medications?
8        A.  Yes.
9        Q.  Did you get them refilled?
10       A.  Couldn't afford them.
11       Q.  Okay.  And how long did the anxiety and
12   depression continue?
13       A.  It lasted a while, over six or seven
14   months.
15       Q.  Okay.  And the reason I bring it up is
16   because when I -- I may have asked that one
17   generally earlier.  And if so, I apologize.  You
18   mentioned something, that it really went on until
19   September when you started at Alcorn?
20       A.  Yes.  I mean, to go to sleep at night
21   every -- I could tell you a week after my
22   medicine, I could drink Nyquil all night and it
23   would knock me out.  I would take me at least
24   three or four cups of Nyquil in order to sleep.  I
25   would take over-the-counter sleep medicine that I

**Page 68**

1    got from Wal-Mart to try to make me sleep.
2        Q.  Gotcha.
3            This is a -- we're back to Bounds Family
4    Medicine.
5            And just for the record on that one, so
6    that we're keeping up with things.  By the way,
7    we're getting the home stretch at just about
8    10:00, so we're making the time we needed.  These
9    notes would be 27 to 37 of 211.  We keep saying
10   that so when me and him look at a month from now,
11   ah-ha, it's that page.
12       A.  Yes, sir.
13       Q.  So this is back to Bounds.  This is a
14   medical note from June 20th of 2024.  Pages 22 to
15   24.  And I'm just going to have you look at this
16   and see do you recall discussing anything with
17   Nurse Bounds about depression on that particular
18   visit?  I will say there's an insomnia indication
19   on it but nothing on depression.
20       A.  I did discuss with him each time I
21   visit.
22       Q.  Yeah, there's just two more visits, so
23   we really are on the home stretch.
24           And I understand in these notes there's
25   not a mention of depression, but you did tell him?

**Page 69**

1        A.  Yes, sir.  I did.
2        Q.  And did he prescribe anything
3    specifically for depression, if you recall?
4        A.  Yes, sir, he did.
5        Q.  Okay.  And what did he prescribe?
6        A.  It was some type of sleep medicine.
7        Q.  Because he does mention refilling your
8    Losartan, which is your hypertension.
9        A.  Yes.
10       Q.  That's a potassium tablet.
11           And this means something to doctors and
12   nurses and not to the rest of it.  But PRN means
13   return whenever you want to as opposed to a
14   specific.
15       A.  Yes, sir.
16       Q.  Did he tell you just come back whenever
17   you need to?
18       A.  Well, he told me to come back in two
19   weeks, but I couldn't afford to pay him no $125 a
20   visit.
21       Q.  All right.
22           Then we're on -- and this is, again,
23   next to the last one.  This is -- and we've
24   covered those notes in terms of the page numbers.
25   These are page -- Pages 15 to 17 of 211 of the

18 (Pages 66 to 69)

Carolyn Smith 4/18/2025

Page 70

1    Jackson{sic} Health Center Records.
2        In this case you went back to Nurse
3    Turner.  Do you recall telling her --
4        MR. RHODES:  What's the date?
5        MR. CARPENTER:  Sure.  August 26 of
6    2024.
7        Q.  (By Mr. Carpenter)  So this is about the
8    end of eight months following your not working for
9    the facility.  And it indicates the reason for
10   appointment was bilateral foot pain on this visit.
11   And she did a depression index on that one as well
12   that indicated that you had no depression.  Did
13   you mention to her that you were still suffering
14   from depression, anxiety?
15       A.  Yes, sir, I did.  I asked her can she
16   prescribe some kind of medication that wasn't so
17   high that I can afford.  And she told me the only
18   thing that she could give me was the one that I
19   was already on that would suppress my depression.
20       Q.  Okay.
21       A.  And I told her I've gone back to the
22   drug store from the prescription that you have
23   given me.  Those bottles was 200 something dollars
24   and I couldn't afford that.
25       Q.  And what was her response?

Page 71

1        A.  She told me she was going to get back
2    with me once she find out -- if she find out any
3    lower doses or something that I can take for a
4    lower amount.
5        Q.  All right.
6        A.  And I never heard from her.
7        Q.  Okay.  Now, it's fair to say, I'm
8    guessing, you haven't seen these records before?
9        A.  No, sir, I have not.
10       Q.  So, she would be the one to talk to
11   about why these depression scores are at 0?
12       A.  Right.
13       Q.  Now, you had mentioned that you had lost
14   weight.  And I'm just going to go back real quick.
15   Because on January the 3rd of 2024, a few days
16   after.  It indicates on Page 39 that you are at a
17   weight of 335.
18       A.  Uh-huh.  (Affirmative response.)
19       Q.  And then on August of 2024, your weight
20   was 327, according to this.  Does that sound about
21   right?
22       A.  It probably was.
23       Q.  And in March of 2024, you were at
24   318 pounds, which was about a weight loss of about
25   nine pounds.  Is that what you're referring to?

