# Carolyn Smith, et al. v. James E. Bailey, et al.

## Kelvin King

### April 29, 2025

All depositions & exhibits are available for downloading at
<<www.brookscourtreporting.com>>
Please call or e-mail depo@brookscourtreporting.com if you need a
**Username** and **Password.**



**Mississippi - Louisiana - Tennessee - New York**
**1-800-245-3376**

EXHIBIT 10

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

CAROLYN SMITH, SHAQUITA McCOMB,                PLAINTIFFS
BONITA BLAKE, SANDRA SANDERS,
AND JAMES ELLIS, JR.

VS.               CIVIL ACTION NO. 5:24-cv-72-DCB-ASH

JAMES E. BAILEY, IN HIS                        DEFENDANTS
INDIVIDUAL CAPACITY AND IN HIS
OFFICIAL CAPACITY AS SHERIFF OF
JEFFERSON COUNTY, MISSISSIPPI,
AND DIRECTOR OF THE
JEFFERSON-FRANKLIN REGIONAL
CORRECTIONAL FACILITY, AND
JEFFERSON COUNTY, MISSISSIPPI


DEPOSITION OF KELVIN KING

Taken at the Jefferson County Circuit Courthouse,
1483 Main Street,
Fayette, Mississippi,
on Tuesday, April 29, 2025,
beginning at approximately 12:10 p.m.


REPORTED BY:

ELLA J. HARDWICK, CVR-M, CCR #1749

**Page 2**

```
 1              APPEARANCES
 2   CARROLL E. RHODES, ESQ.
        Law Offices of Carroll Rhodes
 3      119 Downing Street
        Hazlehurst, Mississippi 39083-3001
 4         Email: Crhode@bellsouth.net
 5      COUNSEL FOR PLAINTIFFS
 6
     THOMAS L. CARPENTER, JR., ESQ.
 7      Wise Carter
        2510 14th Street, Suite 1125
 8      Gulfport, Mississippi 39501
           Email: Tlc@wisecarter.com
 9
        COUNSEL FOR DEFENDANTS
10
11   ALSO PRESENT:  Ms. Carolyn Smith
                   Nickita S. Banks, Esq.
12                 Sheriff James Bailey, Sr.
```

**Page 3**

```
 1          TABLE OF CONTENTS
 2                    PAGE
 3   Title Page....................... 1
 4   Appearance Page.................. 2
 5   Table of Contents................ 3
 6   Exhibit Index.................... 3
 7   Certificate of Court Reporter.... 50
 8
 9          EXAMINATION
     Examination By Mr. Rhodes........ 4
10
11          EXHIBITS
12   NO.     DESCRIPTION          PAGE
13   Exhibit 1  Defendants' Answers to    9
                Plaintiffs' First Set of
14              Interrogatories
15   Exhibit 2  Letter to Board of       11
                Supervisors from S. McComb
16
     Exhibit 3  Grievance Procedure      31
17
     Exhibit 4  Letter to C. Smith from  34
18              H. Felton and Response,
                1/13/2024
19
     Exhibit 5  General Policy on Employment  40
```

**Page 4**

```
 1              KELVIN KING,
 2       having been first duly sworn,
 3   was examined and testified as follows:
 4        MR. CARPENTER:  At this point, we'll
 5   reserve the issue on reading and signing
 6   until after deposition.  We may let it go.
 7        MR. RHODES:  Usual stipulations?
 8        MR. CARPENTER:  Yeah.  And he knows
 9   what they are, so we're good to go.
10        MR. RHODES:  Okay.  Good.
11              EXAMINATION
12   BY MR. RHODES:
13     Q.  Good afternoon, Mr. King.
14     A.  Good afternoon.
15     Q.  My name is Carroll Rhodes, and I represent
16   Ms. Carolyn Smith and all the other folks who've
17   filed suit against Mr. Bailey and the county, and
18   we're here today to take your deposition.
19        I want to ask you:  Have you given a
20   deposition before?
21     A.  I have.
22     Q.  So you're familiar with the process?
23     A.  Yes, sir.
24     Q.  Okay.  And you understand that you were
25   sworn in, and any statement you give today is
```

**Page 5**

```
 1   really testimony under oath as if you were in a
 2   courtroom testifying?
 3     A.  Yes, sir.
 4     Q.  And I might ask a convoluted question or
 5   one that doesn't make sense, and if you don't
 6   understand what I asked, do not hesitate to ask me
 7   to rephrase it or re-ask it or to tell me that you
 8   don't understand the question.
 9     A.  Yes, sir.
10     Q.  And I presume that all the answers you
11   give, that you would have understood the question?
12     A.  Yes.
13     Q.  Okay.  Could you give us your name?
14     A.  Kelvin T. King.
15     Q.  And how old are you, Mr. King?
16     A.  I'll be 52 Wednesday.
17     Q.  And where do you live?
18     A.  Jefferson County.
19     Q.  And what's your educational background?
20     A.  Masters in Ag business.  Agriculture
21   business masters.
22     Q.  When did you get that?
23     A.  '97, 1997.
24     Q.  Where?
25     A.  Alcorn State University.
```

Kelvin King 4/29/2025

Page 6

1    Q.  And do you hold -- have any licenses or
2  certifications?
3    A.  Just banking certification.  Financial.
4    Q.  Financial?
5    A.  Yes.
6    Q.  What about any certifications in law
7  enforcement?
8    A.  No, sir.  Just a gun permit; that's it, if
9  that means anything.
10   Q.  And just for purposes later on if we have
11 to go to trial, do you have any close family
12 members who live in Wilkinson, Amite, Pike, Adams,
13 Franklin, Lincoln, Jefferson, or Claiborne
14 counties?
15   A.  Jefferson, I have close -- close family
16 here.  Claiborne, distant relatives.
17   Q.  Okay.  Last names, what are the last
18 names?
19   A.  King, Chambliss.  In Jefferson, King,
20 Chambliss, in Jefferson.  And King in Claiborne
21 County.
22   Q.  Okay.  And do you hold any elected office?
23   A.  Yes, sir.  I'm the board president for the
24 Jefferson County Board of Supervisors.
25   Q.  And when were you first elected to the