Page 72

1        A.  Yes, sir.
2        Q.  And it looks like -- this is now the
3    last note I'm going to go into.  Again, this was
4    taken by Germany King.  Do you know Nurse King?
5        A.  Yes, sir.
6        Q.  And at this point your weight is
7    317.8 pounds.  So that sounds about right?
8        A.  Yes, sir.
9        Q.  Okay.  All right.
10           And, once again, the depression
11   screening on here is 0.
12       A.  Yes, sir.
13       Q.  But would you say that as of March of
14   '25, that would be accurate?
15       A.  Yes.
16       Q.  Fair enough.  All right.
17           I think that's all I have.
18       A.  Yes, sir.
19   EXAMINATION BY MR. RHODES:
20       Q.  I'm just going to ask her about the --
21   well, I might do two or three.
22           Organizational chart and the general
23   policies.
24       MR. CARPENTER:  Okay.  Organization
25   chart?

Page 73

1        MR. RHODES:  Uh-huh.  (Affirmative
2    response.)
3        MR. CARPENTER:  And there's some
4    policies on here, too.
5        MR. JOHNSON:  Yeah.
6        MR. CARPENTER:  Make them one exhibit,
7    collectively.
8        MR. RHODES:  Yeah, yeah.
9        MR. CARPENTER:  Okay.  So this will be
10   X-3.
11       (Exhibit 3 marked for identification.)
12       MR. RHODES:  The medicals are two,
13   right?
14       MR. CARPENTER:  Yeah, the notice of
15   depositions will be 1, just to cover us.
16       Q.  (By Mr. Rhodes)  Ms. Smith, I'm going to
17   hand you what's been marked as Exhibit 3.  The
18   first page of that, and ask if you can look at it
19   and then tell us what it is?
20       A.  The first page, coming from top?
21       Q.  Uh-huh.  (Affirmative response.)  Is
22   that the organizational chart of the --
23       A.  Yes, sir.
24       Q.  -- health center -- Franklin --
25       A.  Jefferson Franklin Correctional

19 (Pages 70 to 73)

Carolyn Smith 4/18/2025

## Page 74

1    Facility?
2        Q.  Correctional Facility.
3        A.  Yes, sir, it is.
4        Q.  In that organizational chart, who is
5    your immediate supervisor?
6        A.  My immediately supervisor would have
7    been Captain Duveaux.
8        Q.  And did Captain Duveaux have a
9    supervisor above him?
10       A.  Captain would have -- the major would
11   have been above him.
12       Q.  And above the major?
13       A.  Above the major would have been the
14   deputy warden.
15       Q.  Were you a confidential employee of the
16   sheriff?
17       A.  No, sir.
18           MR. CARPENTER:  I'm going to object
19   because that's a legal conclusion, but you can ask
20   all the time you want to.
21       Q.  (By Mr. Rhodes)  Did the sheriff ever
22   talk to you about any policy issues?
23       A.  No, sir.
24       Q.  Did the sheriff ever talk to you about
25   any security issues?

## Page 75

1        A.  No, sir.
2        Q.  If you could turn to the second page,
3    I'm going to ask you about the policy.  Were these
4    policies that the Correctional Facility had in
5    place?
6        A.  Yes, sir.
7        Q.  Was there a policy about retaliating
8    against an employee for their political
9    participation?
10       A.  No, sir.
11       Q.  Was there a policy in place?
12       A.  Was -- is there a policy in place?
13       Q.  Yes.
14       A.  I don't think I've seen that.
15       Q.  Okay.  If you can look at that first
16   paragraph.  Number two.  Look at number two.
17       A.  Number two.  Okay.  Yes, sir, that is in
18   place.
19       Q.  Was this a policy that the Correctional
20   Facility had in place?
21       A.  Yes, sir.
22       Q.  That there would be no discrimination
23   for political or religious activity or beliefs?
24       A.  Yes, sir.
25       Q.  And if we look at the third page, about

## Page 76

1    equal opportunity.
2        A.  Yes, sir.
3        Q.  And was there a policy in place that
4    there would be no discrimination against any
5    employee for any political or religious opinion?
6        A.  Yes, sir.
7        Q.  Okay.  I'm going to ask you one more
8    question.  Of the folks who were running for
9    sheriff in that -- it was a democratic primary?
10       A.  Yes, sir.
11       Q.  Were you related to any candidate?
12       A.  Derrick Stampley.  We share the same
13   father.
14       Q.  That's your brother?
15       A.  That's my brother.  We share the same
16   father.
17       Q.  That's all I have.
18   EXAMINATION BY MR. CARPENTER:
19       Q.  Question about security issues.
20           Is contraband a security issue?
21       A.  Yes, sir.
22       Q.  And you were, in fact, called in,
23   because you testified that you did get called in,
24   to the discussion between the Sheriff and
25   Ms. McComb regarding what happened with the