Page 7

1  Board of Supervisors?
2    A.  2020.  It's my second term.
3    Q.  And do you hold any other elected offices
4  or appointed offices in Jefferson County?
5    A.  No, sir.
6    Q.  Now, are you familiar with the
7  Jefferson-Franklin Regional Correctional Facility?
8    A.  It is located here.  Yes.
9    Q.  Okay.  Do you know if there's -- do you
10 understand that that is a state facility, a
11 facility of the Mississippi Department of
12 Corrections?
13   A.  I do understand that.  Yes, sir.
14   Q.  Now, does the Mississippi Department of
15 Corrections have a memorandum of understanding with
16 Jefferson County concerning that correctional
17 facility?
18   A.  It's been here for so long, I would assume
19 so, but that's before my time.
20   Q.  Because I was going to ask you about the
21 terms, but you're not familiar with the terms of
22 that?
23   A.  No, sir.
24   Q.  Okay.  I can skip all that.
25      And you were the president of the board of

Page 8

1  supervisors?
2    A.  Starting --
3    Q.  Is that yours?
4    A.  No.  That's yours.
5    Q.  That's mine?
6       (INTERRUPTION; OFF THE RECORD.)
7  BY MR. RHODES:
8    Q.  Okay.  And were you serving as the
9  president of the board of supervisors when
10 Ms. Carolyn Smith, Shaquita McComb, Bonita Blake,
11 Sandra Sanders, and James Ellis sued the sheriff
12 and the county?
13   A.  Yes.  That's my first term, 2024, in
14 January.
15   Q.  And we submitted some interrogatories to
16 the county and the sheriff, and there's some
17 responses that were the -- I'm going to hand that
18 to you in a second.  Just ask you to -- if you'll
19 look over and see if those are --
20      MR. CARPENTER:  You want to make that
21 Exhibit 1?
22      MR. RHODES:  Make that Exhibit 1.
23      MR. CARPENTER:  Okay.  Got it.
24      THE WITNESS:  I'm just looking to see
25 over -- those are the plaintiffs.  Okay.

Page 9

1  (Witness reviews document.)  This is
2  stating the process.
3       MR. CARPENTER:  That's correct.
4       THE WITNESS:  Okay.
5       MR. RHODES:  Now I want to have it
6  marked as Exhibit 1.
7       MR. CARPENTER:  Sure.  No objection.
8       (EXHIBIT 1 MARKED FOR THE RECORD.)
9  BY MR. RHODES:
10   Q.  Pass it back to him.  Okay.  Mr. King --
11   A.  Yes, sir.
12   Q.  -- if you'll look on the first page, your
13 answer to Exhibit 1, and the question concerned --
14 first and second page is your answer, and the
15 question was concerning persons known or reasonably
16 believed by you or the county to have knowledge
17 about the case that Ms. Smith and the others filed,
18 and there are people listed in that answer.
19      And I'm going to ask you, are those all
20 the people that you know have information about the
21 lawsuit filed against Sheriff Bailey and the
22 county?
23   A.  As far as I know of, these are the ones.
24   Q.  And you don't know of anybody else that
25 has any knowledge about it?

3 (Pages 6 to 9)

Kelvin King 4/29/2025

Page 10

1   A.  No.
2   Q.  Okay.  Now, where did you get your
3   knowledge from about these people having knowledge
4   about it?
5   A.  I know they first came to the board,
6   should have been January, and they had some
7   concerns.
8   Q.  Okay.
9   A.  And Ms. Smith stated at the meeting that
10  they had some -- we listened to the concerns.  I
11  can't remember right in depth what they were.  And
12  we just directed it back to the sheriff because
13  he's elected, and, you know, we didn't have any
14  jurisdiction over there.  But we did hear the
15  concerns.
16  Q.  Okay.  Now, Ms. Smith came to the board in
17  January?
18  A.  No --
19  Q.  I'm going to list all of them.
20  A.  Yeah.  I think, yeah, January and probably
21  on Zoom, too, if I'm not mistaken.
22  Q.  And Shaquita McComb?
23  A.  I'm thinking she was there, too.  I don't
24  quite know her as far as face-wise, but I know I
25  heard her name.

Page 11

1   Q.  What I'm trying to find out, were all
2   the -- did all the plaintiffs sort of file a
3   grievance with the board of supervisors about
4   being -- being terminated by the sheriff and not
5   being rehired by the sheriff?
6   A.  They just stated a complaint.  They had
7   some issues going on with the sheriff's department,
8   and we listened to those concerns.  At that time,
9   I -- I don't know if they got in depth, but they
10  stated that they had some issues going on there.
11  Q.  And do you know what issues they stated
12  they had concerns about?
13  A.  It was something with employment, stating,
14  you know, employment as far as termination.  I know
15  that.
16  Q.  Okay.  Going to try to see if I can show
17  you something to refresh your memory.
18      MR. RHODES:  I'm going to have this
19      marked as Exhibit 2.
20      MR. CARPENTER:  Sure.  Okay.  And for
21      reference, this is a letter that Shaquita
22      sent to the board of supervisors?
23      MR. RHODES:  Right.
24      MR. CARPENTER:  Got it.  Okay.
25      (EXHIBIT 2 MARKED FOR THE RECORD.)

Page 12

1   BY MR. RHODES:
2   Q.  Mr. King, I'm going to hand you what's
3   been marked as Exhibit 2 and ask you if you could
4   look through it and see if that refreshes your
5   memory.
6   A.  Yes, it does.  This was stated in the -- I
7   think it was stated twice in January from the
8   in-person meeting and the Zoom meeting.
9   Q.  And that's -- Ms. McComb said that she
10  wanted to -- she felt that she was wrongfully
11  terminated --
12  A.  Yes.
13  Q.  -- from the Jefferson-Franklin Regional
14  Correctional Facility?
15  A.  She stated that.  Yes.
16  Q.  Now, I want to ask you about the other
17  plaintiffs, like Ms. Smith and Ms. Blake,
18  Ms. Sanders, and Mr. Ellis, all of them sort of
19  stated that same --
20  A.  Stated the same thing.  I don't remember
21  Mr. Ellis coming, but I remember Ms. Smith and
22  the --
23  Q.  And Ms. Blake and Ms. Sanders?
24  A.  Yes.  I remember them.
25  Q.  Okay.  You're not sure of Mr. Ellis?