## Page 77

1    contraband.  And the discussion was well, that
2    happened at night shift and not the day shift.
3        A.  Yes, sir.
4        Q.  Okay.  So that was at least one security
5    issue that you did talk directly with the sheriff
6    about?
7        A.  That I could recall about it.
8        Q.  Okay.  Did you ever talk with him on any
9    occasion, whether it be alone or in a group of the
10   other officers that were between you and the
11   sheriff regarding anything relating to security?
12       A.  About contraband?
13       Q.  Oh, no, just any security issue.  Could
14   be inmate counts, could be anything.
15       A.  No, sir, not -- well, inmates count.  At
16   certain time, the sheriff will come over if he
17   been got a call from a outsider parent saying I
18   want my child to come to your facility.  And the
19   sheriff will come over and ask me -- give me an
20   inmate number to pull up this person off MDOC
21   record.
22       Q.  Sure.
23       A.  I will pull up that inmate and go
24   through things about that inmate to discuss things
25   that he didn't know about Correctional that I knew

Carolyn Smith 4/18/2025

**Page 78**

1    out of 27 years.  And that was the only thing
2    that -- you know, he would come quite often to
3    tell me about than, to pull up certain inmates for
4    him.
5        Q.  And then now that we mentioned the chain
6    of command and Major Felton came up, did Major
7    Felton ever tell you anything -- because there was
8    a note that you had passed on, a handwritten note
9    that Major Felton may have explained something to
10   you about why you weren't still working with the
11   facility?
12       A.  Yes, sir, he did.  Major Felton, he came
13   to visit me.  Well, he came to my house to bring
14   me something that I may have left there.  And I
15   asked him did the sheriff ever give him a reason
16   why I was terminated.  He said the sheriff said he
17   said because you didn't support him.
18       Q.  And that's how he put it?
19       A.  Yes, sir.
20       Q.  Because the reason I'm asking is -- and
21   I can let you see the handwritten note, that's no
22   big deal, and probably should because it's not
23   fair to ask you questions about it.  I'm not sure
24   we need to make it an exhibit.  But, it indicates
25   that Warden Felton said, "I was going around

**Page 79**

1    talking too much.  I asked about what.  He stated
2    he just listened to all the rumors from other
3    peoples."  Do you recall --
4        A.  Yeah, that's what he said.  And I said
5    well, I want to know what was I talking about.
6    Because peoples talk to me because I'm an elected
7    official.  But I never talks about election if
8    it's not my own election.
9        Q.  And when you say "election", because in
10   Jefferson County you are elected to the school
11   board?
12       A.  Yes, sir.
13       Q.  And not appointed?
14       A.  Right.
15       Q.  Okay.  I think that's it.
16           (Time Noted:  10:16 a.m.)
17           SIGNATURE/NOT WAIVED
18
19   ORIGINAL:  MR. CARPENTER, ESQ.
20   COPY:  MR. RHODES, ESQ.
21
22
23
24
25

**Page 80**

1           CERTIFICATE OF DEPONENT
     DEPONENT:  CAROLYN SMITH
2    DATE:  April 18, 2025
     CASE STYLE:  Smith, et al vs. Jefferson County,
3    Mississippi,
     ORIGINAL TO:  MR. CARPENTER, ESQ.
4
         I, the above-named deponent in the
5    deposition taken in the herein styled and numbered
     cause, certify that I have examined the deposition
6    taken on the date above as to the correctness
     thereof, and that after reading said pages, I find
7    them to contain a full and true transcript of the
     testimony as given by me.
8        Subject to those corrections listed below,
     if any, I find the transcript to be the correct
9    testimony I gave at the aforestated time and place.
     Page    Line            Comments
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17
18       This the ____ day of _____, 2025.
19
             CAROLYN SMITH
20   State of Mississippi
     County of _____
21
         Subscribed and sworn to before me, this the
22   ____ day of _____, 2025.
     My Commission Expires:
23   _____
24   _____
25           Notary Public

**Page 81**

1           CERTIFICATE OF COURT REPORTER
2        I, Robin G. Burwell, Court Reporter and
3    Notary Public, in and for the State of Mississippi,
4    hereby certify that the foregoing contains a true
5    and correct transcript of the testimony of CAROLYN
6    SMITH, as taken by me in the aforementioned matter
7    at the time and place heretofore stated, as taken by
8    stenotype and later reduced to typewritten form
9    under my supervision by means of computer-aided
10   transcription.
11       I further certify that under the authority
12   vested in me by the State of Mississippi that the
13   witness was placed under oath by me to truthfully
14   answer all questions in the matter.
15       I further certify that, to the best of my
16   knowledge, I am not in the employ of or related to
17   any party in this matter and have no interest,
18   monetary or otherwise, in the final outcome of this
19   matter.
20       Witness my signature and seal this the
21   30th day of April, 2025.
22
23
             ROBIN G. BURWELL, #1651
24           CRR, RPR, CCR
     My Commission Expires:
25   April 6, 2029