Page 13

1   A.  I'm not sure about him, but I remember
2   them -- you know --
3   Q.  Okay.
4   A.  -- Ms. Carolyn came to a couple of
5   meetings and observed.
6   Q.  And what was the board's response to their
7   complaint about being wrongfully terminated?
8   A.  Well, at that time, we heard a lot of
9   complaints, because we're a government body.  So we
10  stated that we heard their concern.  We sent them
11  back to the sheriff, because he's elected, and we
12  have no jurisdiction on that side.
13      And it was nothing we really could say.
14  We just listened to their concerns.
15  Q.  Okay.  Now the sheriff, he's the chief law
16  enforcement officer for the county?
17  A.  Yes.
18  Q.  And he's the chief policymaker for law
19  enforcement for the county --
20  A.  Yes, sir.
21  Q.  -- is that correct?
22      Okay.  Now, when you say you-all did not
23  have any jurisdiction on that side, you mean you
24  didn't have any jurisdiction over the sheriff's
25  department?

4 (Pages 10 to 13)

Brooks Court Reporting
1-800-245-3376

**Page 14**

1  A. Yeah. He's the elected official, so he's
2  the governing body over there. We -- you know, we
3  handle the budget, but he's elected.
4  Q. Now, in her statement, though, she didn't
5  say she was working for the sheriff's department.
6  A. Oh, well, he's, you know, over the
7  Jefferson County Correctional Facility, so he's
8  tied into that. So we just call the sheriff on
9  everything.
10  Q. Okay. So when you say he's -- he's tied
11  in and being over the regional correctional
12  facility, through that memorandum of understanding
13  that the county has with the Mississippi Department
14  of Corrections?
15  A. Now, like I said, that memorandum of
16  understanding was back then. I hadn't looked at
17  that, because I wasn't -- that's before my time.
18  So I don't know what's in that memorandum of
19  understanding.
20    I know it should be one there because the
21  facility is Jefferson County Correctional Facility,
22  but I hadn't looked at that. I couldn't tell you
23  nothing about that. That's before my time.
24  Q. Okay. Now, Ms. Carolyn Smith, Shaquita
25  McComb, Bonita Blake, Sandra Sanders, and James

**Page 15**

1  Ellis, Jr., were they all county employees?
2  A. Yeah. We -- we pay all employees through
3  the county. Yes, sir.
4  Q. Okay. And you-all paid their payroll?
5  A. Yes. Payroll process, yes.
6  Q. What about any retirement benefits paid to
7  PERS? The county paid that portion?
8  A. Yes, sir. It's through the county. Yes,
9  sir.
10  Q. Okay. And Social Security and Medicare
11  payments that have to be taken out --
12  A. I guess the payroll. That goes to the
13  payroll, too. Yes, sir.
14  Q. Okay. But the county takes care of --
15  pays that --
16  A. Yes.
17  Q. -- the employees?
18  A. Yes. We pay all county employees.
19  Q. And what about health insurance or medical
20  insurance, dental insurance? What insurance does
21  the county provide?
22  A. Well, I can't say because it depends on
23  what you opt in for, you know. But that all is in
24  that arena.
25  Q. Okay. What insurance would county

**Page 16**

1  employees have a chance to opt in for? What
2  insurance does the county provide?
3  A. I guess general -- well, the insurance is
4  through Nick Floyd & Associates, but I guess you
5  got -- you can opt into the dental, all the above.
6  You know, you have that option.
7  Q. Dental, health --
8  A. Health and you got -- yeah.
9  Q. Okay. What about life insurance? Does
10  the county --
11  A. Yes. They have an option to take that,
12  too. Yes, sir.
13    THE COURT REPORTER: Try to be
14    careful not to -- I know you anticipate
15    his question, but try to let him finish
16    it. Y'all are cutting each other off a
17    good bit. Thank you.
18    THE WITNESS: All right. Thank you.
19  BY MR. RHODES:
20  Q. The premiums for that insurance, how are
21  those premiums paid?
22  A. I have no idea. That's through our
23  payroll clerk and through the insurance. I don't
24  have an idea of that.
25  Q. That was a bad question. What I was

**Page 17**

1  trying to find out: Does the county pay any
2  portion of those insurance premiums, or does the
3  employee -- county employee pay all of it or part
4  of it?
5  A. That's a question -- a good question. I
6  would have to ask. I don't know that process.
7  Q. Now I'm going to go back to Exhibit 1. If
8  you turn over to Interrogatory Number 7 and the
9  answer to Interrogatory Number 7, in 7, we asked to
10  identify all statements made by any of the
11  plaintiffs which support or tend to support the
12  defendants' answer, and answer to it was defendants
13  have no such statements.
14    Do I take that to mean that y'all don't
15  have any statements from any of the plaintiffs that
16  would support the defendants' answer to the
17  plaintiffs' complaint?
18    MR. CARPENTER: Yeah. And, you know,
19    that -- that calls for a legal conclusion.
20    And so, that was the decision made by this
21    counsel as to whether or not -- for
22    example, this letter, if it had said
23    relates to the answer, I'd have said it,
24    but I don't know if this necessarily
25    supports.

5 (Pages 14 to 17)

Kelvin King 4/29/2025

Page 18

1 So to the extent he can answer about
2 what supports an answer, that'll be fine.
3 MR. RHODES: And all I'm trying to do
4 is find out is there any other information
5 that you might have that would change this
6 answer that they have, whether you say
7 that you don't have --
8 MR. CARPENTER: Right.
9 MR. RHODES: -- any -- any statements
10 from any of the plaintiffs that would
11 support the defendants' answer.
12 THE WITNESS: Now, you got to kind of
13 rephrase that. I'm not understanding.
14 BY MR. RHODES:
15 Q. Okay. What I'm trying to find out: Is
16 there any other information or -- let me strike
17 that.
18 Is your answer today still the same, that
19 the defendants don't have any information that --
20 any statements by any of the plaintiffs that would
21 support your -- the defendants' answer?
22 A. That we -- that we as the defendants?
23 Q. Yeah. The defendants denied everything
24 that they said happened, and you say you don't have
25 any statements from the plaintiffs?

Page 19

1 A. I wouldn't know -- with this statement, I
2 wouldn't know what happened. You know, I can only
3 go by what they brought in the letter.
4 Q. Okay. Okay.
5 A. And what -- you know, what was said.
6 So -- verbally.
7 Q. Okay.
8 MR. CARPENTER: Can we go off the
9 record for a second?
10 MR. RHODES: Uh-huh. (Affirmative
11 response.)
12 (OFF THE RECORD.)
13 BY MR. RHODES:
14 Q. And if you can flip over to Interrogatory
15 Number 11, and Interrogatory Number 11 asks you to
16 state each conversation that Sheriff Bailey had
17 with each of the plaintiffs. And as far as the
18 county knows, you-all don't know about the
19 conversations that Sheriff Bailey had with them?
20 A. No, sir. At that time, we was running for
21 election ourselves trying to get back in.
22 Q. Okay. Okay. I'm just trying to make sure
23 I don't get surprised later on with --
24 MR. CARPENTER: Oh, you got it. Good
25 question.

Page 20

1 BY MR. RHODES:
2 Q. And number 12, actually, you know, the --
3 state each reason that each one of the plaintiffs
4 were terminated by the correctional -- regional
5 correctional facility, and the response was no
6 plaintiffs were terminated.
7 And I want to ask you: Why do you say
8 they weren't terminated?
9 A. We -- I said that they weren't terminated?
10 Q. Well, why would the county say that --
11 A. They weren't terminated?
12 Q. Yeah.
13 A. I wouldn't -- I --
14 Q. The sheriff does the hiring and firing for
15 the deputies?
16 A. Yes. He does the hiring -- he's the
17 governing body at that facility in the sheriff's
18 department, and we don't intervene. You know, he's
19 elected.
20 So whatever went down, we -- we heard
21 their concerns, and that was under his discretion.
22 So we -- you know, he's the hiring -- he's the
23 person that does all --
24 Q. For the sheriff's department?
25 A. For the sheriff's department.

Page 21

1 Q. But the -- for all the other county
2 employees, who hires and fires those county
3 employees?
4 A. Well, they --
5 Q. The road -- people working in the road
6 department.
7 A. Right. As supervisors, we only govern the
8 road department and the county administrator. So
9 it's -- upon firing, they would bring it to us
10 because they're definitely under the umbrella of
11 our two department heads.
12 So the department heads would bring it to
13 us. He's not a department head. That falls under
14 Jefferson County Board of Supervisors.
15 Q. But those employees who work for the road
16 department and the administrators are county
17 employees?
18 A. Yes.
19 Q. Is that correct?
20 A. Yes.
21 Q. And all the plaintiffs were county
22 employees, too?
23 A. Right, right.
24 MR. CARPENTER: Objection.
25 BY MR. RHODES:

6 (Pages 18 to 21)

Brooks Court Reporting
1-800-245-3376

Kelvin King 4/29/2025

Page 22

1  Q. And the county paid the plaintiffs, right?
2  A. County employees paid is on our payroll,
3  but that falls on the sheriff's department.
4  Q. All the plaintiffs were paid sort of in
5  the same way that the folks in the road department
6  and county administrative office were paid? It's
7  all paid out of the same payroll office?
8  A. That's it. Everybody's paid out of the
9  same payroll office, but that falls -- everybody
10 has their own budget. He's elected. He has his
11 own budget.
12 Q. But the sheriff did not have a separate
13 office of payroll that write checks to --
14 A. He has his employees, and with our staff,
15 his payrolls, his clearance, whatever, come through
16 our accounts.
17 Q. Okay.
18 A. Yes, sir.
19 Q. But he doesn't write the checks?
20 A. Nor do I.
21 Q. No, no. Right, right. But all the checks
22 are written from a common --
23 A. He hires and -- he hires, set the rates
24 and does everything under that budget of the
25 correctional facility under his elected -- his

Page 23

1  jurisdiction.
2  Q. Now, who signs the county employees'
3  payroll checks?
4  A. The sheriff -- I think the sheriff signs
5  his, and we sign ours, the board of supervisors.
6  Q. County employees, payroll checks, payroll
7  that is made out, do the board of supervisors have
8  to approve those payments and spread it on their
9  minutes?
10 A. Just -- the salaries, yes. The payroll,
11 yes.
12 Q. And I'm trying to find out what difference
13 is it between any employee that works for the road
14 department and an employee that works for the
15 regional correctional facility, as far as pay is
16 concerned.
17 A. As far as pay is concerned --
18 Q. How -- how -- how do those employees
19 receive their pay?
20 A. Direct deposit, paper check, either/or,
21 but the difference is that we hire those employees.
22 That's under our umbrella. And the sheriff hires
23 and does -- hires his own employees.
24 Q. Okay.
25 A. It's just spread across the minutes.

Page 24

1  Q. But who write the checks?
2  A. We approve the docket, the board of
3  supervisors.
4  Q. You approve the claims docket?
5  A. Yes, sir.
6  Q. But I'm trying to figure out the actual --
7  even if it's direct deposit, do you-all have a
8  payroll clerk or an administrator that handles that
9  part of it?
10 A. He has someone that handles that part and
11 communicates with our central office.
12 Q. So he would write checks straight from the
13 sheriff's department?
14 A. It all comes from the county.
15 Q. Right. That's what I'm trying to find
16 out. Is there one central --
17 A. Yes.
18 Q. -- person?
19 A. Yeah. That -- yes.
20 Q. He might send his information to --
21 A. Whereas his employees might send the
22 information on whoever he has in that role.
23 Q. Send it to the -- who -- who is the person
24 that handles that for the county?
25 A. We have Ms. Thompson and Ms. Linda White.

Page 25

1  Q. Okay. And what are their titles?
2  A. One is -- I can't think of Ms. -- payroll?
3  And Ms. Linda is the compcontroller and something
4  else she does, and the other lady, I can't think of
5  her -- her -- her title.
6  Q. Okay. Now, if you can turn to
7  Interrogatory Number 15, I'm going to ask you if
8  you could read Interrogatory 15, and read it out
9  loud and then read your answer out loud.
10 A. Okay. "State in specific detail each
11 written warning or reprimand given to Carolyn
12 Smith, Shaquita McComb, Bonita Blake, Sandra
13 Sanders, and James Ellis, Jr., concerning their
14 respective jobs at Jefferson-Franklin Regional
15 Correctional Facility.
16     "Include in your response the date the
17 warning was given, the person giving the warning,
18 the reason the warning was given, and witnesses to
19 the warning being given."
20 Q. What was your answer to -- to the
21 interrogatory?
22 A. (No verbal response.)
23 Q. What was the answer?
24 A. The answer? Oh, okay, to 15. I'm sorry.
25 "Other than a reprimand given to Smith in 2006, no

7 (Pages 22 to 25)

Page 26

1  written warnings were provided."
2    Q.  So no written warnings were provided to
3  Shaquita McComb?
4    A.  I wouldn't have that -- privy to that
5  information.  We don't look at their personnel
6  file, so that's under the sheriff -- leadership of
7  the sheriff.
8    Q.  Okay.  And the only reason I'm asking, you
9  signed the answers, too --
10   A.  Right.
11   Q.  -- and you got your information from the
12 sheriff in signing these answers?
13   A.  No.  But I know we don't -- we don't -- we
14 don't -- we don't look at reprimands like that.
15 We're not -- that's under the sheriff.  So we
16 don't -- we -- when we do the payroll, pass the
17 motion, we look at it and go from there.  He does
18 the hiring and firing at that facility in the
19 sheriff's department.
20   Q.  Okay.  I know.  The only reason I'm
21 asking, so you signed these answers that stated
22 that other than a reprimand given to Smith in 2006,
23 no written warnings were provided.  And I'm just
24 trying to make sure that that answer came from
25 information provided you by the sheriff.

Page 27

1    A.  Yeah.
2    Q.  I'm talking about the sheriff gave you the
3  information to put in the answer?
4    A.  No.  He didn't give me the information.
5  You know, we -- I guess we discussed it and talked
6  about it, but we wouldn't know if any other
7  reprimand was given.
8    Q.  Okay.  And that's what I'm trying to find
9  out.  You don't know of any other written
10 reprimand?
11   A.  Don't know.  I -- I --
12   Q.  You don't know of any of them?
13   A.  That -- that's his.  This is employees,
14 his employee personnel.
15   Q.  Okay.
16   A.  Yeah.
17       MR. CARPENTER:  Off the record.
18       (OFF THE RECORD.)
19 BY MR. RHODES:
20   Q.  To your knowledge, no employee had been
21 given a written reprimand?
22   A.  To my knowledge.  That. . .
23   Q.  Okay.  And I know you said you and the
24 sheriff were involved in elections during the same
25 time in 2023.

Page 28

1    A.  Yes, sir.
2    Q.  Do you know how many people were running
3  for sheriff in 2023 in the Democratic primary?
4  Because we know there's a primary runoff and then
5  general.
6    A.  I think it was Sheriff Bailey, Sean Jones.
7  I can't think of the other guy.  They call them --
8  what's that guy's name?  Shoot, I can't think of
9  his name.  There's one more other person.  He's not
10 around here anymore.  There was another person in
11 there.
12   Q.  Okay.  There were three people in the --
13 including Sheriff Bailey in the first Democratic
14 primary?
15   A.  I believe so.
16   Q.  And it was Sheriff Bailey and Sean Jones
17 wound up in the runoff?
18   A.  Yes.
19   Q.  Did y'all ever campaign in this together?
20 Not campaign together, but ever at the same events,
21 you and Sheriff Bailey or any of the other
22 candidates?
23   A.  I stopped at a couple and kind of
24 campaigned for myself.  One in Jefferson County.
25   Q.  And who was -- who -- what other -- what

Page 29

1  sheriff candidate --
2    A.  I think I -- well, I don't know if the
3  sheriff did.  I think it was all us invited.  So it
4  was Sean Jones right over here.
5    Q.  Okay.  Do you recall where and when that
6  was?
7    A.  I can't recall a date, but it was -- it
8  was during that year.  It was right over here in
9  the city park.  I was passing out some of my
10 information.
11   Q.  Did Sheriff Bailey ever talk to you about
12 how his campaign for sheriff was going?
13   A.  No.  I was concerned about myself.
14   Q.  And do you know Ms. Carolyn Smith?
15   A.  Yes, I do.
16   Q.  And how do you know her?
17   A.  Being a school board member.  Just being a
18 productive citizen of Jefferson County.
19   Q.  Okay.  And she's elected to the school
20 board?
21   A.  Yes.
22   Q.  County school board?
23   A.  Yes, sir.
24   Q.  Did you ever go to any campaign events
25 where you saw Ms. Smith there?

Page 30

1  A. No. I don't remember seeing her at any of
2  them.
3  Q. What about Ms. Shaquita McComb? Do you
4  know her?
5  A. I really don't know her, but I know the
6  other -- you know, I recognize her by face if I can
7  see her, but I know the rest of them.
8  Q. Did you ever see her at any campaign?
9  A. Who?
10 Q. Ms. Shaquita McComb.
11 A. Okay. Wouldn't know if I seen her, unless
12 I -- somebody probably introduced me, but I didn't
13 see her, but I don't really know her by face.
14 Q. Bonita Blake?
15 A. I know Ms. Blake. I hadn't seen her
16 either.
17 Q. At any campaign?
18 A. I hadn't seen her either. No, sir.
19 Q. Sandra Sanders?
20 A. Hadn't seen her.
21 Q. At any campaign?
22 A. Right.
23 Q. And James Ellis, Jr.?
24 A. Correct. Hadn't seen him at any campaign.
25    MR. RHODES: I'll have this marked as

Page 31

1     the next exhibit. Thank you, ma'am.
2        MR. CARPENTER: Okay. Correct. All
3     right. Very good. Grievance procedure.
4     (EXHIBIT 3 MARKED FOR THE RECORD.)
5  BY MR. RHODES:
6  Q. I want you to take a moment and look over
7  that grievance procedure --
8        MR. CARPENTER: And the context?
9     That's coming from the employee handbook,
10    right?
11       MR. RHODES: Yes.
12       MR. CARPENTER: You got it. Okay.
13       THE WITNESS: (Witness reviews
14    document.)
15 BY MR. RHODES:
16 Q. Now, that's a grievance procedure I think
17 the county adopted for the regional correctional
18 facility, and I was going to ask you had you seen
19 it before. Do you recognize it?
20 A. I haven't -- is this the new -- is this
21 the sheriff's department handbook, come out of his
22 handbook?
23 Q. No. It came out of Jefferson --
24 Jefferson-Franklin Regional Correctional Facility's
25 handbook.

Page 32

1  A. Okay.
2  Q. Which is different from --
3  A. Right, right.
4  Q. -- the county and the sheriff --
5  A. I know we adopted one, but I don't
6  remember seeing that one at the correctional
7  facility. I know he was working on a handbook. So
8  I can't say, you know, that grievance procedure,
9  but I was heavily involved in ours.
10 Q. And the reason I was going to ask you
11 about -- in that first sentence, they talk about
12 resolving grievances with employees, and I was
13 going to ask you: What would the board mean by
14 employees? Is that county employees?
15 A. Again, you have to -- this is with the
16 correctional facility with their handbook. We can
17 go back to our handbook, but I have no recollection
18 of his handbook for the correctional facility
19 because we adopted one.
20    That might have been adopted for my time.
21 So I hadn't reviewed his. So I can't comment on
22 something I haven't reviewed.
23 Q. But the employees at the correctional
24 facility are county employees; are they not?
25 A. Right.

Page 33

1        MR. CARPENTER: Object, but it's
2     okay. I mean, it's --
3        THE WITNESS: Okay.
4  BY MR. RHODES:
5  Q. They are county employees?
6  A. They are paid through the county. Yeah,
7  yes, sir. Paid by the county. They are employees
8  of the correctional facility under his budget, so
9  they are paid through the county.
10    All departments are paid through the
11 county, but they fall under the leadership of the
12 sheriff and department head.
13 Q. So folks in the road department fall under
14 the leadership of the supervisors?
15 A. Fall under the leadership of the road
16 manager. We govern the road manager and the county
17 administrator. If they have a problem, they follow
18 protocol and get to us like everybody else did. We
19 hear all concerns.
20 Q. But they're considered county employees?
21       MR. CARPENTER: Same objection. Go
22    ahead. It's all good.
23       THE COURT REPORTER: Did you say
24    objection, go ahead?
25       MR. CARPENTER: Yeah, I did. This is

9 (Pages 30 to 33)

**Page 34**

1  a discovery deposition. He can pretty
2  much ask everything but my sock size, and
3  it's good to go.
4       MR. RHODES: I'm going to probably
5  put this together as well as -- have it
6  marked.
7       MR. CARPENTER: Okay.
8       MR. RHODES: This will be Exhibit 4?
9       THE COURT REPORTER: Exhibit 4, yes,
10 sir.
11      MR. CARPENTER: That's what it is.
12 Okay. Very good.
13      (EXHIBIT 4 MARKED FOR THE RECORD.)
14 BY MR. RHODES:
15   Q. Mr. King, I put two different letters
16 together as Exhibit 4. The second page of that is
17 a letter Ms. Smith wrote, and the first page is a
18 response that she received. So I want you to look
19 at the second page first.
20   A. (Witness reviews document.) Okay.
21   Q. Okay. Now, the second page, Ms. Smith
22 wrote a letter to the board of supervisors about
23 being put on the agenda about the grievance she had
24 for being wrongfully terminated from the
25 Jefferson-Franklin Correctional Facility.

**Page 35**

1    A. Right.
2    Q. And she received a response from Warden
3  Felton about her grievance --
4    A. Yes, sir.
5    Q. -- by being put on the board of
6  supervisors?
7    A. She actually forwarded a letter to our
8  past county administrator, Brenda Buck, to be put
9  on the agenda, and the employee -- Jefferson County
10 Employee's Handbook. I see that now. Yeah. She
11 was.
12   Q. And that's the meeting that you said
13 Ms. Smith and -- everybody, except you don't
14 remember Mr. Ellis, but all the women showed up
15 to --
16   A. I remember most of the women because they
17 was on Zoom with us, and Ms. Smith kind of came to
18 our meetings afterward. Her presence was felt for
19 the next six or seven months.
20   Q. But now you don't remember Mr. Ellis?
21   A. I don't remember -- I can't -- I can't say
22 if I remember seeing him, but Ms. Smith spoke, and
23 somebody else spoke. I remember Ms. Smith,
24 Ms. Sandra, and Ms. Blake. And I -- I -- I just
25 can't remember the other one.

**Page 36**

1    Q. Now, are there any minutes from the board
2  of supervisors where they address this grievance,
3  the grievances that they were presenting?
4    A. Should be, yeah. All minutes are
5  recorded, and the Zoom, video recording both ways,
6  so. . .
7    Q. Because I wanted to ask: Do you recall
8  what that -- what the final decision or the
9  determination was as reflected in the board minutes
10 concerning their grievances?
11   A. I -- I -- the final decision, I can't. I
12 just know when they came, and we directed them to
13 follow the process, you know, which is, you know,
14 we heard their concerns.
15      So I don't know what the final decision
16 was with -- with this going to the county
17 administrator, getting on the -- like I said, you
18 got day-to-day operations, and the statute for the
19 county supervisor, we don't -- it -- you don't get
20 in the day-to-day operation. You govern it to the
21 county administrator. Any concerns goes through
22 the protocol through her.
23   Q. Okay. But I mean a decision on the
24 grievance.
25   A. The grievance, yes, yes.

**Page 37**

1    Q. Were there any minutes reflecting the
2  decision the board of supervisors made on the
3  grievance?
4    A. Well, the grievance would have went -- it
5  came to us, but we directed it to the sheriff, too,
6  because he's elected. Like I said, he's elected,
7  and that was under his jurisdiction. So we
8  directed him to follow the process through him.
9    Q. So that's what I'm asking. The minutes
10 are going to say --
11   A. Yes, sir, they should.
12   Q. -- follow the process through the sheriff?
13   A. Not in that wording, but we all -- it's
14 five supervisors. So from my recollection, we
15 explained that the concerns, which was
16 disheartening, we would direct them to follow the
17 process. Protocol.
18   Q. Now, see, I understand what you-all might
19 have done in the meeting --
20   A. Right.
21   Q. -- but, you know, the board only speaks
22 through its minutes --
23   A. Right.
24   Q. -- and I was -- I'm trying to see if the
25 minutes reflect what y'all told them.

**Page 38**

1    A.  They should.
2    Q.  And so, the minutes -- do you recall when
3  that meeting was so I know what -- what minutes to
4  look for?
5        MR. CARPENTER:  Oh, we're already
6    looking for them.  Yeah, yeah.  I talked
7    to -- I talked to Nickita.  We'll pull
8    those.  There were two.  There was one
9    during an ice storm that was a Zoom and
10   one in person.
11       THE WITNESS:  Yeah.
12       MR. RHODES:  Okay.  But I'm going to
13   look for them, too.
14       MR. CARPENTER:  Okay.  That'll work.
15   We'll help you.
16       THE WITNESS:  I think they own it.
17       MR. CARPENTER:  Between us we'll find
18   them.
19       MR. RHODES:  Give me just a minute.
20   I'm going to take a minute break.
21       (OFF THE RECORD.)
22  BY MR. RHODES:
23   Q.  Mr. King, do you remember attending a
24  political forum in Union Church?
25   A.  Yes.

**Page 39**

1    Q.  And do you remember people asking was a
2  supervisor all -- was it all good at the time?
3    A.  Yes.
4    Q.  About the -- what the supervisors could do
5  about the regional correctional facility?
6    A.  I don't remember that question, but I
7  remember them asking a bunch of questions about
8  supervisors.
9    Q.  And do you remember Ms. Smith asking
10  specific questions about the -- what the
11  supervisors could do about the regional
12  correctional facility?
13   A.  I can't remember that question.  I know
14  she got up and asked a question, but I can't
15  remember that question.
16   Q.  And do you remember that you answered more
17  questions than Supervisor Osgood?  Because it
18  looked like the people were getting on him.
19   A.  Yeah.  That -- that's -- that is true.
20   Q.  Yeah.
21   A.  Yes, sir.
22   Q.  Do you recall when that public forum was
23  held in Union Church?
24   A.  That was 20- -- that might have been -- I
25  can't remember.  It was during the first term, the

**Page 40**

1  first two years.  I don't know the date, you know,
2  but it should have been somewhere in the first
3  term.  Might been coming up to election.  I can't
4  remember.
5    Q.  Coming up to the election?
6    A.  Coming to the election.  Might have been
7  '22, '23, somewhere along in there.
8    Q.  Okay.  I'm going to ask you generally if
9  the board of supervisors ever approve a general --
10       MR. RHODES:  I'll have that marked as
11   the next exhibit, Exhibit 5.
12       MR. CARPENTER:  Okay.  So this
13   would -- also just make sure I understand,
14   this is coming from the Jefferson County
15   Correctional Facility handbook?
16       MR. RHODES:  Yes.
17       MR. CARPENTER:  Fair enough.  Okay.
18   There you go.
19       (EXHIBIT 5 MARKED FOR THE RECORD.)
20  BY MR. RHODES:
21   Q.  Mr. King, I want to ask you whether or not
22  the board of supervisors ever approved that policy.
23   A.  Again, I guess here I can't say that we
24  have because that's the correctional facility.  We
25  approved our handbook, but, of course, that -- this

**Page 41**

1  is probably before my time already established.
2        So as far as the handbook, I haven't
3  reviewed it or looked at anything at the
4  correction -- Jefferson County Correctional
5  Facility.
6    Q.  Would it be standard procedure for the
7  board of supervisors to approve any handbook issued
8  by the -- about employees issued by the sheriff's
9  department?
10   A.  Well, come to think back when you asked me
11  the other question, I got it confused with the
12  sheriff's department.  The sheriff's department are
13  our employees.  The correctional facility are the
14  correctional facility employees, where the money
15  come from MDOT inmate housing that's wired to the
16  county, then it goes to the sheriff's fund.
17       So they're not our employees.  The sheriff
18  department, we go -- they fall under our handbook,
19  the deputies.  So. . .
20   Q.  The deputies?
21   A.  Yes.
22   Q.  But now, are deputies county employees?
23   A.  The deputies are.  They follow under our
24  handbook and our payroll.  The correctional
25  facility doesn't.

11 (Pages 38 to 41)

Kelvin King 4/29/2025

Page 42

1  Q. And that's why I asked earlier about
2  that --
3  A. Yeah. I got --
4  Q. -- memorandum of understanding.
5  A. Yeah. I got confused, because --
6  Q. That's why I asked about the MOU.
7  A. -- the sheriff's department -- yeah. Yes,
8  yes.
9  Q. And along that line, the sheriff's
10 department receives part of the funds, federal
11 funds that come in, that come to the -- to the
12 county, law enforcement federal funds?
13 A. I can't gauge on the funds. I have to
14 look back at it. I can't really say. I looked at
15 the budget, but his budget is computed with him,
16 with them, that department.
17 Q. All right. But --
18 A. It falls on them.
19 Q. But the employees of the correctional
20 facility receive a check from Jefferson County,
21 don't they?
22 A. I think that comes from the correctional
23 facility, you know. It -- it comes there with
24 their money. We -- I -- that money runs through
25 his department.

Page 43

1  Q. I know, but I'm talking about the actual
2  checks that's issued to the employees.
3  A. Yeah. It signed -- signed by the
4  sheriff's check -- James -- Sheriff James Bailey.
5  So I have no signature on that.
6  Q. Does the sheriff have a separate bank
7  account where he issues checks?
8  A. He -- that -- his money has -- comes to
9  the payroll clerk. I -- I can't answer that
10 question because I know it's separate -- the
11 correctional facility is separate from us. So
12 it -- nine times out of ten, it does. The
13 sheriff's department falls under our budget.
14 Q. The uniforms that the correctional
15 facility employees wear, who bought those uniforms?
16 A. Then that comes out of his money. That
17 comes there from MDOC. I don't know that process,
18 but I'm assuming it does.
19 Q. I know. I'm asking who write those checks
20 to pay for those uniforms? Does the --
21 A. I think -- that's in his --
22 Q. -- one of those two ladies?
23 A. I don't -- I can't say because that --
24 that's part of his money that he gets for his
25 inmates. Whatever correctional facility, that's

Page 44

1  part of that budget right there for that facility.
2  So it comes from those funds from inmate housing.
3  Q. Okay. I know where you say where the
4  money -- source of the money.
5  A. Yeah.
6  Q. But I'm talking about who actually writes
7  the checks that are paid out.
8  A. I'm assuming that comes from his facility,
9  you know, the people that work in that facility.
10 Q. So if we subpoenaed records from Jefferson
11 County, payroll records --
12 A. I can't say --
13 Q. -- we won't see any checks signed by any
14 of those two ladies issued to employees of the
15 correctional facility?
16 A. I -- I don't know that process. I know
17 that that money comes from MDOT for inmate housing.
18 The sheriff's department falls under -- our checks
19 come from our payroll. They're not paid as county
20 employees.
21 Q. Now, the source of county funds are state,
22 federal, and local funds; is that correct?
23 A. Uh-huh. (Affirmative response.)
24 Q. Is that yes?
25 A. State?

Page 45

1  Q. State, federal, and local --
2  A. We get state funds. Yeah, yes.
3  Q. And you get federal funds?
4  A. Yes, yes, sir.
5  Q. Yeah. But they all go into the county
6  funds?
7  A. They go for the county -- for the county
8  funds because --
9  Q. Yeah.
10 A. Yes.
11 Q. And the two ladies you mentioned, they
12 write those checks out?
13 A. That processes through our payroll, yes.
14 Q. And all I was asking is that the funds
15 that the sheriff might get, he -- those funds are
16 put into the county fund where those two ladies
17 write those checks out?
18 A. Well, they're deposited. Then they fund
19 it over -- send it to his -- to the correctional
20 facility funds, accounts, and pay it through there.
21 Q. Does the sheriff have someone to pay PERS?
22 A. That I don't know. You know, PERS falls
23 under the county. So I don't know with the
24 facility how that worked, but the sheriff's
25 department PERS falls under us.

12 (Pages 42 to 45)

Brooks Court Reporting
1-800-245-3376

**Page 46**

1  Q. Did you know that Carolyn Smith had PERS
2  contributions paid by Jefferson County?
3     MR. CARPENTER: He's asking you if
4  you know.
5     THE WITNESS: No. I have no idea
6  what's coming out of their check.
7  BY MR. RHODES:
8  Q. Do you recall if Shaquita McComb had PERS
9  payments paid by Jefferson County?
10  A. I can't say. You know, I hadn't seen they
11  pay stub.
12  Q. Bonita Blake had PERS payments --
13  A. Okay.
14  Q. -- paid by Jefferson County?
15  A. (No verbal response.)
16     THE COURT REPORTER: Yes?
17  BY MR. RHODES:
18  Q. Do you know?
19  A. I -- I -- I can't say, you know, if -- I
20  don't know that process, but I know, you know, that
21  that side is the correctional facility. So it's a
22  state thing, so it probably was in PERS, but I
23  don't know how this process --
24  Q. Sandra Sanders had PERS?
25  A. Have no idea.

**Page 47**

1  Q. James Ellis, Jr.?
2  A. Have no idea how that worked.
3  Q. And what about payments from their payroll
4  made to the United States Treasury for federal
5  income tax? Do you know if the county made those
6  payments?
7  A. I don't know the process.
8  Q. What about Medicare, Medicaid?
9  A. Still don't know that process.
10  Q. What if -- what about insurance? If
11  Carolyn Smith had medical insurance?
12  A. I wouldn't know that process. I wouldn't
13  know if they -- I don't look at their stubs like
14  that. So. . .
15  Q. So you don't know if the county paid all
16  that?
17  A. Don't know. I mean, I don't -- I'm not on
18  that side. I know, like I said, the sheriff's
19  department PERS, we are in PERS. I'm not in those
20  departments. That's day-to-day operation that we
21  don't get into.
22  Q. I know you said sheriff's department --
23  A. Sheriff's department.
24  Q. -- now, but Jefferson Correctional --
25  A. Jefferson-Franklin.

**Page 48**

1  Q. -- Jefferson-Franklin Correctional
2  Facility --
3  A. Yeah.
4  Q. -- is different from the sheriff's
5  department, isn't it?
6  A. Yes.
7  Q. And you don't know if there's a memorandum
8  of understanding between Jefferson County and
9  Mississippi Department of Corrections about the
10  Jefferson-Franklin Correctional -- Regional
11  Correctional --
12  A. It should be, but that's before -- the
13  facility's been there so long, I wasn't there at
14  the beginning.
15  Q. All right.
16     MR. RHODES: That's all I got.
17     MR. CARPENTER: I don't have nothing.
18  We're good.
19     THE COURT REPORTER: Read and sign?
20     MR. RHODES: You want to read and
21  sign? Are you good with everything you
22  said?
23     THE WITNESS: I'm good with
24  everything.
25     MR. CARPENTER: Yeah. We'll waive.

**Page 49**

1     THE COURT REPORTER: But you want a
2  copy?
3     MR. CARPENTER: Yes, ma'am.
4  (DEPOSITION CONCLUDED AT 1:05 P.M.)
5
6  ORIGINAL: CARROLL E. RHODES, ESQ.
7  COPY: THOMAS L. CARPENTER, JR., ESQ.

13 (Pages 46 to 49)

Kelvin King 4/29/2025

Page 50

```
 1        CERTIFICATE OF COURT REPORTER
 2      I, Ella J. Hardwick, CVR-M, CCR #1749, Court
 3   Reporter and Notary Public in and for the State of
 4   Mississippi, hereby certify that the foregoing
 5   contains a true and correct transcript, to the best
 6   of my ability, as taken by me in the aforementioned
 7   matter at the time and place heretofore stated.
 8      I further certify that under the authority
 9   vested in me by the State of Mississippi the
10   witness was placed under oath by me to truthfully
11   answer all questions in the matter.  I further
12   certify that I am not in the employ of or related
13   to any counsel or party in this matter and have no
14   interest, monetary or otherwise, in the final
15   outcome of this matter.
16      Witness my signature and seal this the 13th day
17   of May, 2025.
18
19   _____
       Ella J. Hardwick, CVR-M, CCR #1749
20
     My Commission Expires:
21   February 8, 2029
22
23
24
25
```

14 (Page 50)